# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

## CIVIL ACTION NO. 6 : 21-cv- 694 - CEM-DCI

SECURITIES AND EXCHANGE COMMISSION,

     Plaintiff,

v.

HARBOR CITY CAPITAL CORP.,
HARBOR CITY VENTURES, LLC,
HCCF-1 LLC,
HCCF-2 LLC,
HCCF-3 LLC,
HCCF-4 LLC,
HCCF-5 LLC,
HARBOR CITY DIGITAL VENTURES, INC.,
HCC MEDIA FUNDING, LLC,
JONATHAN P. MARONEY,

     Defendants,
and

CELTIC ENTERPRISES, LLC and
TONYA L. MARONEY,

     Relief Defendants.

_____/

**UNDER SEAL**

*FILED 2021 APR 20 AM 11: 54 U.S. DISTRICT COURT MIDDLE DISTRICT OF FLORIDA ORLANDO, FLORIDA*

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S EMERGENCY *EX PARTE* MOTION AND MEMORANDUM OF LAW FOR TEMPORARY RESTRAINING ORDER, ASSET FREEZE, AND OTHER INJUNCTIVE RELIEF

S-4

Jonathan P. Maroney bilked investors out of more than $17.1 Million. Through his firm Harbor City Capital Corp. ("Harbor City"), he solicited investors through a series of unregistered offerings in an entity called Harbor City Ventures, LLC ("HC Ventures"), and several special purpose entities called HCCF-1, LLC, HCCF-2 LLC, HCCF-3 LLC, HCCF-4 LLC and HCCF-5 LLC (collectively the "HC SPEs"), promising monthly returns ranging from 1% to 1.5% per month (up to 18% annually). The purported purpose of the offerings was to provide bridge funding for Harbor City's customer lead generation businesses, which Maroney touted as a highly profitable pipeline of business and guaranteed by UCC-1 lien filings and stand-by letters of credit ("SBLCs"). All of this was false.

Indeed, despite statements made by Defendants in the offering materials that investor funds would be used to fund Harbor City's customer lead generation campaigns, bank records show that Maroney misappropriated at least $4.48 million in investor funds, which was diverted for his personal use. *Ex. 1, Declaration of Kathleen Strandell at ¶ 13.* Maroney also misused approximately $1.4 million of investor money by making payments to other entities unrelated to the supposed purpose of the offerings. *Id.* Bank records further reveal that about $6.5 million of the

2

returns distributed to investors were in reality Ponzi-like payments funded by other investors, and that there were no recurring sources of revenue from lead campaigns backing the investments. *Id. at ¶¶ 12, 13a.*

As shown below, Maroney has already freely drawn from the Funds at whim, whether it be to pay for his residence, home improvements, or to purchase luxury automobiles. Without emergency relief, there is a great risk that Maroney and the other Defendants and Relief Defendants will dissipate investors' funds. In addition, this fraud is ongoing: individuals have invested with Harbor City as recently as *this February. Ex. 1, Declaration of Kathleen Strandell at ¶ 7.* To stop this fraud, the SEC brings this emergency action, under Federal Rule of Civil Procedure 65(b), to request that the Court:

(1) enter a temporary restraining order to prevent Defendants from violating the anti-fraud provisions of the federal securities laws and prohibit the acceptance or disbursement of any additional investor funds,

(2) freeze Defendants' and the Relief Defendants' assets to repay Defendants' victims,

(3) compel Defendants to provide an accounting of, among other things, the identities of the investors from whom they stole funds, the

amounts stolen, the disposition of such funds, and current location of all investor funds and assets purchased with investor funds,

(4) expedite certain discovery and preserve relevant evidence, and

(5) order Defendants to show cause at a preliminary injunction hearing why the asset freeze and other emergency relief in the accompanying proposed order should not be extended for the pendency of the litigation.[1]

Such relief is necessary to preserve the status quo and to protect this Court's ability to enter a meaningful judgment of disgorgement, prejudgment interest, and monetary penalties in this action.

## STATEMENT OF FACTS

### I. DEFENDANTS AND RELIEF DEFENDANTS

#### A. Defendants

1.    Jonathan P. Maroney, age 50, resides in Melbourne, Florida. Maroney is the founder, Chief Executive Officer, and President of Harbor City, and the President of Harbor City Digital Ventures, Inc. ("HC Digital"). *Ex. 2, Harbor City Corporate Filings; Ex. 3, HC Digital Corporate filings.* He is

---

[1] As explained in the Rule 65(b) Certification, the SEC believes that, if Defendants become aware of this action before the asset freezes are instituted, they will dissipate their assets. Thus, the SEC has not conferred with Defendants regarding this *Ex Parte* Motion.

also the sole Manager of HC Ventures, HCC Media Funding, LLC ("HCC Media"), and each of the HC SPEs. *Ex. 4, HC Ventures Corporate Filings, Ex. 5, HCC Media Corporate Filings; Ex. 6 HC SPE's Corporate Filings.* Maroney also controls all of the Defendants' bank accounts.[2] *Ex. 1, Declaration of Kathleen Strandell at ¶ 5.* In June 2020, the Alabama Securities Commission issued a cease and desist order against Maroney, Harbor City and HC Digital for offering or selling securities in the state. *Ex. 7, Alabama Cease and Desist Order.*

2.      Harbor City is a Nevada company formed in December 2014 with its principal place of business in Melbourne, Florida. *Ex. 2, Harbor City Corporate Filings.* Harbor City and its securities have never been registered with the Commission in any capacity. Harbor City filed a Form D Notice of Exempt Offering of Securities with the Commission on January 29, 2019, seeking to raise $1,000,000 in debt securities under a Rule 506(c) exemption. *Ex. 8, Harbor City Form D.*

3.      HC Ventures is a Nevada limited liability company established in 2014 with its principal place of business in Melbourne, Florida. *Ex. 4, HC*

---

[2] A possible exception is HCC Media for which the Commission was unable to discover any bank account records.

*Ventures Corporate Filings.* HC Ventures and its securities have never been registered with the Commission in any capacity.

4.      HCCF-1 LLC ("HCCF-1") and HCCF-2 LLC ("HCCF-2") are Nevada limited liability companies formed in August 2018 and April 2019, respectively, with their principal place of business in Melbourne, Florida. *Ex. 6, HC SPE's Corporate Filings.* Both are wholly-owned and managed by Harbor City. *Id.* Neither has been registered with the Commission in any capacity.

5.      HCCF-3 LLC ("HCCF-3"), HCCF-4 LLC ("HCCF-4") and HCCF-5 LLC ("HCCF-5") are Wyoming limited liability companies formed in September 2019, November 2019 and July 2020, respectively, with their principal place of business in Melbourne, Florida. *Ex. 6, HC SPE's Corporate Filings.* All three are wholly-owned and managed by Harbor City. *Id.* None have been registered with the Commission in any capacity.

6.      HC Digital is a Nevada company established in 2017 with its principal place of business in Melbourne, Florida. *Ex. 3, HC Digital Corporate filings.* It is the "Operator" of the HCCF-1, HCCF-2, HCCF-3 and HCCF-4 offerings. *Ex. 16, HCCF-4-LLC-Business Plan Deck at p. 7; Ex. 24, HCCF-3-LLC Business Plan Deck at p. 7; Ex. 25, HCCF-2 Business Plan Deck at p. 7.*

7.     HCC Media is a limited liability company established in 2020 with its principal place of business in Melbourne, Florida. *Ex. 5, HCC Media Corporate Filings.* HCC Media is the Manager of the HCCF-5 offering. *Ex. 15, Annex A-PPM Business Description of HCCF-5.*

**B. Relief Defendants**

1.     Celtic Enterprises, LLC ("Celtic") is a Wyoming limited liability company with its principal place of business listed in Melbourne, Florida. *Ex. 1, Declaration of Kathleen Strandell at ¶ 16 and Exhibit F thereto.* Maroney is Celtic's Manager. Celtic received at least $617,000 in ill-gotten gains out of the offering proceeds. *Id. at ¶ 14.*

2.     Tonya L. Maroney, age 51, resides in Melbourne, Florida and is married to Jonathan P. Maroney. On her LinkedIn profile she describes herself as the Owner and Founder of Harbor City. *Ex. 9, Tonya Maroney LinkedIn profile.* Tonya Maroney received at least $452,000 in ill-gotten gains out of the offering proceeds. *Ex. 1, Declaration of Kathleen Strandell at ¶ 14.*

**II.  HARBOR CITY'S UNREGISTERED SECURITIES OFFERINGS**

From at least 2015, continuing through the present, Harbor City, HC Ventures, the HC SPEs, HC Digital, and HCC Media, through Maroney, have raised more than $17.1 million from more than 100 investors

7

nationwide through a series of unregistered fraudulent securities offerings. *Ex. 1, Declaration of Kathleen Strandell at ¶ 7.* Initially, starting in about May 2015, the securities sold were in form of either promissory notes or agreements entitled "Unsecured Promissory Notes" and "Fixed-Rate Funding Agreements" issued by HC Ventures. These earlier notes and agreements offered interest rates varying from 2% to 5% per month for terms ranging from 12 to 36 months. *Ex. 10, Declaration of Investor James Halpin at Exs. A, B and C; Ex. 11, Declaration of Investor Michael Handelsman at Ex. A; Ex. 12, Declaration of Investor Steven Estle at Exs. B and C.*

Maroney also solicited some investors directly. He explained to at least one prospective investor that Harbor City "bought the leads for $1.00 each and resold them to businesses for $5.00" apiece. *Ex. 10, Declaration of Investor Halpin at ¶ 3.* Investors were also told that Harbor City could generate 14% to 20% in guaranteed returns. *Id. at ¶ 2; Ex. 23, David Anthony Testimony Transcript at pp. 146, 158-160.* Investors in those instruments were promised a full return of their investment principal upon maturity. *Ex. 10, Declaration of Investor Halpin at ¶ 2 .* In marketing materials, Harbor City told investors that "Harbor City's Proven Arbitrage Strategy Generates HIGH RETURNS at Relatively LOW RISK!" *Ex. 16, HCCF-4-LLC Business*

*Plan Deck at p. 27.*

Beginning in late 2018, the securities sold took the form of "high yield, secured bonds" issued by the five "special purpose" entities controlled by Maroney. *Ex. 14, High Yield Bond Subscription Agreements for HCCF-1, HHCF-2, HCCF-3, HCCF-4 and HCCF-5.* The so-called high yield, secured bonds issued in the HC SPEs offerings promised interest rates that varied from 1% to 1.5% per month (or 12% to 18% annually). *Id.* The HC SPE's subscription agreements are signed by J.P. Maroney as "Manager of HCCF." *Id.* The bonds are offered in 1, 2, 3 or 5 year terms, with a guaranteed return of investment principal at maturity. *Id.; Ex. 23; David Anthony Testimony Transcript at pp. 158-160.*

Defendants Harbor City, the other Harbor City entities, and Maroney represented to investors that proceeds from the offerings would be used to provide "bridge funding" for Harbor City's business of generating online customer lead campaigns for other businesses. *Ex. 16, HCCF-4 Business Plan Presentation at pp. 3; Ex. 24, HCCF-3-LLC Business Plan Deck at p. 3; Ex. 25, HCCF-2 Business Plan Deck at p. 3; Ex. 15, Annex A PPM Business Description of HCCF-5 at p. A-2.* A customer lead generation campaign is essentially the process of capturing online interest in a service or product for the purpose

of developing sales leads.  Harbor City claims its campaigns generate 20%-45% ROI in 90 days or less and that they provided the funding to cover the 30-90 day gap between when the campaigns generate the leads and when they get paid on the leads.  *Ex. 16, HCCF-4 Business Plan Presentation at pp. 3-8.*  As for the HC SPEs' bond offerings, Harbor City and Maroney claim that the proceeds were to be "loaned" to one of the two Harbor City related entities charged with managing the SPEs and administering the internet lead generation campaigns: HC Digital or HCC Media.  *Id. at p. 7; Ex. 15 Annex A PPM Business Description of HCCF-5 at p. A-2.*

According to the offering documents, the leads generated from the campaigns were to be sold at a substantial profit to Harbor City's "pipeline" of business clients within the "$200 Billion internet advertising sector."  *Ex. 16, HCCF-4 Business Plan Presentation at p. 3.* From the resulting profits, investors were supposed to receive monthly interest payments followed by the return of their principal when their notes or bonds mature.  *Id. at pp. 3-8.*  With each new offering, Harbor City touted its plan to "expand into as many as 100 online vertical industries." *Ex. 15, Annex A PPM Business Description of HCCF-5 at p. A-2.*  For example, according to HCCF-4's offering documents, the proceeds from that offering were to be used to "fund the

ramp-up in lead production needed to service the current pipeline" of business clients. *Ex. 16, HCCF-4 Business Plan Presentation at p. 26.*

Defendants solicited and raised money from investors primarily through Harbor City's website and a series of on-line marketing videos featuring Maroney posted both on the company's website and on YouTube. *Ex. 17, Harbor City Investment Updated Offerings; Ex. 18, Harbor City Website Capture (10/4/19); Ex. 19, YouTube Video Transcription HCCF-1 Bond Webcast; Ex. 21, You Tube Transcription Harbor City Capital-Video 1 and 2 (9-26-19).*[3] In the on-line videos, Defendant Maroney gives prospective investors a detailed description of the investment opportunity.   For example, he reiterates in these videos that investor money will be used to fund Harbor City's lead generation business and he tells prospects about the guaranteed returns they could expect to receive. *Ex. 19, YouTube Video Transcription HCCF-1 Bond Webcast; Ex. 21, You Tube Transcription Harbor City Capital-Video 1 and 2 (9-26-19) at pp. 14-24.*

In a video posted on Harbor City's website, Defendant Maroney describes the Harbor City bond offering as "backed by a CD—the safest

---

[3] Copies of the videos can be found at Exhibit 31 on DVD.  Selected transcripts of the videos are also provided as Exs. 19- 22.

form of investment out there" and equates it to going down to your local bank and purchasing a certificate of deposit. *Ex. 22, YouTube Video Transcription Harbor City Capital SBLC Video-1-28-20.* In one of the YouTube videos, labeled "Harbor City Capital Corp. - Safe Investments," Defendant Maroney explains that Harbor City has "put a financial instrument backing our bond that would make sure if anything happened, there would be an asset sitting there, a cash asset sitting there that would pay off the investor's principal." *Ex. 20, You Tube Video Transcription Harbor City Capital Corp.-Safe Investments at pp.* 2-3. Maroney's statements in the video are accompanied by a pop up flag stating that the "bonds are 100% secured by a cash asset-backed instrument issued by a major top-tiered bank, which ensures return of principal." These representations were false.

After sending in their investments, Defendant Maroney would often send email updates to investors about Harbor City and the Harbor City related companies. *Ex. 11, Declaration of Investor Michael Handelsman at ¶¶ 15-16 and Exhibits J-N thereto.* In these emails, Defendant Maroney promised "substantial, double digit returns" and reassured investors that they "will not lose a dime of [our] money." *Id.* In one email Maroney sent to investors in January 2018, he falsely claimed that there was such "a MASSIVE pipeline

of standing orders for leads" from companies seeking Harbor City's services and expertise that Harbor City does not "expect to have enough capital to serve ALL of that demand." *Ex. 11, Declaration of Investor Michael Handelsman at ¶ 16 and Exhibits N thereto.* As shown below, these representations were also false.

## III.   MARONEY AND HARBOR CITY'S FRAUDULENT CONDUCT

### A. <u>Defendants' Misuse and Misappropriation of Investor Funds</u>

Defendants Harbor City, HC Ventures, the HC SPEs, HC Digital, HCC Media, and Maroney represented to investors and prospective investors orally and in offering documents that the proceeds raised from the offerings would be used to fund Harbor City's and its related companies' customer lead generation campaigns. In return, investors were told that they would receive monthly interest payments from the profits on the leads generated, as well as a return of their principal when their notes, agreements, or bonds matured. The offering documents distributed to investors also provided that "management will not have any discretion as to any other use of the proceeds" nor "receive any salary." *Ex. 13, HCCF-4 PPM at p. 32.*

Contrary to the representations made to investors, Defendants

Harbor City, HC Ventures, the HC SPEs, HC Digital, and Maroney were not engaged in a significant lead generation business and only used a small portion of money raised from investors to fund their business. *Ex. 1, Declaration of Kathleen Strandell at ¶¶ 10, 13.* Instead, from January 2017 to February 2021, Harbor City generated **no** significant revenues from its customer lead generation businesses or from any other venture. *Id.* Significantly, of the $17.1 million in investor funds deposited into the Harbor City related bank accounts, only a small percentage appears to have gone to fund business expenses. *Id.*

Instead, Maroney used investor money to enrich himself and his family, and to perpetuate the Ponzi scheme by making payments of fictitious returns to existing investors using other investor funds. Specifically, of the $17.1 million raised from Harbor City's investors, Maroney misappropriated more than $4.48 million for his own personal use. *Id. at 13.* Some of the items that he spent investor money on were:

- $1.35 million to pay his credit card bills,
- $827,000 towards the purchase and maintenance of his waterfront home,
- $808,000 towards housing and renovation-related expenses,

- $90,000 to purchase a Mercedes,

- over $265,000 in cash or ATM withdrawals,

- $394,000 deposited into a joint bank account with his wife, Tonya Maroney, and

- $617,000 transferred to Relief Defendant Celtic, a nominee entity he controls. *Id.* at ¶ *14.*

Defendant Maroney also commingled investors' money. Although Defendant Maroney had separate bank accounts for Defendants HC Ventures, HC Digital, HCCF-1, HCCF-2, HCCF-3 and HCCF-4, the investor funds initially deposited into those accounts were later transferred into Harbor City's accounts and commingled along with funds from the other offerings. *Ex. 1, Declaration of Kathleen Strandell at* ¶¶ *9, 17.* Maroney was named as the signatory on all of the Harbor City and other Harbor City related companies bank accounts. *Id. at* ¶ *5.*

In addition, Maroney misused approximately $1.4 million of investor money by making payments to other entities unrelated to the supposed purpose of the offerings, including money sent to a company involved in the container, storage and shipping industry. *Id.* at ¶ *13.* Thus, about $6

million of investors' money was misappropriated and misused by Defendant Maroney. *Id.*

### B. Defendants Are Conducting a Ponzi Scheme

Defendants were operating a Ponzi scheme since at least January 2017. Since Defendants promised investors high rates of return but generated no significant revenues from their touted business model, Defendants needed new investor money to make interest payments to existing investors. More specifically, in a classic Ponzi-scheme fashion, since 2017, Maroney has caused the Funds to use at least $6.5 million of new investor funds to make monthly interest payments and other payouts to earlier investors. *Ex. 1, Declaration of Kathleen Strandell at ¶ 13 and Ex. A thereto.* Since 2017, Defendant Maroney

### C. Misrepresentations and Omissions to Investors

In addition, to the misrepresentations detailed above, Defendants Harbor City, HC Ventures, the HC SPEs, HC Digital, HCC Media, and Maroney also told investors that the funding for their customer lead generation business is "provided as a line of credit that is guaranteed by a UCC-1 filed lien" using Defendants Harbor City's, HC Digital's and HCC Media's accounts receivable and purchase orders as collateral. *Ex. 16, HCCF-*

*4 Business Plan Presentation at p. 9.* They claimed that with this "secure position with guaranteed repayment," they are able to mitigate the risk of loss to its investors. *Id.*

Investors in the HCCF-4 and HCCF-5 offerings were also provided with an additional purported "guarantee of payment" in the form of a "Standby Line of Credit (SBLC)" issued to Harbor City from what is described as a "top tier bank." *Ex. 16, HCCF-4 Business Plan Presentation at p. 11.* The offering documents for HCCF-4 stated:

> **Secured Interest in Citibank Standby Letter of Credit**
> The HCCF-4 High Yield Secured Bond holds a claim guarantee which in the event and only in the event that the Bond is not repaid at the termination of the agreed term, said Bondholder shall have a legal claim up to the principal paid as against the Standby Letter of Credit issued by 1ST American and Citibank. All claims shall be presented for legal payment upon demonstration of a breach of the terms under this Agreement. The 1ST American / Citibank Standby Letter of Credit is limited to a total claim value of $5,000,000.00 USD.

*Ex. 13, HCCF-4 PPM at p. 30.* As Maroney explained to one investor, "this cash line of credit is there, its liquid, it's available, so that if something happens and we can't make our bond payments or we go bankrupt, … we have a claim on the monies that we've put on deposit with Harbor City via this cash line of credit." *Ex. 23, David Anthony Testimony Transcript at p. 49.*

In truth, the UCC filings and the SBLCs do not exist. The SEC has been unable to find any evidence that Defendants ever made any UCC lien filings for any loan-related business transactions. *Ex. 26, Declaration of Celeste Byrd.* Moreover, at no point were Defendants ever issued a SBLC. *Ex. 27, Declaration of Paul Nater at ¶ 7.* Rather, Defendant Harbor City, through Defendant Maroney, merely entered into an "Agreement for Service" dated November 2019 with an intermediary who would have been responsible for arranging the issuance of a SBLC of $5 million in favor Harbor City. *Id.* The transaction never went through and the Agreement for Service was canceled less than a month later due to Harbor City's and Maroney's failure to pay the required fees to secure the SBLC. *Id. at ¶¶ 5-7.* Despite knowing this SBLC was cancelled, Maroney continued to falsely tout its existence in publicly available videos and directly to investors. *Id. at ¶ 6; Ex. 22, YouTube Video Transcription Harbor City Capital SBLC Video-1-28-20; Ex. 23, David Anthony Testimony Transcript at pp. 47-50.*

The offering documents for the HCCF-5 offering also include a section discussing HCC Media's "Track Record" that touted Harbor City's "four successful bond issues." *Ex. 15, Annex A PPM Business Description of HCCF-5 at p. 5.* This section of the materials represented that "[a]ll previous bond

issues have generated above average returns for the investors, and all investor payments have been completed successfully and on time." *Id.* Defendant Maroney likewise told at least one investor, Harbor City's largest, that everyone has been paid back from the previous offerings. *Ex. 23, David Anthony Testimony Transcript at p. 141.* These statements are all false and misleading. In fact, several investors' "interest payments" were often delayed and eventually stopped completely. *Ex. 10, Declaration of Investor Halpin at ¶ 13; Ex. 11, Declaration of Investor Michael Handelsman at ¶ 17; Ex. 12, Declaration of Investor Steven Estle at ¶ 14.* They contacted Defendant Maroney numerous times demanding their interest payments and a return of their principal investment amounts, but to date have not received their money back. *Id.* Indeed, at least one investor filed a lawsuit in federal court to get his investment returned. *Ex. 30, Amended Complaint in Investor Scherzinger Lawsuit.* More importantly, the offering materials omitted to disclose to investors that because the Defendants did not generate any significant revenues or profits from their businesses, the "interest payments" and other returns Defendants were paying to investors came from other investors' money. *Ex. 1, Declaration of Kathleen Strandell at ¶ 13 and Ex. A thereto.*

Finally, in Defendant HCCF-5's offering documents, which are dated July 2020, Defendant Maroney touts himself as a "seasoned business growth strategist" with "more than 30-years of experience starting, building, buying, and selling companies in a wide variety of industries." *Ex. 15, Annex A PPM Business Description of HCCF-5 at p. 3.*  However, the same materials failed to disclose to investors and prospective investors that in June 2020, securities regulators in Alabama issued an administrative cease-and-desist order against Defendants Maroney, Harbor City, and HC Digital for offering and selling unregistered securities and making misstatements and omissions to residents in the state. *Ex. 7, Alabama Cease and Desist Order.*  This omission rendered false and misleading the statements made to investors about Defendant Maroney's background and experience.

### D.     Defendants' Failure to Respond to the SEC's Investigation

On March 1, 2021, the Commission served investigative subpoenas on Harbor Capital and Maroney, seeking documents, and tried to schedule Maroney's investigative testimony.  *Ex. 28, Investigative Subpoenas to Harbor City and Maroney.*  Defendant Maroney, however, failed to respond to the subpoena in any manner.  Nor has the SEC received documents it requested

from Harbor City, even though an investigative subpoena was sent to its

Registered Agent. *Ex. 29, Proof of Service on Harbor City's Registered Agent.*

## **MEMORANDUM OF LAW**

### I.   LEGAL STANDARD

To obtain emergency relief of a temporary restraining order, asset

freeze, and other relief to prevent fraud, the SEC must show at least an

inference that Defendants have violated the securities laws (in the case of an

asset freeze) or a prima facie showing of a violation and the likelihood of

future violations (in the case of a temporary restraining order). *See, e.g.,*

*Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011); *SEC v. Shiner*, 268 F. Supp. 2d

1333, 1340 (S.D. Fla. 2003). The SEC has made such a showing.

Section 20(b) of the Securities Act, 15 U.S.C. § 77t, and Section 21(d)

of the Exchange Act, 15 U.S.C. § 78u(d), provide that in Commission actions

the Court shall grant injunctive relief upon a proper showing. *Shiner*, 268 F.

Supp. 2d at 1340. This "proper showing" has been described as "a justifiable

basis for believing, derived from reasonable inquiry or other credible

information, that such a state of facts probably existed as reasonably would

lead the SEC to believe that the defendants were engaged in violations of

the statutes involved." *SEC v. Gen. Int'l Loan Network, Inc.,* 770 F. Supp. 678, 688 (D.D.C. 1991).

The SEC appears "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws." *SEC v. Lauer,* 03-80612-CIV-MARRA, 2008 WL 4372896 (S.D. Fla. Sept. 24, 2008), *aff'd,* 478 Fed. Appx. 550 (11th Cir. 2012). The Commission therefore faces a lower burden than a private litigant when seeking an injunction, and need not meet the requirements imposed by traditional equity jurisprudence. *Hecht Co. v. Bowles,* 321 U.S. 321, 331 (1944); *SEC v. J.W. Korth & Co.,* 991 F. Supp. 1468, 1472 (S.D. Fla. 1998). Unlike private litigants, the Commission need not demonstrate irreparable harm or the unavailability of an adequate remedy at law. *Hecht,* 321 U.S. at 331; *J.W. Korth,* 991 F. Supp. at 1473. Nor is it required to show a balance of equities in its favor. *SEC v. U.S. Pension Trust Corp.,* 07-22570-CIV-MARTINEZ, 2010 WL 3894082 (S.D. Fla. Sept. 30, 2010) *aff'd sub nom.; SEC v. U.S. Pension Trust Corp.,* 444 Fed. Appx. 435 (11th Cir. 2011).

As discussed below, the Commission's evidence in this case warrants entry of the requested injunctive relief on all applicable grounds. The declarations, account records, and other exhibits attached to this motion

demonstrate that Defendants are violating the anti-fraud and registration provisions of the federal securities laws, and will continue to violate them if the Court does not immediately restrain and enjoin them.  As a result, the Court should enter the requested *ex parte* relief.

## II.    DEFENDANTS VIOLATED THE FEDERAL SECURITES LAWS

As shown in the ensuing sections, the Court has more than an adequate basis to make a threshold finding that Defendants violated the federal securities laws in fraudulently offering and selling the unregistered securities to investors.

### A. Defendants' Offerings are Securities

Defendants offered fixed-rate notes, agreements and "bonds" that promised to pay annual returns.  As the Supreme Court noted in *Reves v. Ernst & Young*, 494 U.S. 56, 66 (1990), "[i]f the seller's purpose is to raise money for the general use of a business enterprise . . . and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'"  Here, each investment stated in its offering materials that its purpose was to provide funding for HC Digital or HC Media.  *See e.g., Ex. 13, HCCF-4 at p. 26; Ex. 15 Annex A-PPM Business*

*Description of HCCF-5 at p. A-3.* Thus, by their own stated purpose, the debentures should be deemed to be securities.

Second, with respect to the "plan of distribution" of these investments, they were "offered or sold to a broad segment of the public," and as such involved "common trading." Reves, 494 U.S. at 66. The debentures were sold in a widespread distribution to more than 100 investors nationwide who collectively invested over $17.1 million, and the investors had no role in selecting or analyzing the underlying lead campaigns.

In addition, Harbor City filed a Form D with the Commission, which also indicates these investments constituted securities offerings. *Ex. 8, Harbor City Capital-SEC FORM D.* As a result, it is clear that the investments that Defendants were offering and selling are considered securities. *Diaz Vicente v. Obenauer,* 736 F. Supp. 679, 693 (E.D. Va. 1990) (absent countervailing factors leading one to question the characterization, documents own characterization as investment is probative of status as a security under the law) (citing *Reves,* 494 U.S. at 68).

Moreover, Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define a "security" to include, among other things, "any

note, . . . bond, [or] debenture." Thus, the investments "notes," "agreements" and "bonds" Defendants' sold are considered securities. *See Reves*, 494 U.S at 65-67 (1990) (noting a "presumption that every note is a security," which may be rebutted only by a showing that the note bears a strong "family resemblance" to instruments that are not recognized as securities). Here, the investments sold do not bear any resemblance to non-security instruments and clearly involve an "investment of money." Investors were unquestionably interested in the investments because of the high (and steady) rate of return offered. In addition, the reasonable expectations of the investing public were that these notes, agreements and bonds were investments.

Finally, there are no risk-reducing factors indicating that the investments are not in fact securities. *Reves*, 494 U.S. at 69. As such, the Harbor City investments are properly categorized as securities and thus subject to federal securities regulation. [4]

_____

[4] Alternatively, the promissory notes, funding agreements, and bonds Defendants' issued constitute investment contracts and are therefore securities under the analysis in <u>SEC v. W.J. Howey Co.</u>, 328 U.S. 293, 298-99 (1946). Under *Howey*, an investment contract exists if there is: (a) an investment of money; (b) in a common enterprise; (c) based on the expectation of profits to be derived from the entrepreneurial or managerial efforts of others. See <u>SEC v. Friendly Power Company, LLC</u>, 49 F. Supp. 2d 1363, 1368 (S.D. Fla. 1999). Here, investors purchased the notes, agreements, and bonds from Defendants in

### B. **Defendants Violated Sections 5(a) and 5(c) of the Securities Act**

Absent an exemption from registration, Section 5(a) of the Securities

Act makes it unlawful for any person to use any means or instruments of

transportation or communication in interstate commerce or of the mails to

sell a security for which a registration statement is not in effect. Similarly,

Section 5(c) makes it unlawful to offer for sale a security for which a

registration statement has not been filed with the Commission. A prima

facie case for a violation of Section 5 is established by showing that: (1) the

defendant sold or offered to sell securities; (2) no registration statement

covered the securities; and (3) the sale or offer was made through the use of

interstate facilities or mails. *SEC v. Randy*, 38 F. Supp. 2d 657, 667 (N.D. Ill.

1999). Scienter is not required to establish a violation of Section 5. *SEC v.

CMKM Diamonds, Inc.*, 729 F.3d 1248, 1256 (9th Cir. 2013); *SEC v. Holschuh*,

694 F.2d 130, 137 n.10 (7th Cir. 1982). The defendant need not have

personally sold securities as long as "the defendant was a 'necessary

_____

order to earn a profit. The investors' expected profitability of 12% to 18% in annual
interest from the investments was derived solely from the efforts of Defendants. In
addition, the investors were entirely passive, and once investors sent their money, they
had no control over how Defendants would use it. Because the investments satisfy all three
elements of an investment contract, they are securities under *Howey*.

participant' or 'substantial factor' in the sale." *SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004).

Once the Commission establishes a *prima facie* case of a violation, the defendant assumes the burden of proving that the securities offering qualified for an exemption from registration. *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953). Courts narrowly construe the exemptions from the registration provisions to provide full and fair disclosure and to prevent frauds. *SEC v. Murphy*, 626 F.2d 633, 641 (9th Cir. 1980); *Quinn and Co. v. SEC*, 452 F.2d 943, 946 (10th Cir. 1971).

In this case, the Commission can establish a *prima facie* case against the Defendants for violations of Sections 5(a) and 5(c) of the Securities Act. Each investment at issue, directly or indirectly, involved the offer and sale securities to the general public by email, telephone, the internet, and other instruments of interstate commerce to approximately 100 investors who were located throughout the U.S. As stated in the offering documents for the investments, no registration statement was in effect or had been filed with the Commission in connection with the securities. *See e.g. Ex. 13*, HCCF-4 PPM at. p. 3. As a result, Defendants violated Securities Act Sections 5(a) and 5(c) by engaging in the unregistered offering of securities.

Here, no exemptions were available for Defendants' offerings. The exemptions from registration pursuant to Section 4(a)(2) of the Securities Act and Rules 504, 505,[5] and 506(b) of Regulation D thereunder were unavailable to the Defendants because, among other reasons, the offerings involved general solicitation (including using a website, YouTube videos and social media to solicit interested investors to contact management). Because there were sales made to investors in multiple states, the intrastate offering exemptions of 3(a)(11), Rule 147, and Rule 147A are not available.

Moreover, Rule 506(c) requires both that "all purchasers of securities sold [pursuant to this exemption] … are accredited investors" and, separately, that issuers "take reasonable steps to verify that the purchasers of the securities are accredited investors." Rule 506(c) of Regulation D, 17 C.F.R. § 230.506(c). Here, although some of the investors did complete so-called accredited investor certifications, others did not, and regardless, self-certifications like these do not constitute reasonable steps to verify. *Eliminating the Prohibition Against General Solicitation and General Advertising in Rule 506 and Rule 144A*, Rel. No. 33-9415, at 33-34, 2013 WL 3817300, *14 (Jul. 10, 2013) (adopting release) ("We do not believe that an issuer will have

---

[5] The exemption under Rule 505 was repealed as of May 22, 2017.

taken reasonable steps to verify accredited investor status if it, or those acting on its behalf, required only that a person check a box in a questionnaire or sign a form, absent other information about the purchaser indicating accredited investor status."). Here, no other exemptions from registration were available. As a result, Defendants violated Securities Act Sections 5(a) and 5(c) through their failure to register these offerings.

## B. Violations of Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act

Section 10(b) of the Exchange Act and Rule 10b-5(b) prohibit the making of (1) a false statement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of a security. *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007). A fact is material if there is a "substantial likelihood that a reasonable [investor] would consider it important in deciding how to [invest]." *Basic Inc.* v. *Levinson*, 485 U.S. 224, 231 (1988). The Eleventh Circuit has concluded scienter may be established by a showing of knowing misconduct or severe recklessness. *SEC v. Carriba Air Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982). For purposes of Rule 10b-5(b), the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate

it. *See Janus Capital Group, Inc. v. First Derivative Traders,* 564 U.S. 135, 142.[6]
For the SEC's case, reliance, damages, and loss causation are not required
elements. *SEC v. Morgan Keegan & Co.,* 678 F.3d 1233, 1244 (11th Cir. 2012).

Section 17(a)(2) of the Securities Act prohibits any person, in the offer
or sale of a security, from directly or indirectly obtaining money or property
by means of an untrue statement of a material fact or an omission to state a
material fact necessary to make the statements made, in light of the
circumstances under which they were made, not misleading. A violation of
Section 17(a)(2) can be shown by negligent conduct. *See Aaron v. SEC,* 446
U.S. 680, 701-02 (1980). Liability under Section 17(a)(2) is not contingent on
whether one has "made" a false statement. Rather, liability under Section
17(a)(2) turns on whether one has obtained money or property "by means
of" an untrue statement.

These antifraud provisions reach beyond misrepresentations or
omissions and encompass any wrongdoing by any person that rises to the
level of a deceptive practice. *Superintendent of Insurance v. Bankers Life and
Casualty Co.,* 404 U.S. 6, 10 (1971). A defendant engages in a fraudulent

---

[6] *Janus's* "maker" requirement does not apply to Section 17(a) of the Securities Act or
Rules 10b-5(a) or (c) of the Exchange Act. *SEC v. Big Apple Consulting USA, Inc.,* 783 F.3d
786, 795-98 (11th Cir. 2015); *SEC v. Monterosso,* 756 F.3d 1326, 1334 (11th Cir. 2014).

scheme in violation of the antifraud provisions of the securities laws and violates Sections 17(a)(1) and (3) of the Securities Act and Rules 10b-5(a) and (c) of the Exchange Act when he commits any manipulative or deceptive act or acts that are part of a fraudulent or deceptive course of conduct, or are in furtherance of a scheme to defraud. *SEC v. Huff*, 758 F. Supp. 2d 1288, 1347-48 (S.D. Fla. 2010); *see also Lorenzo v. SEC*, 139 S. Ct. 1094, 1103 (2019) ("[U]sing false representations to induce the purchase of securities would seem a paradigmatic example of securities fraud."). To state a claim based on conduct violating these provisions, the Commission must establish: (1) the defendant committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter. *In re Alstom SA Securities Litigation*, 406 F. Supp. 2d 433, 474 (S.D.N.Y. 2005) (citing *In re Global Crossing*, 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004)).

### 1. *Defendants Made Material Misrepresentations and Omissions*

As detailed above, Defendants made materially misleading statements and omissions necessary to make statements made not misleading both in the offer and sale and in connection with the purchase or sale of securities. Specifically, as to the use of investors' money, their running of a Ponzi scheme, the misstatements that the investments were

31

guaranteed by UCC liens and SBLC, and that they were running large profitable lead campaigns.

Through these misrepresentations and omissions, Defendants violated Section 17(a)(2) of the Securities Act in that they "obtain[ed] money or property by means of any untrue statement of a material fact or any [material] omission." 15 U.S.C. § 77q(a)(2). The misrepresentations and omissions listed above each enabled Maroney to persuade investors to invest in the offerings, from which Maroney extracted significant monies for himself and his wife. Furthermore, the misstatements and omissions listed above violated Section 10(b) and Rule 10b-5(b) of the Exchange Act in that they constituted untrue statements of material fact or material omissions.

### 2. *The Statements Were Material*

A false statement or omission must be material for a defendant to be liable for it. The test for materiality is "whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action." *Merchant Capital*, 483 F.3d at 766 (citation omitted). Put another way, information is material if a reasonable investor would consider it significant to making an investment decision. *Levinson*, 485 U.S.at 230. A false statement or omission need not be outcome determinative for it to be

32

considered material; rather it simply must be significant to the investor's decision. *SEC v. City of Miami*, 988 F. Supp. 2d 1343, 1357 (S.D. Fla. 2013) ("to be material, a fact need not be outcome-determinative, that is, it need not be important enough that it would necessarily cause a reasonable investor to change his investment decision") (quoting *SEC v. Meltzer*, 440 F. Supp. 2d 179, 190 (E.D.N.Y. 2006)).

Under this standard, the Defendants' false statements and omissions were clearly material. The most significant misrepresentations and omissions concerned the use of investors' funds. Instead of investing the investors' funds as stated in the offering documents and PPMs, Maroney in many cases misappropriated investors' funds for personal use. Clearly, any reasonable investor would want to know that a defendant was not using his or her money in the way the defendant promised – to invest in a specific type of investment – but instead for the defendant's own financial gain. *U.S. v. Lochmiller*, 521 Fed. Appx. 687, 691-92 (10th Cir. April 15, 2013) (upholding conspiracy to commit securities fraud conviction because, among other things, Defendant made material misrepresentations when he told investors he would use money for low-income housing but instead used it for personal gain); *SEC v. Smart*, 678 F.3d 850, 857 (10th Cir. 2012) (that

defendants were not using money as represented would be material to a reasonable investor).

In addition, Defendants created an illusion that investments were profitable, when in fact they had no recurrent source of revenue and were running a Ponzi scheme. *See Merchant Capital*, 483 F.3d at 768 (optimistic statement about business prospects materially misleading if it "fails to include past performance information that would be useful . . . in assessing those statements."); *SEC v. Coplan*, 13-62127-CIV, 2014 WL 695393, at *4 (S.D. Fla. Feb. 24, 2014) (omissions of how revenue was generated was material because "a reasonable investor considering whether to invest would have wanted to know that [the investment manager] used investors' funds to pay earlier investors their purported returns.").

### 3. Defendants Acted With a High Degree of Scienter

Courts have defined scienter as a state of mind embracing intent to deceive, manipulate or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). The Commission may establish scienter for violations of Sections 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act by "a showing of knowing misconduct or severe recklessness." *Monterosso*, 756 F.3d at 1335 (quoting *Carriba Air*, 681 F.2d at 1324).

Here, Defendants obtained millions of dollars by means of these misrepresentations and omissions. Maroney and the Harbor City entities he controlled, acted with scienter. Maroney knew, or was reckless in not knowing, that he was making misrepresentations and omissions to investors. Maroney knew, or was reckless in not knowing, that the Harbor City entities were using investor funds to make Ponzi-like payments, and not to fund lead campaigns. As the individual who misappropriated investor funds and orchestrated this scheme, it is axiomatic that Maroney knew, or was reckless in not knowing, he was not investing the funds in accordance with the representations made to investors. Maroney's scienter can also be imputed to the other Defendants. *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1340 (S.D. Fla. 1999) (the scienter of corporate officers is properly imputed to the corporation). Therefore, the Harbor City entity Defendants also acted with the requisite scienter.

### 3. The Misconduct Satisfies the "In the Offer or Sale" and "In Connection With" Requirements

Because Defendants made their misrepresentations and omissions and participated in a fraudulent scheme in connection with in the offer, purchase, and sale of the investments, the requirements that the fraud be "in the offer or

sale" (Securities Act § 17(a)) or "in connection with the purchase or sale" (Exchange Act § 10(b) and Rule 10b-5) of securities is met. *United States v. Naftalin*, 441 U.S. 768, 772-73 (1979) ("in the offer or sale" to be read broadly); *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (courts should interpret the "in connection with" requirement broadly to effectuate the remedial purpose of the federal securities laws); *SEC v. Merkin*, 2012 WL 5245561 *8 (S.D. Fla. Oct. 3, 2012) (the "in connection with" requirement is satisfied if the SEC shows that the material misrepresentations were relayed to the public in a way that a reasonable investor would rely on them).

## C. An *Ex Parte* Temporary Restraining Order is Necessary

Based on the facts and law set forth above, the Commission has met its burden of showing: (1) there is *prima facie* evidence the Defendants are violating the securities laws; and (2) there is a reasonable likelihood they will continue to violate the law unless the Court immediately issues an *ex parte* temporary restraining order against Defendants. As explained in more detail in our accompanying Certification under Rule 65 as to why we are not providing notice to the Defendants, we have grave concerns the Defendants will dissipate investor assets if we do. They have already misappropriated millions for personal use, and misused millions more of the money they have

raised from investors.  Given that Defendants continue to raise money from new investors and the ongoing fraud Defendants are committing, we ask the Court to enter the attached proposed order granting this temporary restraining order and entering the asset freeze without notice to the Defendants to prevent them from further pilfering investor funds.  The Commission will immediately serve the Defendants with the pleadings and orders, and the Defendants can appear and argue why the Court should not enter a preliminary injunction and further extend the asset freeze.

### D.   An *Ex Parte* Freeze of Assets Is Necessary

A district court may exercise its full range of equitable powers, including an asset freeze, to preserve sufficient funds for the payment of a disgorgement award.  *FTC v. United States Oil & Gas Corp.*, 748 F.2d 1431, 1433-34 (11th Cir. 1984); *see also Levi Strauss & Co. v. Sunrise Int'l Trading Co.*, 51 F.3d 982, 987 (11th Cir. 1995).  Freezing assets is a well-accepted equitable remedy employed to "preserve the status quo" and is proper in actions arising under the federal securities laws.  *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734-35 (11th Cir. 2005).  Thus, it is well recognized that an asset freeze is sometimes necessary to ensure a future disgorgement order will not be rendered meaningless. *SEC v. Lauer*, 478 Fed. Appx. 550, 554 (11th Cir. 2012)

("The district court may freeze assets in order to preserve funds while a party seeks an equitable remedy such as disgorgement."); *CFTC v. Levy*, 541 F.3d 1102, 1114 (11th Cir. 2005) ("[A] district court may freeze a defendant's assets to ensure the adequacy of a disgorgement remedy"). The Court need only find some basis for inferring a violation of the federal securities laws to impose an asset freeze. *Unifund SAL*, 910 F.2d 1028, 1041-42 (2d Cir. 1990).

The Commission's "burden for showing the amount of assets subject to disgorgement (and, therefore available for freeze) is light: a reasonable approximation of a defendant's ill-gotten gains" is all that is required. "Exactitude is not a requirement . . . ." *ETS Payphones*, 408 F.3d at 735 (citation and quotation omitted); *FTC v. IAB Marketing Associates, LP,* 746 F.3d 1228, 1234 (11th Cir. 2014). The Commission's burden to demonstrate the potential for dissipation of funds is even lighter. *FTC v. IAB Marketing Associates, LP,* 972 F. Supp. 2d 1307, 1313 n.3 (S.D. Fla. 2013) ("There does not need to be evidence that assets will likely be dissipated in order to impose an asset freeze") (citing *ETS Payphones*, 408 F.3d at 734, and *SEC v. Lauer*, 445 F. Supp. 2d 1362, 1367-70 (S.D. Fla. 2006)); *SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 415 (S.D.N.Y. 2001) ("the SEC must demonstrate only . . . a concern that defendants will dissipate their assets . . . .").

Moreover, the Court's power to freeze assets extends to Relief Defendants. *CFTC v. Walsh*, 618 F.3d 218, 225 (2d Cir. 2010); *CFTC v. International Berkshire Group Holdings, Inc.*, 2006 WL 3716390 at *10 (S.D. Fla. Nov. 3, 2006). A Relief Defendant is a party not charged with wrongdoing who nevertheless "possesses illegally obtained profits but has no legitimate claim to them." *Huff*, 758 F. Supp. 2d at 1362. To obtain a freeze over a Relief Defendant's assets, the Commission "most demonstrate only that [it] is likely ultimately to succeed in disgorging the frozen funds." *Walsh*, 618 F.3d at 225.[7]

As discussed in above, the Court has the power to enter an asset freeze against Defendants and Relief Defendants as an equitable remedy to preserve the status quo and preserve funds for disgorgement that will compensate defrauded investors. The evidence demonstrates that Defendants violated the federal securities laws, that Defendants received investor funds as a result of these violations, and that Defendants

---

[7] *See also SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998) (federal courts may order equitable relief against a person who is not accused of wrongdoing in a securities enforcement action); *SEC v. Posner*, 16 F.3d 520, 521-22 (2d Cir. 1994) (courts have "broad equitable power in securities cases to fashion appropriate ancillary remedies necessary to grant full relief").

transferred investor funds that they obtained through their violations to themselves and to the Relief Defendants.

Moreover, there is ample evidence that Defendants may continue to dissipate investor funds if all of these assets are not frozen.  As detailed above, Defendant Maroney directed millions in payments to himself despite the precarious financial position of the investments.  Accordingly, for the reasons set forth above, the Court should enter an asset freeze against Defendants and all of the Relief Defendants in the form of the Order accompanying this memorandum.  The Court should further set a hearing within 14 days ordering Defendants and the Relief Defendants to show cause why the asset freeze and other emergency relief in the accompanying order should not be extended for the pendency of the litigation.

### E.  A Sworn Accounting is Necessary

The SEC seeks disgorgement orders against Defendants and the Relief Defendants.  To this end, sworn accountings by Defendants are necessary to enable the Commission and the Court to more precisely determine the amounts the Defendants have received, spent, and misappropriated in furtherance of the fraud, and to better identify the amount of any unjust enrichment and the assets available for disgorgement.  *SEC v. Lybrand,* 2000

WL 913894 at *12 (S.D.N.Y. July 6, 2000). The Commission asks the Court to order sworn accountings be received within 7 days.

### F.  An Order Prohibiting The Destruction Of Records

The Commission also seeks an Order prohibiting the destruction of records against Defendants and all the Relief Defendants to prevent the altering or destruction of evidence before this Court can hear and adjudicate the Commission's claims. Such an Order is also necessary to ensure that whatever equitable relief that might be appropriate is not compromised. *Shiner*, 268 F. Supp. at 1345-46. Thus, we ask the Court to enter an order prohibiting the destruction of records pending the outcome of this case.

### G. An Expedited Deposition of Maroney

Under the Federal Rules of Civil Procedure, the parties in a civil case may not ordinarily conduct discovery before they hold their Rule 16 scheduling conference and Rule 26(f) discovery meeting. However, because of the emergency nature of this action, Maroney's failure to appear for noticed testimony, and the imminent threat that he will dissipate assets, the Commission asks the Court to allow us to notice Maroney for deposition immediately upon the signing of the Order accompanying this memorandum on three business days notice.

41

As described throughout this memorandum, Maroney has transferred investor funds to himself and companies he controls. The Commission has sought documents from Maroney, and tried to schedule his investigative testimony through sending an investigative subpoena to him prior to bringing this lawsuit. Maroney, however, failed to respond to the subpoena in any manner. Nor has the Commission received the documents it requested from Maroney's companies, through service of an investigative subpoena on its Registered Agent. Thus, for the further preservation of investor funds, the Commission asks the Court to allow the Commission to set Maroney's expedited deposition immediately, as set forth in the accompanying Order.

## IX. CONCLUSION

For the foregoing reasons, the Court should grant the Commission's Motion for Temporary Restraining Order and Other Emergency Relief and issue the accompanying proposed Order.

Respectfully submitted,

April 19, 2021                  By:____s/ Alise Johnson_____
                                     Alise Johnson, Esq.
                                     Senior Trial Counsel
                                     Fla. Bar No. 0003270
                                     Direct Dial: (305) 982-6385

42

Email: johnsonali@sec.gov

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154