**EXHIBIT 13**

EXHIBIT

13

# HCCF-4 LLC

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

**Sale of 5,000 Offered HCCF-4 12% High Yield Secured Bonds @ $1,000.00 per bond**

**Maximum Offering: $5,000,000**



The information contained in this Confidential Private Placement Memorandum (this "Memorandum") has been supplied by HCCF-4 LLC. ("we," 'HCCF-4' or the "Company"). Any estimates, forecasts or other forward-looking statements contained in this Memorandum have been prepared by the management of HCCF-4 LLC in good faith on a basis it believes is reasonable. Such estimates, forecasts and other forward-looking statements involve significant elements of subjective judgment and analysis, and no representation can be made as to their attainability. No representation or warranty (express or implied) is made or is to be relied upon as a promise or representation as to the future performance of 'HCCF-4'.

| | Estimated Costs & Expenses | Selling Expenses | Gross Proceeds to Company |
|---|---|---|---|
| Maximum Offering: $5,000,000 | $50,000 | $150,000 | $1,800,000 |
| Minimum Offering: $500,000 | $15,000 | $0 | $585,000 |

**Date:** November 24, 2019

1

## Table of Contents

'HCCF-4' is offering (the "Offering") for sale to persons who qualify as "accredited" investors as that term is defined in Regulation D under the Securities Act of 1933, as amended (the "Securities Act"), up to 5,000 Offered HCCF-4 12% High Yield Secured Bonds (the "Maximum Offering"). The Per Bond purchase price is equal to $1,000.00 (the "Offering Price"). No market exists for the trading of any of the HCCF-4 12% High Yield Secured Bonds.  See "Restrictions on Transfer of Bonds."

An investment in 'HCCF-4' involves a high degree of risk. See "Risk Factors" below. Prospective investors are encouraged to retain their own professional advisors to review and evaluate the economic, tax and other consequences of investing in the Offering and should not construe the contents of this Memorandum, or any other information furnished by 'HCCF-4', as legal or tax advice.

This Memorandum has been prepared by 'HCCF-4', and no representation or warranty is made by any other person as to the accuracy or completeness of the information contained herein.  The annex documents attached to this Memorandum constitute an integral part hereof. Prospective investors will be given the opportunity to meet with management and conduct their own due diligence investigations and they must rely on such due diligence, the information disclosed in this Memorandum and the professional advice of their advisors in making their investment decision.

THE HCCF-4 12% HIGH YIELD SECURED BONDS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES OR "BLUE SKY" LAWS OF ANY JURISDICTION. THE INFORMATION CONTAINED HEREIN HAS NOT BEEN APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR SIMILAR BODY. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

**See "Notices Regarding This Memorandum" and "Notices Regarding This Offering."**

**CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM**

**$5,000,000 in Limited Liability Company Bonds**

**Number of Bonds Offered: 5,000**

**Maximum Offering Amount: $5,000,000**

**Minimum Offering Amount:  $500,000**

**Minimum Investment for HCCF-4 12% High Yield Secured Bonds**:

(1) We are offering a maximum of 5,000 Offered HCCF-4 12% High Yield Secured Bonds at the price indicated.  See "Terms of the Offering."



## WHO MAY INVEST

- The offer and sale of the HCCF-4 12% High Yield Secured Bonds are being made in reliance on an exemption from the registration requirements of the Act and applicable state securities laws. Accordingly, distribution of this Memorandum and any supplements has been strictly limited to persons who are "Accredited Investors." The Company reserves the right, in its sole discretion, to declare any prospective investor ineligible to purchase HCCF-4 12% High Yield Secured Bonds based on any information that may become known or available to the Company concerning the suitability of such prospective investor, for any other reason, or for no reason.

- An investment in the HCCF-4 12% High Yield Secured Bonds involves a high degree of risk and may only be purchased by persons of substantial financial means who have no need for liquidity in this investment. This investment will be sold only to prospective investors who purchase a minimum of $50,000 at a price per HCCF-4 12% High Yield Bond of $1,000.00 for a total of Fifty (50) Bonds, subject to the right of the Manager to waive or reduce said minimum in its sole and absolute discretion.

- The HCCF-4 12% High Yield Secured Bonds may not be suitable investments for a qualified plan, an IRA or other tax-exempt entity. This Memorandum discusses certain risks that may be associated with an investment in the HCCF-4 12% High Yield Secured Bonds by a "Qualified Plan" which includes, without limitation, an IRA and certain other tax-exempt entities. Each investor must consult its own advisers before making an investment and must be willing to bear the risk of a total loss of their investment.

3

- Each prospective investor must represent in writing that he or she meets, among other criteria determined by the Manager, just one of the following Investor Suitability Requirements, as applicable:

- The investor is a bona fide resident or domiciliary of the address set forth in the Subscription Agreement. The investor understands that if the investor, in fact, is not a resident or domiciliary of the address stated below, he or she shall be liable to indemnify the Company pursuant to the Subscription Agreement; and

- As applicable, the investor is an "Accredited Investor" which is an investor who meets one of the following tests to qualify as an "<u>Accredited Investor</u>": See Annex C.

- Under Rule 506b this offering can be offered to up to 35 "Non-Accredited" investors as this limited group is exempt from the Accreditation requirement.

- a bank, insurance company, registered investment company, business development company, or small business investment company;

- an employee benefit plan, within the meaning of the Employee Retirement Income Security Act, if a bank, insurance company, or registered investment adviser makes the investment decisions, or if the plan has total assets in excess of $5 million;

- a charitable organization, corporation, or partnership with assets exceeding $5,000,000;

- director, executive officer, or general partner of the company selling the securities;

- a business in which all the equity owners are accredited investors;

- a natural person who has individual net worth, or joint net worth with the person's spouse, that exceeds $1,000,000 at the time of the purchase, excluding the value of the primary residence of such person;

- a natural person with income exceeding $200,000 in each of the two most recent years or joint income with a spouse exceeding $300,000 for those years and a reasonable expectation of the same income level in the current year; or

- a trust with assets in excess of $5,000,000, not formed to acquire the securities offered, whose purchases a sophisticated person makes.

For purposes of calculating an investor's net worth above, "net worth" is generally defined as the difference between total assets and total liabilities. For purposes hereof, the value of the investor's primary residence must be excluded from net worth. Indebtedness that is secured by the investor's primary residence, up to the estimated fair market value of the primary residence, shall not be included as a liability (except that if the amount of such indebtedness outstanding exceeds the amount outstanding 60 days prior to the Offering, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability). The indebtedness secured by the primary residence in excess of the value of the home is considered a liability and must be deducted from the investor's net worth. In the case of fiduciary accounts, the net worth

4

and/or income suitability requirements may be satisfied by the beneficiary of the account or by the fiduciary if the fiduciary directly or indirectly provides funds for the purchase; and

The investor has read, understands and is fully familiar with and agrees to be bound by the terms and conditions of the Subscription Agreement, this Memorandum. The investor is basing his decision to invest only on the Memorandum and related documents. The investor has relied on the information contained in said materials and has not relied upon any representations made by any other person; and

The investor has such knowledge and experience in financial and business matters, either alone or with his or her advisor(s) (the "Purchaser Representative(s)") in considering, analyzing and evaluating an investment in the Company and he or she is capable of evaluating the merits and risks of this prospective investment in the Company; and

The investor understands that an investment in the HCCF-4 12% High Yield Secured Bonds involves substantial risks and is fully cognizant of, and understands, all of the risk factors relating to a purchase of the HCCF-4 12% High Yield Secured Bonds, including, without limitation, those risks set forth below in the section entitled "Risk Factors" in this Memorandum, and that the investor's investment in the HCCF-4 12% High Yield Secured Bonds may be compromised due to the enumerated risks and other risks not described in this Memorandum, leaving only the secured claims as against the Citibank Standby Letter of Credit and only up to the total claim value of $5,000,000.00; and

The investor's overall commitment to investments that are not readily marketable is not disproportionate to his individual net worth, and his investment in the HCCF-4 12% High Yield Secured Bonds will not cause such overall commitment to become excessive; and

The investor has adequate means of providing for his financial requirements, both current and anticipated, and has no need for liquidity in these investments; and

The investor recognizes the speculative nature of the investment, can bear and is willing to accept the economic risk of losing his entire investment in the HCCF-4 12% High Yield Secured Bonds, and the investor has either received professional guidance with respect to his or her investment in the Company or is experienced in investment and business matters; and

The investor is acquiring the HCCF-4 12% High Yield Secured Bonds for his own account and for investment purposes only and has no present intention, agreement or arrangement for the distribution, transfer, assignment, fractionalization, resale or subdivision of the HCCF-4 12% High Yield Secured Bonds; the investor has no contract, undertaking, agreement or arrangement with any person to sell, transfer or pledge to such person or anyone else, all or any part of the HCCF-4 12% High Yield Secured Bonds acquired by the investor; and the investor has no plans or intentions to enter into any such contract, undertaking or arrangement; and

The investor has had an opportunity to ask questions of and receive answers from the Manager concerning the terms and conditions of this investment, and all such questions have been answered to the full satisfaction of the investor; and

The investor recognizes that the Company is newly formed and has no history of operations or earnings. There is no assurance that the Company will ever be profitable and that failure or loss of the investor's entire

investment is neither impossible nor unlikely; and

The investor expressly represents that: (a) the investor's financial condition is such that the investor has no need for liquidity with respect to this investment in the Company to satisfy any existing or contemplated undertaking or indebtedness; (b) the investor is able to bear the economic risk of this investment in the Company for an indefinite period of time, including the risk of losing all of the investor's investment, and the loss of the investor's entire investment would not materially adversely affect the standard of living of the investor and the investor's family; (c) the investor has either secured independent tax advice with respect to the investor's investment in the Company, upon which the investor is solely relying, or the investor is sufficiently familiar with the income taxation of limited liability company transactions that the investor has deemed such independent advice unnecessary; (d) the investor is not seeking a current cash return with respect to the investor's investment in the Company and has no need for a current return on the investor's investment in the Company and (e) after reasonable inquiry, considering the investor's investment objectives, financial situation and needs, the investor believes that an investment in the Company is a suitable investment for the investor; and

The Investor acknowledges that all documents pertaining to the transaction described in or attached to this Memorandum, the Company, Manager and Company Sponsor, and the Subscription Agreement, or requested by the investor have been made available to the investor and/or the investor's Purchaser Representative(s), and that the investor and/or the investor's Purchaser Representative(s) have been allowed an opportunity to ask questions and receive answers thereto and to verify and clarify any information contained in this Memorandum, and the Subscription Agreement, or other said documents. The Investor acknowledges that the investor has been advised not to invest in the Company before the investor has reviewed all documents pertaining to the transaction and all questions have been answered to the investor's satisfaction; and

The investor has relied solely upon this Memorandum, and the Subscription Agreement, and any other documents and materials submitted therewith or attached thereto, advice of his or her Purchaser Representative(s), if any, and independent investigations made by the investor and/or his or her Purchaser Representative(s) in making the decision to invest in the Company. The investor has not relied on any written or oral statement concerning an investment in the Company except as is consistent with the terms and conditions of this Memorandum, and the Subscription Agreement, and other documents attached thereto, and in the event of such inconsistency, if any, the investor acknowledges and agrees that the terms and conditions of the Memorandum, and the Subscription Agreement, and their respective annexes and attachments shall be controlling and binding on the investor; and

The investor understands that no governmental authority has made any finding or determination relating to the fairness of an investment in the HCCF-4 12% High Yield Secured Bonds of the Company and that no governmental authority has recommended or endorsed or will recommend or endorse the HCCF-4 12% High Yield Secured Bonds; and

The investor recognizes that there will be no market for the HCCF-4 12% High Yield Secured Bonds and that he or she cannot expect to be able readily to liquidate this investment. The investor also understands that as a result of the illiquid nature by the investor in the Company he or she must bear the economic risk of the investment in the Company for an indefinite period of time; and

The investor recognizes that the Company has no operating history and as such may not have sufficient

6

working capital to begin or continue the operation of its business or distribute any future or accumulated earnings to the investor; and

The investor understands that the revenues of the Company will be generated through the loans it makes to Harbor City Digital Ventures, Inc. The ability of Harbor City Digital Ventures, Inc. to generate the desired revenues is highly dependent upon market conditions and other risks. An investor should consider an investment in the Company a risk investment. There is no assurance of satisfactory earnings or distributions or that failure is impossible or unlikely; and

The investor understands that subscriptions for the HCCF-4 12% High Yield Secured Bonds are being offered pursuant to a private offering exemption from registration under the Act and Regulations thereunder. If the Offering was deemed not to be qualified to meet such exemption, subscribers might have the right to rescind their purchase of the HCCF-4 12% High Yield Secured Bonds. In the event of rescission, the Company might face severe financial demands which could adversely affect the Company as a whole, and thus, the non-rescinding subscribers; and

The investor understands that the HCCF-4 12% High Yield Secured Bonds are being offered pursuant to an exemption from state and Federal registration and cannot be resold by him or her without registration under the Act and applicable State law or an exemption therefrom in addition to compliance with the Company's Operating Agreement. The Investor represents that he or she is acquiring the securities for himself or herself and not for any other person. The investor understands that a legend will be placed upon any certificate or instrument that evidences the securities stating that the securities have not been registered under the Act or the securities laws of any state and referring to the restrictions on their transferability and resale, including those set forth in the Subscription Agreement; and

The investor, if a "qualified plan" as that term is defined in the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and the Internal Revenue Code of 1986, as amended ("Code"), understand and agrees to allow the Company, in the event that the Company, in its sole discretion, determines that the continuation of the investor, or the conduct of the Company will result, or there is a material likelihood the same will result, in a violation of any of the provisions of ERISA or the Code to (1) reduce the number of HCCF-4 12% High Yield Secured Bonds that the investor may acquire pursuant to the Subscription Agreement; and (2) redeem, at any time and from time to time, all or any portion of the HCCF-4 12% High Yield Secured Bonds held or otherwise subscribed to by the investor.  Additionally, to maintain the required 25% threshold proportion of Qualified Plans within the Offering, to the degree that in each applicable closing the tendered subscriptions from Qualified Plans exceed said 25% threshold limit, the Company may require that the portion of the subscription payment from all such Qualified Plan subscribers (including, without limitation, the above-specified Subscriber) which exceeds said threshold must be liquidated by each such subscriber, on a pro rata basis, from each of the respective Qualified Plans into cash and invested as cash in the Offering in the subscriber's name set forth in an applicable subscription agreement. In order to minimize the need for liquidation, the Company shall be authorized to hold subscriptions from subscribers who are Qualified Plans for an additional 30 days so that such held subscriptions can be accommodated in a later closing.  The Company shall provide prompt written notice to any Qualified Plan subscriber who will be required to so liquidate in order to subscribe.

The Investor acknowledges that the investor is aware of, understands, and, in addition to all of the additional Risk Factors contained herein, has fully considered the following matters before deciding to invest in the

7

Company:

While the Company seeks to realize revenues and income, there is no guarantee that the Company will, in fact, realize any amount of revenues or income;

There are significant restrictions on the transferability of any Bonds being offered hereunder;

The Company may offer or sell additional Bonds of the Company, whether as one or more classes or series of Bonds in the Company, on such specific terms and conditions as shall be determined in the sole and absolute discretion of the Manager.

Based on the anticipated number and composition of the subscribers to this offering, and in an effort to minimize administrative costs and legal fees, the Company, in the sole discretion of the Manager, may fail to prepare any necessary disclosure document, with respect to the offer or sale of the HCCF-4 12% High Yield Secured Bonds in the Company, notwithstanding any such securities law requirements with respect to the offer or sale of the HCCF-4 12% High Yield Secured Bonds in the Company.

Information that the investor has provided concerning the investor, the investor's financial position and each of the investor's Purchaser Representative(s) is correct and complete as of the date set forth below, and if there should be any material change in such information prior to the acceptance of the investor's investment in the Company, the investor will immediately provide such information to the Manager.

The Investor acknowledges that the Company may decline to accept the Subscription Agreement for any reason, in its sole discretion, thereby denying the investor as a purchaser of the HCCF-4 12% High Yield Secured Bonds.

The Investor Suitability Requirements stated above represent minimum suitability requirements as established by the Company for investors. Accordingly, the satisfaction of the above requirements by a prospective investor will not necessarily mean that the HCCF-4 12% High Yield Secured Bonds are a suitable investment for such investor or that the Company will accept the prospective investor as a subscriber. Furthermore, the Company may modify such requirements at its discretion and any such modification may raise the suitability requirements for investors.



8

The written representations made by prospective investors will be reviewed to determine the suitability of each prospective investor, and the Company will have the right to refuse a subscription for HCCF-4 12% High Yield Secured Bonds if, in its sole and absolute discretion, it believes that a prospective investor does not meet the applicable Investor Suitability Requirements or the HCCF-4 12% High Yield Secured Bonds otherwise constitute an unsuitable investment for such investor.

## NOTICES REGARDING THIS MEMORANDUM

THIS MEMORANDUM IS BEING FURNISHED BY THE COMPANY SOLELY FOR USE BY POTENTIAL INVESTORS IN CONNECTION WITH THE OFFERING.

THIS MEMORANDUM HAS BEEN PREPARED BY THE COMPANY, AND NO PERSON OTHER THAN AN AUTHORIZED REPRESENTATIVE OF THE COMPANY HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM IN CONNECTION WITH THE BONDS DESCRIBED HEREIN AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY. POTENTIAL INVESTORS ARE CAUTIONED NOT TO RELY ON ANY INFORMATION NOT EXPRESSLY SET FORTH IN THIS MEMORANDUM. STATEMENTS CONTAINED HEREIN AS TO THE CONTENT OF ANY AGREEMENT OR OTHER DOCUMENT ARE SUMMARIES AND, THEREFORE, ARE NECESSARILY SELECTIVE AND INCOMPLETE AND ARE QUALIFIED IN THEIR ENTIRETY BY THE ACTUAL AGREEMENTS OR OTHER DOCUMENTS. THE COMPANY WILL MAKE AVAILABLE TO ANY PROSPECTIVE INVESTOR, PRIOR TO THE CONSUMMATION OF THE SALE, THE OPPORTUNITY TO ASK QUESTIONS OF AND RECEIVE ANSWERS FROM THE COMPANY OR PERSONS ACTING ON BEHALF OF THE COMPANY CONCERNING THE TERMS AND CONDITIONS OF THE OFFERING, THE COMPANY OR ANY OTHER RELEVANT MATTERS AND ANY ADDITIONAL REASONABLE INFORMATION TO THE EXTENT  THE COMPANY POSSESSES SUCH INFORMATION.

THE OFFERING PRICE OF THE HCCF-4 12% HIGH YIELD BOND HAS BEEN DETERMINED BY THE COMPANY AND DOES NOT NECESSARILY BEAR ANY RELATIONSHIP TO THE ASSETS, BOOK VALUE OR POTENTIAL EARNINGS OF THE COMPANY OR ANY OTHER RECOGNIZED CRITERIA OF VALUE.

BECAUSE THIS MEMORANDUM FOCUSES PRIMARILY ON INFORMATION CONCERNING THE COMPANY RATHER THAN THE INDUSTRY IN WHICH THE COMPANY OPERATES, POTENTIAL INVESTORS MAY WISH TO CONDUCT THEIR OWN SEPARATE INVESTIGATION OF THE COMPANY'S INDUSTRY TO OBTAIN GREATER INSIGHT IN ASSESSING THE COMPANY'S PROSPECTS.

THIS MEMORANDUM DOES NOT PURPORT TO CONTAIN ALL OF THE INFORMATION THAT MAY BE REQUIRED TO EVALUATE THE OFFERING, AND ANY RECIPIENT HEREOF SHOULD CONDUCT ITS OWN INDEPENDENT ANALYSIS. THE DELIVERY OF THIS MEMORANDUM AT ANY TIME DOES NOT IMPLY THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY

TIME SUBSEQUENT TO THE DATE OF THIS MEMORANDUM. THIS MEMORANDUM IS SUBMITTED IN CONNECTION WITH THE OFFERING DESCRIBED HEREIN AND MAY NOT BE REPRODUCED OR USED FOR ANY OTHER PURPOSE. EACH RECIPIENT OF THIS MEMORANDUM  AGREES THAT ALL INFORMATION CONTAINED HEREIN IS OF A CONFIDENTIAL NATURE, THAT IT WILL TREAT SUCH INFORMATION IN A CONFIDENTIAL MANNER AND THAT IT WILL NOT, DIRECTLY OR INDIRECTLY, DISCLOSE OR PERMIT ITS AGENTS OR AFFILIATES TO DISCLOSE ANY SUCH INFORMATION WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY.PLACEANDUM

## NOTICES REGARDING THIS OFFERING

THIS OFFERING CAN BE WITHDRAWN AT ANY TIME BEFORE A CLOSING AND IS SPECIFICALLY MADE SUBJECT TO THE TERMS DESCRIBED IN THIS MEMORANDUM. THE COMPANY RESERVES THE RIGHT TO REJECT ANY SUBSCRIPTION, IN WHOLE OR IN PART, OR TO ALLOCATE TO ANY PROSPECTIVE INVESTOR LESS THAN THE NUMBER OF BOND SUBSCRIBED FOR BY SUCH PROSPECTIVE INVESTOR.

THE PURCHASE OF THE BONDS OFFERED HEREBY ENTAILS A HIGH DEGREE OF RISK. NO INVESTMENT IN THE BONDS OFFERED HEREBY SHOULD BE MADE BY ANY PERSON WHO IS NOT IN A POSITION TO LOSE THE ENTIRE AMOUNT OF SUCH INVESTMENT. ALL INVESTORS SHOULD CAREFULLY REVIEW THIS MEMORANDUM, INCLUDING THE SECTION ENTITLED "RISK FACTORS."

PROSPECTIVE INVESTORS ARE ENCOURAGED TO RETAIN THEIR OWN PROFESSIONAL ADVISORS TO REVIEW AND EVALUATE THE ECONOMIC, TAX AND OTHER CONSEQUENCES OF INVESTING IN THIS PRIVATE OFFERING AND ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM OR ANY OTHER INFORMATION FURNISHED BY 'HCCF-4' AS LEGAL, FINANCIAL OR OTHER ADVICE.

THE BONDS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES OR "BLUE SKY" LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. THE BONDS ARE SUBJECT TO RESTRICTION ON TRANSFERABILITY AND RESALE AND MAY NOT BE PLEDGED, TRANSFERRED, RESOLD OR OTHERWISE DISPOSED OF EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND SUCH LAWS PURSUANT TO REGISTRATION OR EXEMPTIONS THEREFROM. THE BONDS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THE OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THE OFFEREE, BY ACCEPTING DELIVERY OF THE OFFERING MATERIALS AGREES TO RETURN THIS MEMORANDUM, ALL OTHER OFFERING MATERIALS AND ALL ACCOMPANYING OR RELATED DOCUMENTS TO THE COMPANY UPON REQUEST IF THE

OFFEREE DOES NOT PURCHASE ANY OF THE BONDS OFFERED HEREBY.

THIS MEMORANDUM AND ALL OTHER OFFERING MATERIALS ARE SUBMITTED IN CONNECTION WITH THE PRIVATE OFFERING OF THE HCCF-4 12% HIGH YIELD SECURED BONDS AND DO NOT CONSTITUTE AN OFFER OR SOLICITATION BY ANYONE IN ANY JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED. ANY REPRODUCTION OR DISTRIBUTION OF THIS MEMORANDUM OR ANY OTHER OFFERING

MATERIALS IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF THEIR CONTENTS, WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY, IS PROHIBITED. ANY OFFEREE ACTING CONTRARY TO THE FOREGOING RESTRICTIONS MAY PLACE ITSELF AND THE COMPANY IN VIOLATION OF FEDERAL OR STATE SECURITIES LAWS.

EACH OFFEREE MAY, IF IT SO DESIRES, MAKE INQUIRIES OF MANAGEMENT OF THE COMPANY WITH RESPECT TO THE COMPANY'S BUSINESS OR ANY OTHER MATTERS SET FORTH HEREIN AND MAY OBTAIN ANY ADDITIONAL INFORMATION THAT SUCH OFFEREE DEEMS TO BE NECESSARY IN ORDER TO VERIFY THE ACCURACY OF THE INFORMATION CONTAINED IN THIS MEMORANDUM AND TO MAKE AN INVESTMENT DECISION (TO THE EXTENT THAT THE COMPANY POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE). IN CONNECTION WITH SUCH INQUIRY, ANY DOCUMENTS THAT ANY OFFEREE WISHES TO REVIEW WILL BE MADE AVAILABLE FOR INSPECTION AND COPYING OR PROVIDED, UPON REQUEST, SUBJECT TO THE OFFEREE'S AGREEMENT TO MAINTAIN SUCH INFORMATION IN CONFIDENCE AND TO RETURN THE SAME TO THE COMPANY IF THE RECIPIENT DOES NOT PURCHASE THE BONDS OFFERED HEREUNDER. ANY SUCH INQUIRIES OR REQUESTS FOR ADDITIONAL INFORMATION OR DOCUMENTS SHOULD BE MADE IN WRITING TO THE COMPANY ADDRESSED TO THE COMPANY AT 100 RIALTO PLACE, SUITE 700, MELBOURNE FL 32901, ATTENTION: J.P. MARONEY - MANAGER

### IMPORTANT FACTORS REGARDING FORWARD-LOOKING STATEMENTS

Certain of the statements set forth under the captions "Executive Summary," "The Company" and "Use of Proceeds" and set forth elsewhere in this Memorandum constitute "forward-looking statements." Forward-looking statements include, without limitation, any statement that may predict, forecast, indicate, or imply future results, performance or achievements, and may contain the words "estimate," "project," "intend," "forecast," "anticipate," "plan," "planning," "expect," "believe," "will," "will likely," "should," "could," "would," "may" or words or expressions of similar meaning. All such forward-looking statements involve risks and uncertainties, including, but not limited to, statements regarding the marketing, sales, research and development programs of 'HCCF-4' , the effect of competition and proprietary rights of third parties, the availability of additional financing and access to capital with respect to 'HCCF-4' , and the period of time for which the proceeds of the Offering will enable 'HCCF-4'  to fund its operations. Therefore, prospective investors are cautioned that there can be no assurance that the forward-looking statements included in this Memorandum will prove to be accurate. In light of the significant uncertainties inherent to the forward-looking statements included herein, the inclusion of such information should not be regarded as a representation or warranty by 'HCCF-4' or any other person that the objectives and plans of 'HCCF-4' will be achieved in

11

any specified time frame, if at all. Except to the extent required by applicable laws or rules, 'HCCF-4' does not undertake any obligation to update any forward-looking statements or to announce revisions to any of the forward-looking statements.

## NASAA LEGEND

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES MAY BE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER FEDERAL AND STATE SECURITIES LAWS. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

### JURISDICTIONAL NOTICES AND REPRESENTATIONS

**FOR RESIDENTS OF ALL STATES:** THE PRESENCE OF A LEGEND FOR ANY GIVEN STATE REFLECTS ONLY THAT A LEGEND MAY BE REQUIRED BY THAT STATE AND SHOULD NOT BE CONSTRUED TO MEAN AN OFFER OR SALE MAY BE MADE IN A PARTICULAR STATE. IF YOU ARE UNCERTAIN AS TO WHETHER OR NOT OFFERS OR SALES MAY BE LAWFULLY MADE IN ANY GIVEN STATE, YOU ARE HEREBY ADVISED TO CONTACT THE COMPANY. THESE SECURITIES MUST BE ACQUIRED FOR INVESTMENT PURPOSES ONLY AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION OF SUCH SECURITIES UNDER SUCH LAWS, OR AN OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.

**NOTICE TO ALABAMA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE ALABAMA SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ALABAMA SECURITIES COMMISSION. THE COMMISSION DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THIS PRIVATE PLACEMENT MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

**NOTICE TO ALASKA RESIDENTS ONLY:** THE SECURITIES OFFERED HAVE NOT BEEN REGISTERED WITH THE ADMINISTRATOR OF SECURITIES OF THE STATE OF ALASKA UNDER PROVISIONS OF 3 AAC 08.500-3 AAC 08.504. THE INVESTOR IS ADVISED THAT THE

ADMINISTRATOR HAS MADE ONLY A CURSORY REVIEW OF THE REGISTRATION STATEMENT AND HAS NOT REVIEWED THIS DOCUMENT SINCE THE DOCUMENT IS NOT REQUIRED TO BE FILED WITH THE ADMINISTRATOR. THE FACT OF REGISTRATION DOES NOT MEAN THAT THE ADMINISTRATOR HAS PASSED IN ANY WAY UPON THE MERITS, RECOMMENDED, OR APPROVED THE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A VIOLATION OF 45.55.170. THE INVESTOR MUST RELY ON THE INVESTOR'S OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED IN MAKING AN INVESTMENT DECISION ON THESE SECURITIES.

**NOTICE TO ARIZONA RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN FILED UNDER THE ARIZONA SECURITIES ACT IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION PURSUANT TO A.R.S. SECTION 44-1844 (1).

**NOTICE TO ARKANSAS RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED IN RELIANCE UPON CLAIMS OF EXEMPTION UNDER THE ARKANSAS SECURITIES ACT AND SECTION 4(2) OF THE SECURITIES ACT OF 1933. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ARKANSAS SECURITIES DEPARTMENT OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE DEPARTMENT NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, MADE ANY RECOMMENDATIONS AS TO THEIR PURCHASE, APPROVED OR DISAPPROVED THIS OFFERING OR PASSED UPON THE ADEQUACY OR ACCURACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

**NOTICE TO CALIFORNIA RESIDENTS ONLY:** THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS OFFERING HAS NOT BEEN FILED WITH COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA. THE SALE OF SECURITIES IS EXEMPTED FROM QUALIFICATION BY SECTION 25100, 25102, OR 25104 OF THE CALIFORNIA CORPORATIONS CODE.

**NOTICE TO COLORADO RESIDENTS ONLY:** THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1991 BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE RESOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1991, IF SUCH REGISTRATION IS REQUIRED.

**NOTICE TO CONNECTICUT RESIDENTS ONLY:** MEMBERSHIPS ACQUIRED BY CONNECTICUT RESIDENTS ARE BEING SOLD AS A TRANSACTION EXEMPT UNDER SECTION 36-409(b)(9)(A) OF THE CONNECTICUT, UNIFORM SECURITIES ACT. THE MEMBERSHIPS HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF CONNECTICUT. ALL INVESTORS SHOULD BE AWARE THAT THERE RE CERTAIN RESTRICTIONS AS TO THE TRANSFERABILITY OF THE MEMBERSHIPS.

13

**NOTICE TO DELAWARE RESIDENTS ONLY:** IF YOU ARE A DELAWARE RESIDENT, YOU ARE HEREBY ADVISED THAT THESE SECURITIES ARE NOT BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE DELAWARE SECURITIES ACT. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

**NOTICE TO DISTRICT OF COLUMBIA RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES BUREAU OF THE DISTRICT OF COLUMBIA NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

**NOTICE TO WYOMING RESIDENTS ONLY:** THE MEMBERSHIPS DESCRIBED HEREIN HAVE NOT BEEN REGISTERED WITH THE WYOMING DIVISION OF SECURITIES AND INVESTOR PROTECTION UNDER THE WYOMINGSECURITIES ACT. THE MEMBERSHIPS REFERRED TO HEREIN WILL BE SOLD TO AND ACQUIRED BY THE HOLDER IN A TRANSACTION EXEMPT UNDER SECTION 517.061 OF SAID ACT. THE MEMBERSHIPS HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF WYOMING. IN ADDITION, ALL OFFEREES WHO ARE WYOMING RESIDENTS SHOULD BE AWARE THAT SECTION 517.061(11)(a)(5) OF THE ACT PROVIDES, IN RELEVANT PART, AS FOLLOWS: "WHEN SALES ARE MADE TO FIVE OR MORE PERSONS IN [STATEX], ANY SALE IN [STATEX] MADE PURSUANT TO [THIS SECTION] IS VOIDABLE BY THE PURCHASER IN SUCH SALE EITHER WITHIN 3 DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE PURCHASER TO THE ISSUER, AN AGENT OF THE ISSUER OR AN ESCROW AGENT OR WITHIN 3 DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER." THE AVAILABILITY OF THE PRIVILEGE TO VOID SALES PURSUANT TO SECTION 517.061(11) IS HEREBY COMMUNICATED TO EACH WYOMINGOFFEREE. EACH PERSON ENTITLED TO EXERCISE THE PRIVILEGE TO AVOID SALES GRANTED BY SECTION 517.061 (11) (A)(5) AND WHO WISHES TO EXERCISE SUCH RIGHT, MUST, WITHIN 3 DAYS AFTER THE TENDER OF ANY AMOUNT TO THE COMPANY OR TO ANY AGENT OF THE COMPANY (INCLUDING THE SELLING AGENT OR ANY OTHER DEALER ACTING ON BEHALF OF THE PARTNERSHIP OR ANY SALESMAN OF SUCH DEALER) OR AN ESCROW AGENT CAUSE A WRITTEN NOTICE OR TELEGRAM TO BE SENT TO THE COMPANY AT THE ADDRESS PROVIDED IN THIS CONFIDENTIAL EXECUTIVE SUMMARY. SUCH LETTER OR TELEGRAM MUST BE SENT AND, IF POSTMARKED, POSTMARKED ON OR PRIOR TO THE END OF THE AFOREMENTIONED THIRD DAY. IF A PERSON IS SENDING A LETTER, IT IS PRUDENT TO SEND SUCH LETTER BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ASSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME IT WAS MAILED. SHOULD A PERSON MAKE THIS REQUEST ORALLY, HE MUST ASK FOR WRITTEN CONFIRMATION THAT HIS REQUEST HAS BEEN RECEIVED.

**NOTICE TO GEORGIA RESIDENTS ONLY:** THESE SECURITIES ARE NOT OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE GEORGIA

14

SECURITIES ACT PURSUANT TO SECTION 9(m). THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

**NOTICE TO HAWAII RESIDENTS ONLY:** NEITHER THIS PROSPECTUS NOR THE SECURITIES DESCRIBED HEREIN HAVE BEEN APPROVED OR DISAPPROVED BY THE COMMISSIONER OF SECURITIES OF THE STATE OF HAWAII NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS.

**NOTICE TO IDAHO RESIDENTS ONLY:** THESE SECURITIES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE IDAHO SECURITIES ACT IN RELIANCE UPON EXEMPTION FROM REGISTRATION PURSUANT TO SECTION 30-1345(1) OR (8) THEREOF AND MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SAID ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SAID ACT.

**NOTICE TO ILLINOIS RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECRETARY OF THE STATE OF ILLINOIS NOR HAS THE STATE OF ILLINOIS PASSED UPON THE ACCURACY OR ADEQUACY OF THE PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

**NOTICE TO INDIANA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER SECTION 23-2-1-2 OF THE INDIANA SECURITIES LAW AND HAVE NOT BEEN REGISTERED UNDER SECTION 23-2-1-3. THEY CANNOT THEREFORE BE RESOLD UNLESS THEY ARE REGISTERED UNDER SAID LAW OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE. A CLAIM OF EXEMPTION UNDER SAID LAW HAS BEEN FILED, AND IF SUCH EXEMPTION IS NOT DISALLOWED SALES OF THESE SECURITIES MAY BE MADE. HOWEVER, UNTIL SUCH EXEMPTION IS GRANTED, ANY OFFER MADE PURSUANT HERETO IS PRELIMINARY AND SUBJECT TO MATERIAL CHANGE.

**NOTICE TO IOWA RESIDENTS ONLY:** IOWA RESIDENTS MUST MEET THE FOLLOWING STANDARDS: (1) YOU MUST HAVE A NET WORTH OF $400,000 (EXCLUSIVE OF HOME, AUTOMOBILES, AND FURNISHINGS), IN CONJUNCTION WITH A MINIMUM PURCHASE; OR (2) YOU MUST HAVE A NET WORTH OF $1,000,000 (EXCLUSIVE OF HOME, AUTOMOBILES, AND FURNISHINGS), OR $10,000 (EXCLUSIVE OF HOME, AUTOMOBILES, AND FURNISHINGS), AND A 50% TAX BRACKET, IN CONJUNCTION WITH A MINIMUM PURCHASE; OR (3) YOU MUST BE AN "ACCREDITED INVESTOR" AS DEFINED IN SECTION 203.501(a)(4), (5), (6) OR (7) OF THE FEDERAL REGULATION D.

**NOTICE TO KANSAS RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 81-5-6 OF THE KANSAS SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND

APPLICABLE RULES PROMULGATED THEREUNDER.

**NOTICE TO KENTUCKY RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER RULE 808 OF THE KENTUCKY SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

**NOTICE TO LOUISIANA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER RULE 1 OF THE LOUISIANA SECURITIES LAW AND MAY NOT BE REOFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

**NOTICE TO MAINE RESIDENTS ONLY:** IF YOU ARE A MAINE RESIDENT AND YOU ACCEPT AN OFFER TO PURCHASE THESE SECURITIES PURSUANT TO THIS MEMORANDUM, YOU ARE HEREBY ADVISED THAT THESE SECURITIES ARE BEING SOLD PURSUANT TO AN EXEMPTION FROM REGISTRATION WITH THE BANK SUPERINTENDENT OF THE STATE OF MAIN UNDER SECTION 874-A(3) OF TITLE 32 OF THE MAINE REVISED STATUTES OF 1964, AS AMENDED, WHICH EXEMPTION RELATES TO TRANSACTIONS BY AN ISSUER NOT INVOLVING ANY PUBLIC OFFERING WITHIN THE MEANING OF SECTION 4(2) OF THE SECURITIES ACT OF 1933, AS AMENDED, AND THE RULES AND REGULATIONS THEREUNDER, INCLUDING TRANSACTIONS EXEMPT FROM REGISTRATION UNDER RULE 504 OF THE SECURITIES AND EXCHANGE COMMISSION OR ANY SUCCESSOR RULE ADOPTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND ANY TRANSACTIONS WHICH CONSTITUTE NON-PUBLIC OFFERINGS UNDER RULES AND REGULATIONS ADOPTED BY THE BANK SUPERINTENDED PURSUANT TO SECTION 106, 807 OR 873, SUBSECTION 6 OF SAID TITLE 32. THESE SECURITIES MAY BE DEEMED RESTRICTED SECURITIES AND AS SUCH THE HOLDER MAY NOT BE ABLE TO RESELL THE SECURITIES UNLESS PURSUANT TO REGISTRATION UNDER STATE OR FEDERAL SECURITIES LAWS OR UNLESS AN EXEMPTION UNDER SUCH LAWS EXISTS.

**NOTICE TO MARYLAND RESIDENTS ONLY:** IF YOU ARE A MARYLAND RESIDENT AND YOU ACCEPT AN OFFER TO PURCHASE THESE SECURITIES PURSUANT TO THIS MEMORANDUM, YOU ARE HEREBY ADVISED THAT THESE SECURITIES ARE BEING SOLD AS A TRANSACTION EXEMPT UNDER SECTION 11-602(9) OF THE MARYLAND SECURITIES ACT. THE MEMBERSHIPS HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF MARYLAND. ALL INVESTORS SHOULD BE AWARE THAT THERE ARE CERTAIN RESTRICTIONS AS TO THE TRANSFERABILITY OF THE MEMBERSHIPS.

**NOTICE TO MASSACHUSETTS RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES DIVISION OF THE COMMONWEALTH OF MASSACHUSETTS NOR HAS THE SECRETARY OF THE COMMONWEALTH PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS

16

UNLAWFUL. TO RESIDENTS OF MICHIGAN: NO SALE OF THE SECURITIES WILL BE MADE TO RESIDENTS OF THE STATE OF MICHIGAN WHO ARE UNACCREDITED INVESTORS IF THE AMOUNT OF SUCH INVESTMENT IN THE SECURITIES WOULD EXCEED TEN PERCENT (10%) OF SUCH INVESTOR'S NET WORTH (EXCLUDING PRINCIPAL RESIDENCE, FURNISHINGS THEREIN AND PERSONAL AUTOMOBILES).

**NOTICE TO MICHIGAN RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE MICHIGAN SECURITIES ACT. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

**NOTICE TO MINNESOTA RESIDENTS ONLY:** THESE SECURITIES BEING OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER CHAPTER 80A OF THE MINNESOTA SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO REGISTRATION, OR AN EXEMPTION THEREFROM.

**NOTICE TO MISSISSIPPI RESIDENTS ONLY:** THE MEMBERSHIPS ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE MISSISSIPPI SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE MISSISSIPPI SECRETARY OF STATE OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE SECRETARY OF STATE NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES OR APPROVED OR DISAPPROVED THIS OFFERING. THE SECRETARY OF STATE DOES NOT RECOMMEND THE PURCHASE OF THESE OR ANY OTHER SECURITIES. EACH PURCHASER OF THE SECURITIES MUST MEET CERTAIN SUITABILITY STANDARDS AND MUST BE ABLE TO BEAR AN ENTIRE LOSS OF THIS INVESTMENT. THE SECURITIES MAY NOT BE TRANSFERRED FOR A PERIOD OF ONE (1) YEAR EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE MISSISSIPPI SECURITIES ACT OR IN A TRANSACTION IN COMPLIANCE WITH THE MISSISSIPPI SECURITIES ACT.

**FOR MISSOURI RESIDENTS ONLY:** THE SECURITIES OFFERED HEREIN WILL BE SOLD TO, AND ACQUIRED BY, THE PURCHASER IN A TRANSACTION EXEMPT UNDER SECTION 4.G OF THE MISSOURI SECURITIES LAW OF 1953, AS AMENDED. THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF MISSOURI. UNLESS THE SECURITIES ARE SO REGISTERED, THEY MAY NOT BE OFFERED FOR SALE OR RESOLD IN THE STATE OF MISSOURI, EXCEPT AS A SECURITY, OR IN A TRANSACTION EXEMPT UNDER SAID ACT.

**NOTICE TO MONTANA RESIDENTS ONLY:** IN ADDITION TO THE INVESTOR SUITABILITY STANDARDS THAT ARE OTHERWISE APPLICABLE, ANY INVESTOR WHO IS A MONTANA RESIDENT MUST HAVE A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS, AND AUTOMOBILES) IN EXCESS OF FIVE (5) TIMES THE AGGREGATE AMOUNT INVESTED BY SUCH INVESTOR IN THE MEMBERSHIPS.

**NOTICE TO NEBRASKA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER CHAPTER 15 OF THE NEBRASKA SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

**NOTICE TO WYOMING RESIDENTS ONLY:** IF ANY INVESTOR ACCEPTS ANY OFFER TO PURCHASE THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 49:3-60(b) OF THE WYOMING SECURITIES LAW. THE INVESTOR IS HEREBY ADVISED THAT THE ATTORNEY GENERAL OF THE STATE OF WYOMING HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING AND THE FILING OF THE OFFERING WITH THE BUREAU OF SECURITIES DOES NOT CONSTITUTE APPROVAL OF THE ISSUE, OR SALE THEREOF, BY THE BUREAU OF SECURITIES OR THE DEPARTMENT OF LAW AND PUBLIC SAFETY OF THE STATE OF WYOMING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. WYOMING ALLOWS THE SALE OF SECURITIES TO 25 OR FEWER PURCHASERS IN THE STATE WITHOUT REGISTRATION. HOWEVER, CERTAIN CONDITIONS APPLY, I.E., THERE CAN BE NO GENERAL ADVERTISING OR SOLICITATION. THIS EXEMPTION IS GENERALLY USED WHERE THE PROSPECTIVE INVESTOR IS ALREADY KNOWN AND HAS A PRE-EXISTING RELATIONSHIP WITH THE COMPANY. (SEE NRS 90.530.11.)

**NOTICE TO NEW HAMPSHIRE RESIDENTS ONLY:** NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE UNDER THIS CHAPTER HAS BEEN FILED WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY NEITHER SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

**NOTICE TO NEW JERSEY RESIDENTS ONLY:** IF YOU ARE NEW JERSEY RESIDENT AND YOU ACCEPT AN OFFER TO PURCHASE THESE SECURITIES PURSUANT TO THIS MEMORANDUM, YOU ARE HEREBY ADVISED THAT THIS MEMORANDUM HAS NOT BEEN FILED WITH OR REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

**NOTICE TO NEW MEXICO RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN

18

APPROVED OR DISAPPROVED BY THE SECURITIES DIVISION OF THE NEW MEXICO DEPARTMENT OF BANKING NOR HAS THE SECURITIES DIVISION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PRIVATE PLACEMENT MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

**NOTICE TO NEW YORK RESIDENTS ONLY:** THIS DOCUMENT HAS NOT BEEN REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW YORK PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THE COMPANY  HAS TAKEN NO STEPS TO CREATE AN AFTER MARKET FOR THE MEMBERSHIPS OFFERED HEREIN AND HAS MADE NO ARRANGEMENTS WITH BROKERS OF OTHERS TO TRADE OR MAKE A MARKET IN THE MEMBERSHIPS.

**NOTICE TO NORTH CAROLINA RESIDENTS ONLY:** IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT  BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED ACCURACY OR DETERMINED ADEQUACY OF THIS DOCUMENT. REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE  AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

**NOTICE TO NORTH DAKOTA RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES COMMISSIONER OF THE STATE OF NORTH DAKOTA NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

**NOTICE TO OHIO RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 107.03(2) OF THE OHIO SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

**NOTICE TO OKLAHOMA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED FOR SALE IN THE STATE OF OKLAHOMA IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION FOR PRIVATE OFFERINGS. ALTHOUGH A PRIOR FILING OF THIS MEMORANDUM AND THE INFORMATION HAS BEEN MADE WITH THE OKLAHOMA SECURITIES COMMISSION, SUCH FILING IS PERMISSIVE ONLY AND DOES NOT CONSTITUTE AN APPROVAL, RECOMMENDATION OR ENDORSEMENT, AND IN NO SENSE IS TO BE REPRESENTED AS AN INDICATION OF THE INVESTMENT MERIT OF SUCH SECURITIES. ANY SUCH REPRESENTATION

IS UNLAWFUL.

**NOTICE TO OREGON RESIDENTS ONLY:** THE SECURITIES OFFERED HAVE BEEN REGISTERED WITH THE CORPORATION COMMISSION OF THE STATE OF OREGON UNDER PROVISIONS OF OAR 815 DIVISION 36. THE INVESTOR IS ADVISED THAT THE COMMISSIONER HAS MADE ONLY A CURSORY REVIEW OF THE REGISTRATION STATEMENT AND HAS NOT REVIEWED THIS DOCUMENT SINCE THE DOCUMENT IS NOT REQUIRED TO BE FILED WITH THE COMMISSIONER. THE INVESTOR MUST RELY ON THE INVESTOR'S OWN EXAMINATION OF THE COMPANY CREATING THE SECURITIES, AND THE TERMS OF THE OFFERING INCLUDING THE MERITS AND RISKS INVOLVED IN MAKING AN INVESTMENT DECISION ON THESE SECURITIES.

**NOTICE TO PENNSYLVANIA RESIDENTS ONLY:** EACH PERSON WHO ACCEPTS AN OFFER TO PURCHASE SECURITIES EXEMPTED FROM REGISTRATION BY SECTION 203(d), DIRECTLY FROM THE ISSUER OR AFFILIATE OF THIS ISSUER, SHALL HAVE THE RIGHT TO WITHDRAW HIS ACCEPTANCE WITHOUT INCURRING ANY LIABILITY TO THE SELLER, UNDERWRITER (IF ANY) OR ANY OTHER PERSON WITHIN TWO (2) BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE ISSUER OF HIS WRITTEN BINDING CONTRACT OF PURCHASE OR, IN THE CASE OF A TRANSACTION IN WHICH THERE IS NO BINDING CONTRACT OF PURCHASE, WITHIN TWO (2) BUSINESS DAYS AFTER HE MAKES THE INITIAL PAYMENT FOR THE SECURITIES BEING OFFERED. IF YOU HAVE ACCEPTED AN OFFER TO PURCHASE THESE SECURITIES MADE PURSUANT TO A PROSPECTUS WHICH CONTAINS A NOTICE EXPLAINING YOUR RIGHT TO WITHDRAW YOUR ACCEPTANCE PURSUANT TO SECTION 207(m) OF THE PENNSYLVANIA SECURITIES ACT OF 1212 (70 PS § 1-207(m), YOU MAY ELECT, WITHIN TWO (2) BUSINESS DAYS AFTER THE FIRST TIME YOU HAVE RECEIVED THIS NOTICE AND A PROSPECTUS TO WITHDRAW FROM YOUR PURCHASE AGREEMENT AND RECEIVE A FULL REFUND OF ALL MONEY PAID BY YOU. YOUR WITHDRAWAL WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON. TO ACCOMPLISH THIS WITHDRAWAL, YOU NEED ONLY SEND A LETTER OR TELEGRAM TO THE ISSUER (OR UNDERWRITER IF ONE IS LISTED ON THE FRONT PAGE OF THE PROSPECTUS) INDICATING YOUR INTENTION TO WITHDRAW. SUCH LETTER OR TELEGRAM SHOULD BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED SECOND BUSINESS DAY. IF YOU ARE SENDING A LETTER, IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO EVIDENCE THE TIME WHEN IT WAS MAILED. SHOULD YOU MAKE THIS REQUEST ORALLY, YOU SHOULD ASK WRITTEN CONFIRMATION THAT YOUR REQUEST HAS BEEN RECEIVED. NO SALE OF THE SECURITIES WILL BE MADE TO RESIDENTS OF THE STATE OF PENNSYLVANIA WHO ARE NON-ACCREDITED INVESTORS IF THE AMOUNT OF SUCH INVESTMENT IN THE SECURITIES WOULD EXCEED TWENTY (20%) OF SUCH INVESTOR'S NET WORTH (EXCLUDING PRINCIPAL RESIDENCE, FURNISHINGS THEREIN AND PERSONAL AUTOMOBILES). EACH PENNSYLVANIA RESIDENT MUST AGREE NOT TO SELL THESE SECURITIES FOR A PERIOD OF TWELVE (12) MONTHS AFTER THE DATE OF PURCHASE, EXCEPT IN ACCORDANCE WITH WAIVERS ESTABLISHED BY RULE OR ORDER OF THE COMMISSION. THE SECURITIES HAVE NOT BEEN ISSUED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF THE PENNSYLVANIA SECURITIES ACT OF 1212. NO SUBSEQUENT RESALE OR OTHER DISPOSITION OF THE SECURITIES MAY BE

MADE WITHIN 12 MONTHS FOLLOWING THEIR INITIAL SALE IN THE ABSENCE OF AN EFFECTIVE REGISTRATION, EXCEPT IN ACCORDANCE WITH WAIVERS ESTABLISHED BY RULE OR ORDER OF THE COMMISSION, AND THEREAFTER ONLY PURSUANT TO AN EFFECTIVE REGISTRATION OR EXEMPTION.

**NOTICE TO PUERTO RICO RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE OFFICE OF THE COMMISSIONER OF FINANCIAL INSTITUTIONS OF THE COMMONWEALTH OF PUERTO RICO NOR HAVE THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

**NOTICE TO RHODE ISLAND RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE DEPARTMENT OF BUSINESS REGULATION OF THE STATE OF RHODE ISLAND NOR have THE DIRECTOR PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

**NOTICE TO SOUTH CAROLINA RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE SOUTH CAROLINA UNIFORM SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE SOUTH CAROLINA SECURITIES COMMISSIONER. THE COMMISSIONER DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THIS PRIVATE PLACEMENT MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

**NOTICE TO SOUTH DAKOTA RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED FOR SALE IN THE STATE OF SOUTH DAKOTA PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SOUTH DAKOTA BLUE SKY LAW, CHAPTER 47-31, WITH THE DIRECTOR OF THE DIVISION OF SECURITIES OF THE DEPARTMENT OF COMMERCE AND REGULATION OF THE STATE OF SOUTH DAKOTA. THE EXEMPTION DOES NOT CONSTITUTE A FINDING THAT THIS MEMORANDUM IS TRUE, COMPLETE, AND NOT MISLEADING, NOR HAS THE DIRECTOR OF THE DIVISION OF SECURITIES PASSED IN ANY WAY UPON THE MERITS OF, RECOMMENDED, OR GIVEN APPROVAL TO THESE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

**NOTICE TO TENNESSEE RESIDENT ONLY:** THESE SECURITIES HAVE NOT BEEN REGISTERED WITH THE COMMISSIONER OF INSURANCE OF TENNESSEE. SUCH REGISTRATION DOES NOT CONSTITUTE A RECOMMENDATION OR ENDORSEMENT OF ANY SECURITY NOR DOES THE COMMISSIONER PASS UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS MEMORANDUM.

**NOTICE TO TEXAS RESIDENTS ONLY:** THE SECURITIES OFFERED HEREUNDER HAVE NOT BEEN REGISTERED UNDER APPLICABLE TEXAS SECURITIES LAWS AND, THEREFORE, ANY PURCHASER THEREOF MUST BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME BECAUSE THE SECURITIES CANNOT BE RESOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER SUCH SECURITIES LAWS OR AN EXEMPTION

FROM SUCH REGISTRATION IS AVAILABLE. FURTHER, PURSUANT TO §109.13 UNDER THE TEXAS SECURITIES ACT, THE COMPANY IS REQUIRED TO APPRISE PROSPECTIVE INVESTORS OF THE FOLLOWING: A LEGEND SHALL BE PLACED, UPON ISSUANCE, ON CERTIFICATES REPRESENTING SECURITIES PURCHASED HEREUNDER, AND ANY PURCHASER HEREUNDER SHALL BE REQUIRED TO SIGN A WRITTEN AGREEMENT THAT HE WILL NOT SELL THE SUBJECT SECURITIES WITHOUT REGISTRATION UNDER APPLICABLE SECURITIES LAWS, OR EXEMPTIONS THEREFROM.

**NOTICE TO UTAH RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE UTAH SECURITIES ACT. THE SECURITIES CANNOT BE TRANSFERRED OR SOLD EXCEPT IN TRANSACTIONS WHICH ARE EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

**NOTICE TO VERMONT RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES DIVISION OF THE STATE OF VERMONT NOR HAVE THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

**NOTICE TO VIRGINIA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION UNDER SECTION 13.1-514 OF THE VIRGINIA SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

**NOTICE TO WASHINGTON RESIDENTS ONLY:** THE ADMINISTRATOR OF SECURITIES HAS NOT REVIEWED THE OFFERING OR PRIVATE PLACEMENT MEMORANDUM AND THE SECURITIES HAVE NOT BEEN REGISTERED IN RELIANCE UPON THE SECURITIES ACT OF WASHINGTON, CHAPTER 21.20 RCW, AND THEREFORE, CANNOT BE RESOLD UNLESS THEY ARE REGISTERED UNDER THE SECURITIES ACT OF WASHINGTON, CHAPTER 21.20 RCW, OR UNLESS AN EXEMPTION FROM REGISTRATION IS MADE AVAILABLE.

**NOTICE TO WEST VIRGINIA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 15.06(b)(9) OF THE WEST VIRGINIA SECURITIES LAW AND MAY NOT BE REOFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

**NOTICE TO WISCONSIN RESIDENTS ONLY:** IN ADDITION TO THE INVESTOR SUITABILITY STANDARDS THAT ARE OTHERWISE APPLICABLE, ANY INVESTOR WHO IS A WISCONSIN RESIDENT MUST HAVE A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS, AND

AUTOMOBILES) IN EXCESS OF THREE AND ONE-THIRD (3 1/3) TIMES THE AGGREGATE AMOUNT INVESTED BY SUCH INVESTOR IN THE MEMBERSHIPS OFFERED HEREIN.

**FOR WYOMING RESIDENTS ONLY:** ALL WYOMING RESIDENTS WHO SUBSCRIBE TO PURCHASE MEMBERSHIPS OFFERED BY THE COMPANY MUST SATISFY THE FOLLOWING MINIMUM FINANCIAL SUITABILITY REQUIREMENTS IN ORDER TO PURCHASE MEMBERSHIPS:

(1) A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS AND AUTOMOBILES) OF TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000); AND

(2) THE PURCHASE PRICE OF MEMBERSHIPS SUBSCRIBED FOR MAY NOT EXCEED TWENTY PERCENT (20%) OF THE NET WORTH OF THE SUBSCRIBER; AND

(3) "TAXABLE INCOME" AS DEFINED IN SECTION 63 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, DURING THE LAST TAX YEAR AND ESTIMATED "TAXABLE INCOME" DURING THE CURRENT TAX YEAR SUBJECT TO A FEDERAL INCOME TAX RATE OF NOT LESS THAN THIRTY-THREE PERCENT (33%).

IN ORDER TO VERIFY THE FOREGOING, ALL SUBSCRIBERS WHO ARE WYOMING RESIDENTS WILL BE REQUIRED TO REPRESENT IN THE SUBSCRIPTION AGREEMENT THAT THEY MEET THESE WYOMING SPECIAL INVESTOR SUITABILITY REQUIREMENTS. FOR PERSONS WHO ARE NEITHER NATIONALS, CITIZENS, RESIDENTS NOR ENTITIES OF THE UNITED STATES: THESE SECURITIES HAVE NOT AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT AND , INSOFAR AS SUCH SECURITIES ARE OFFERED AND SOLD TO PERSONS WHO ARE NEITHER NATIONALS, CITIZENS, RESIDENTS NOR ENTITIES OF THE UNITED STATES, THEY MAY NOT BE TRANSFERRED OR RESOLD DIRECTLY OR INDIRECTLY IN THE UNITED STATES, ITS TERRITORIES OR POSSESSIONS, RESIDENTS OR ENTITIES NORMALLY RESIDENT THEREIN (OR TO ANY PERSON ACTING FOR THE ACCOUNT OF ANY SUCH NATIONAL, CITIZEN, ENTITY OR RESIDENT). FURTHER RESTRICTIONS ON TRANSFER WILL BE IMPOSED TO PREVENT SUCH SECURITIES FROM BEING HELD BY UNITED STATES PERSONS.

### Restrictions Imposed by the USA PATRIOT Act and Related Acts

In accordance with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended (the "USA PATRIOT Act"), our Bonds may not be offered, sold, transferred or delivered, directly or indirectly, to any "Unacceptable Investor," which means anyone who is:

a "designated national," "specially designated national," "specially designated terrorist," "specially designated global terrorist," "foreign terrorist organization" or "blocked person" within the definitions set forth in the Foreign Assets Control Regulations of the U.S. Treasury Department; or

acting on behalf of, or an entity owned or controlled by, any government against whom the U.S. maintains economic sanctions or embargoes under the regulations of the U.S. Treasury Department; within the scope of Executive Order 13224 — Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten to Commit, or Support Terrorism, effective September 24, 2001; subject to additional restrictions imposed by the following statutes or regulations and executive orders issued thereunder: the Trading with the Enemy Act, the Iraq Sanctions Act, the National Emergencies Act, the Antiterrorism and Effective Death

24

Penalty Act of 1996, the International Emergency Economic Powers Act, the United Nations Participation Act, the International Security and Development Cooperation Act, the Nuclear Proliferation Prevention Act of 1994, the Foreign Narcotics Kingpin Designation Act, the Iran and Libya Sanctions Act of 1996, the Cuban Democracy Act, the Cuban Liberty and Democratic Solidarity Act and the Foreign Operations, Export Financing and Related Programs Appropriation Act or any other law of similar import as to any non-U.S. country, as each such act or law has been or may be amended, adjusted, modified, or interpreted from time to time; or designated or blocked, associated or involved in terrorism, or subject to restrictions under laws, regulations, or executive orders as may apply in the future similar to those set forth above.

## SUMMARY OF OFFERING

The following summary is qualified in its entirety by the detailed information appearing elsewhere in this Memorandum and by the contents of the other documents included herewith. While this Memorandum can provide you with some information relating to the subject headings set forth, the information provided is not necessarily a complete or exclusive discussion of that subject.

*Prospective investors are urged to read this Memorandum in its entirety, including the annex documents.*

**THE COMPANY:** 'HCCF-4' is a Wyoming "Limited Liability Company" with principal offices at 100 Rialto Place, Suite 700, Melbourne FL 32901, 'HCCF-4' was formed in 2019, and operates under the laws of the State of Wyoming.

**MARKET OPPORTUNITY AND STRATEGY:** 'HCCF-4' - The company provides funding for Harbor City Digital Ventures, Inc. an internet advertising or digital media company. See Annex 'A' Business Plan for specific details.

**HCCF-4 12% High Yield Secured Bonds OFFERED:** 'HCCF-4' intends to offer a maximum of 5,000 Offered HCCF-4 12% High Yield Secured Bonds (the "Maximum Offering).

**OFFERING PRICE:** The HCCF-4 12% High Yield Secured Bonds are being offered at a per-Bond price equal to $1,000.00 (the "Offering Price").

**HCCF-4 BONDS ARE NON-VOTING:** The HCCF-4 12% High Yield Secured Bonds are non-voting.

**HCCF-4 12% HIGH YIELD SECURED BONDS ARE REDEEMABLE:** Each HCCF-4 12% High Yield Bond will be redeemed at its full face value of $1,000 per bond within 12 months of the funds being received from the investor.

**OFFERING PERIOD:** The offering period (the "Offering Period") will expire on the date that 'HCCF-4' completes the sale of 5,000 Offered HCCF-4 12% High Yield Secured Bonds in connection with the Offering; provided, that in the sole and absolute discretion of the Manager and without notice to the Subscriber, the Manager may terminate the Offering on any prior date (the earlier of such dates, the "Termination Date").

**CLOSING:** Upon acceptance by 'HCCF-4' of subscriptions for the amount subscribed for, 'HCCF-4' shall have the right at any time thereafter, prior to the termination of the Offering, to affect an initial closing with respect to the Offering (the "Initial Closing"). Thereafter, 'HCCF-4' shall continue to accept additional subscriptions for and continue to have closings (together with the Initial Closing, each a "Closing") with

respect to subscriptions for HCCF-4 12% High Yield Secured Bonds from new or existing investors from time to time and at any time up to the Termination Date.

**MINIMUM SUBSCRIPTION:** The minimum subscription for 'HCCF-4' is F i f t y  ( 5 0 )  HCCF-4 12% High Yield Secured Bonds ( $50,000 ), subject to 'HCCF-4' right to accept subscriptions in lesser amounts in its sole discretion.

**BONDS OUTSTANDING:** As of the date hereof, 'HCCF-4' has a Total of 5,000 to be authorized HCCF-4 12% High Yield Secured Bonds of which Zero (0) HCCF-4 12% High Yield Secured Bonds are outstanding. There are 5,000 HCCF-4 12% High Yield Secured Bonds available for issuance to new investors.

**RISK FACTORS:** An investment in the HCCF-4 12% High Yield Secured Bonds involves risks due, in part, to the highly speculative nature of investing. Such risks are more fully detailed in the business plan which has been made a part of the Offering Memorandum. The "RISK FACTORS" section of this Memorandum and the included Annex 'A'- Business Plan which describes certain of the risks that should be considered by prospective investors.

**USE OF PROCEEDS:** 'HCCF-4' plans to use the proceeds of this Offering for the specific purpose as is detailed in the included Annex 'A'- Business Plan. 'HCCF-4' management will not have any discretion as to any other use of the proceeds to be received from this Offering. The proceeds can only be used as fully detailed in the Annex 'A'- Business Plan.

**HCCF-4 12% HIGH YIELD SECURED BONDS INTEREST PAYMENT SCHEDULE:** Each HCCF-4 12% High Yield Secured Bonds is entitled to an 1.0% monthly interest payment distribution of the amount of the original purchase price ($1,000.00) or a payment of $10 per bond times minimum purchase requirement of 50 bonds = $500 monthly times 12 months = $6,000 per 12 month period. The interest payment will be paid by the company no later than the 15th of the following month the interest payment was earned.

**SUITABILITY STANDARDS:** The HCCF-4 12% High Yield Secured Bonds will be offered and sold to "accredited investors" and the "exemption of up to 35 non-accredited investors", as that term is defined in Regulation D, adopted pursuant to Section 4(2) of the Securities Act. An investment in the HCCF-4 12% High Yield Secured Bonds is suitable only for investors who have adequate means of providing for current needs and personal contingencies, can bear the economic risk of the investment and have no need for liquidity in their investment. Investors will be required to make representations to such effect to 'HCCF-4' as a condition to the acceptance of their subscriptions. 'HCCF-4', in its sole discretion, may reject any subscription in whole or in part. (See Annex 'C' - Investor Questionnaire)

**NO OFFERING FEE:** In connection with this Offering, 'HCCF-4' does not expect to use the services of any outside placement agents or pay a placement agent fee or other compensation for such services.

**HOW TO SUBSCRIBE:** Investments in connection with this Offering shall be made pursuant to a definitive subscription agreement (the "Subscription Agreement"), and other necessary documents reasonably acceptable to 'HCCF-4' and the investors, (collectively the "Offering Documents"). The Subscription Agreement will contain, among other things, such representations, warranties, and covenants as are customary in transactions of this kind, including, without limitation, representations regarding

organizational matters, authorization, purchase for investment and not for resale or distribution, and investor sophistication and investment experience. W i r e   Procedures & Wire Instructions will be provided by contacting Manager – J.P. Maroney.

## THE COMPANY

'HCCF-4' is a Wyoming limited liability company with principal offices located at 100 Rialto Place, Suite 700, Melbourne FL 32901. 'HCCF-4' was formed in 2019, and operates under the laws of the State of Wyoming.

## HOW TO SUBSCRIBE

If you are interested in subscribing for the HCCF-4 12% High Yield Secured Bonds, you must carefully read this Memorandum. Then you must complete, execute and deliver the Subscription Agreement which is attached as Annex 'B' to this Memorandum and submit the documentation specified in the Subscription Agreement to substantiate your status as an Accredited Investor, as such term is defined herein, along with your total subscription payment to the Manager. By executing the Subscription Agreement, you will attest that, in addition to the representations contained in the Subscription Agreement, you: have received and read this Memorandum and meet our 'accredited investor' suitability standards and you are purchasing the HCCF-4 12% High Yield Secured Bonds for your own account and accept and agree to the terms of the HCCF-4 12% High Yield Secured Bonds; acknowledge that there is no public market for the HCCF-4 12% High Yield Secured Bonds; if an entity, represent that the investor's purchase of the HCCF-4 12% High Yield Secured Bonds is permissible and complies in all respects with laws applicable to such investor and that its investment in the HCCF-4 12% High Yield Secured Bonds has been duly authorized; if an employee benefit plan, foreign plan, IRA, Keogh plan or other employee benefit account or arrangement, acknowledge and agree that the Company, the Manager and their Affiliates will not have any direct fiduciary duty to or relationship with you and that the assets of the Company will not be considered "plan assets" and will not be subject to any fiduciary or investment restrictions under any pension code applicable to you; are in compliance with all of the applicable laws of the United States, including the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended (the "USA PATRIOT" Act), and are not on any governmental authority watch list.

We include these representations in our Subscription Agreement in order to prevent persons who do not meet our suitability standards or other investment qualifications from subscribing to the HCCF-4 12% High Yield Secured Bonds.

Subscriptions will be effective only when we accept them and we reserve the right to reject any subscription in whole or in part, in our sole discretion. Proceeds of the Offering will be held in a Non-Operating Depository Account until the Company has received subscriptions totaling the Minimum Offering Amount of $50,000. If a subscription is not accepted, any funds submitted will be returned promptly to the prospective subscriber.

The Manager will hold closings twice per month to complete the sale of all the HCCF-4 12% High Yield Secured Bonds made through such closing date unless the Manager decides to do closings more often or less often in its absolute and sole discretion. After the company reaches $50,000 or more in capital, subscribers will be issued vested HCCF-4 12% High Yield Secured Bonds.



After the subscription payments have been received and have equaled or exceeded the minimum $50.000; funds in the Depository Account will be transferred into the Company's operating account and will remain there available for use as described fully in the Business Plan. See Annex A for complete details.

The Offering requires a minimum capital commitment of Fifty Thousand Dollars ($50,000) by each investor, unless the Manager, in its sole discretion, waives the minimum commitment.  We may continue the Offering for up to twelve months (12) following the Commencement Date or until such time as the Company has received and accepted subscriptions totaling the Maximum Offering Amount, subject to our right to terminate the Offering earlier. The Minimum Offering Amount for the Offering to go forward is $50,000. If the Company does not receive subscriptions from Subscribers totaling at least $50,000 within approximately twelve (12) months of the December 1, 2019, the Company will return all subscription funds to the Subscribers and cancel the offering. All potential investors ("Subscribers") in the Offering will be required to provide information and certain documentary evidence to show their suitability as investors in the Company. Subscribers in the Offering will be required to submit a Subscription Agreement along with their total subscription payment. The Company and Manager have the sole discretion to accept or reject any subscription or investor for any reason.

In the event, the Company does not accept a prospective Subscriber's subscription for the HCCF-4 12% High Yield Secured Bonds for any reason, the Company will return or cause to be returned, any funds submitted by

such Subscriber to such Subscriber promptly following the date such determination is made by the Company.

## RISK FACTORS

An investment in the BONDS offered hereby is speculative in nature, involves a high degree of risk, and should not be made by an investor who cannot bear the economic risk of its investment for an indefinite period of time and who cannot afford the loss of its entire investment. Each prospective investor should consider carefully the following risk factors associated with the Offering, as well as other information contained elsewhere in the Memorandum before making an investment.

## RISKS RELATED TO OUR BUSINESS

▶ We have little operating history and there can be no assurance that we will be profitable.

'HCCF-4' will commence operations on reaching the minimum offering amount of $500,000. Accordingly, 'HCCF-4' has a limited operating history. Potential investors should evaluate us in light of the expenses, delays, uncertainties, and complications typically encountered by early-stage businesses, many of which will be beyond our control. These risks include (i) lack of sufficient capital, (ii) unanticipated problems, delays, and expenses relating to product development and implementation, (iii) lack of intellectual property, (iv) licensing and marketing difficulties, (v) competition (vi) technological changes (vii) lack of external sources of financing, and (viii) uncertain market acceptance of our products and services (ix) as secured by the Standby Letter of Credit, the guaranteed capital protection is limited to a total of $5,000,000 in claims.

▶ There exists an inherent uncertainty regarding market potential and market

▶ Our operations expose us to numerous and sometimes conflicting legal and regulatory requirements, and violation of these regulations could harm our business. On an "as needed" basis. 'HCCF-4' will retain the services of an attorney that has expertise in the company's specific business areas and operations to ensure that the Company is compliant with all state and federal laws.

▶ The Company may require additional financing in addition to this Offering which may not be available.

Our future success may depend on our ability to raise additional funds. No commitments to provide additional funds have been made by management. Our ability to arrange to finance in the future will depend in part upon the prevailing capital market conditions, as well as our business performance. There can be no assurance that we will be successful in our efforts to arrange additional financing on satisfactory terms.

If additional financing is raised by the issuance of our HCCF-4 12% High Yield Secured Bonds, control of the Company may change and HCCF-4 12% High Yield Secured Bonds holders may suffer additional dilution. If adequate funds are not available or are not available on acceptable terms, we may not be able to take advantage of opportunities, or otherwise, respond to competitive pressures and remain in business.

## RISKS RELATED TO THIS OFFERING

▶ There are restrictions on transfer and no market for the HCCF-4 12% High Yield Secured Bonds: therefore, you may not be able to sell when you want to.

29

Case 6:21-cv-00694-CEM-DCI   Document 4-12   Filed 04/20/21   Page 31 of 39 PageID 430

No public market for the HCCF-4 12% High Yield Secured Bonds currently exists or will result from this Offering. In addition, the HCCF-4 12% High Yield Secured Bonds are being offered pursuant to exemptions from registration under federal and applicable state securities laws and therefore will be subject to substantial restrictions on transfer. Accordingly, HCCF-4 12% High Yield Secured Bonds may be transferred only under appropriate exemptions and only if the transferee provides us with an opinion of counsel that is satisfactory to us to the effect that the proposed transfer complies with appropriate exemptions from the registration requirements of federal and any relevant state securities laws. Consequently, holders of HCCF-4 12% High Yield Secured Bonds may not be able to liquidate their investment in the event of an emergency or for any other reason, and HCCF-4 12% High Yield Secured Bonds may not be readily accepted as collateral for a loan. The purchase of HCCF-4 12% High Yield Secured Bonds, therefore, should be considered only as a long-term investment.

▶ **Secured Interest in Citibank Standby Letter of Credit**

The HCCF-4 High Yield Secured Bond holds a claim guarantee which in the event and only in the event that the Bond is not repaid at the termination of the agreed term, said Bondholder shall have a legal claim up to the principal paid as against the Standby Letter of Credit issued by 1st American and Citibank. All claims shall be presented for legal payment upon demonstration of a breach of the terms under this Agreement. The 1st American / Citibank Standby Letter of Credit is limited to a total claim value of $5,000,000.00 USD.

▶ **Insiders have substantial control over our affairs**

Following the consummation of this Offering, Harbor City Capital Corp will continue to control 'HCCF-4' through its ownership of a majority of the outstanding voting Common Units of 'HCCF-4'. After completion of the offering, Harbor City Capital Corp will directly or indirectly control greater than fifty percent (50%) of our issued and outstanding Voting Units. As a result, Harbor City Capital Corp will be able to elect the Managing Member and or Manager.

**DESCRIPTION OF BONDS**

HCCF-4 12% High Yield Secured Bonds.

'HCCF-4' Operating Agreement authorizes 'HCCF-4' to issue up to Total of 5,000 to be authorized HCCF-4 12% High Yield Secured Bonds. The Manager is authorized to issue Bonds in one or more Series and denominations and to fix the rights, preferences, privileges, and restrictions, including distributions, conversion, voting, redemption, liquidation rights or preferences, sinking fund provisions, and the number of Bonds constituting any Series or the designation of such Series. The issuance of other Bonds may have the effect of delaying, deferring, or preventing a change of control of 'HCCF-4'. In addition, the issuance of Bonds in the future could adversely affect the rights of the holders of HCCF-4 12% High Yield Secured Bonds and, therefore, reduce the value of the Bonds.

Summary of the rights of the HCCF-4 12% High Yield Secured Bonds LIQUIDATION PREFERENCE

In the event of any voluntary or involuntary liquidation, dissolution, winding-up of affairs of 'HCCF-4' or other

30

similar event, before any distribution is made on any other class of capital units of 'HCCF-4' , the holders of HCCF-4 12% High Yield Secured Bonds shall be entitled to be paid, out of the assets of 'HCCF-4' available for distribution to its HCCF-4 12% High Yield Secured Bonds holders, an amount equal to the original per bond issue price ($1,000.00 ) including any accrued and owing interest that is due.

VOTING RIGHTS

HCCF-4 12% High Yield Secured Bonds holders of the 'HCCF-4' have NO voting rights.

APPROVAL RIGHTS AND RIGHT OF FIRST OF REFUSAL

Holders of HCCF-4 12% High Yield Secured Bonds and the Common Units shall not be permitted to transfer such to any party who is not a HCCF-4 12% High Yield Secured Bonds or Common Unitholder of the Company without first obtaining the prior consent of the Company's Manager. In the event such consent is granted by the Manager, existing holders of HCCF-4 12% High Yield Secured Bonds shall be entitled to a right of first refusal with respect to such transfer of HCCF-4 12% High Yield Secured Bonds.

FUND EXPENSES

Fund Expenses (including any expenses of an SPE of the Fund) shall include, but not necessarily be limited to the following: ordinary operating expenses, the Fund's organizational costs, costs to acquire or dispose of Fund Assets, accounting and related costs for the preparation of tax returns or financial statements or audits, legal fees and costs, filing, licensing, or other governmental fees, the Management Fee, Acquisition Fees, Disposition Fees, capital acquisition fees and costs (including payment to duly licensed third parties who are contracted by the Fund to raise capital for the Fund), loan origination fees or other fees or costs associated with any Credit Facility, loan servicing fees (including any such fees payable to the Fund or an Affiliate of the Fund), the portion of any loan origination fees or loan extension fees payable to the Originator (including to the Fund or an Affiliate of the Fund acting as the Originator), any costs associated with the ownership of real property (e.g., property improvement and rehabilitation costs that are not otherwise capitalized, property management fees and expenses, sales and leasing commissions, property taxes, insurance, and utilities), marketing and advertising expenses, and any other expenses associated with the operation of the Fund or the management of its Assets.

The Fund may incur fees to eligible third parties for raising capital on its behalf in the discretion of the Fund. Any such fees shall be borne by the Fund as part of the Fund Expenses.

The Fund shall be reimbursed for all reasonable out of pocket expenses incurred on behalf of the Fund which shall be considered Fund Expenses.

USE OF CREDIT FACILITIES

The Fund or any SPE(s) of the Fund may choose to borrow money from time to time from one or more senior lenders and use debt or leverage for the purposes of acquiring Assets, financing working capital needs, or for any

31

other purpose in the ordinary course of operating the Fund. The Fund may pledge one, some, or all of its Fund Assets for such borrowing. Any Credit Facility will likely have covenants that affect the Company, any SPVs, and the Fund. The Fund or its principal may agree to provide guarantees for a Credit Facility but are not required to do so. The Fund's Bylaws grant the Fund significant discretion in its ability to use Credit Facilities in the operation of the Fund.  Pledging Assets to Lenders may negatively impact the Net Asset and therefore Token value, so the Fund intends to implement a policy that will take account of these potential valuation factors.

Any such borrowing may increase the risk to Investors, as the repayment of any Credit Facilities shall be made prior to the repayment of Notes or return of contributed Capital, but such debt obligations shall be nonrecourse to Investors.

OFFERING PERIOD

Within twelve (12) months of the Offering Date; the Offering must generate a minimum amount to go forward (the "Minimum Offering Amount") is Five Hundred Thousand Dollars. If the Offering does not generate subscriptions for at least $500,000 the Company's Manager will cancel the Offering and return all payments made on subscriptions ("Subscription Payments") to the subscribers.

## TERMS OF THE OFFERING

Subject to the terms and conditions set forth in this Memorandum, there are being offered 5,000 Offered HCCF-4 12% High Yield Secured Bonds at a price of $1,000.00 per bond.

**USE OF PROCEEDS:**

'HCCF-4' plans to use the proceeds of this Offering for the purpose as specified in the Annex 'A' - Business Plan. Management will not have any other discretion as to the use of the proceeds to be received from this Offering. See "Risk Factors."

**FEES /COMPENSATION:**

The Manager will not receive any salary. However, the Manager may be reimbursed any out of pocket expenses connected to this Offering.

**PLAN OF DISTRIBUTION**

In connection with this Offering, 'HCCF-4' does not expect to use the services of any outside placement agents or pay a placement agent fee or other compensation for such services.  Purchasers of the HCCF-4 12% High Yield Secured Bonds will be required to execute and deliver to 'HCCF-4' a Subscription Agreement in the form attached as Annex 'B' and provided as part of the Offering Document. We reserve the right to reject any subscription in whole or in part and to allocate to any potential subscriber a number of HCCF-4 12% High Yield Secured Bonds less than the amount subscribed for by such potential subscriber, for any or no reason and without notice. We expect to conduct a Closing as soon as we deem it appropriate and to conduct
32

additional Closings thereafter. The Offering Price of the HCCF-4 12% High Yield Secured Bonds has been arbitrarily determined by 'HCCF-4' and does not necessarily bear any relationship to 'HCCF-4' asset value, net worth, revenues or other established criteria of value, and should not be considered indicative of the actual value of the HCCF-4 12% High Yield Bond.

## RESTRICTION ON TRANSFER OF BONDS

No market exists for the trading of any of our Bonds. Our Bonds have not been registered under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Further, the HCCF-4 12% High Yield Secured Bonds have not been registered under the Securities Act and will be "restricted securities" under the Securities Act. Accordingly, the HCCF-4 12% High Yield Secured Bonds may not be resold prior to registration under the Securities Act and applicable state securities laws.

## INVESTMENTS BY QUALIFIED PLANS AND INDIVIDUAL RETIREMENT ACCOUNTS

Certain investors in the Company may be subject to the fiduciary responsibility and prohibited transaction requirements of Employee Retirement Income Security Act of 1974, as amended **("ERISA"),** and/or related provisions of the Code. The following is a summary of some of the material fiduciary investment considerations that may apply to such investors under ERISA and the Code. This summary is based on the fiduciary responsibility provisions and prohibited transaction restrictions of ERISA, relevant regulations and opinions issued by the U.S. Department of Labor and court decisions thereunder, and on the pertinent provisions of the Code, relevant regulations published rulings and procedures of the Service and court decisions thereunder.

**This summary does not include all of the fiduciary investment considerations relevant to investors subject to ERISA and/or Section 4975 of the Code and should not be construed as legal advice or a legal opinion. Prospective investors should consult with their own counsel on these matters.**

In considering an investment in the Bonds of any assets of a qualified plan, a fiduciary, taking into account the facts and circumstances of such qualified plan, should consider, among other things:

(1)   whether the investment is in accordance with the documents and instruments governing such qualified plan;

(2)   the definition of plan assets under ERISA ("Plan Assets");

(3)   whether the investment satisfies the diversification requirements of Section 404(a)(l)(C) of ERISA;

(4)   whether the Company, the Manager or any of their affiliates is a fiduciary or a party in interest to the qualified plan;

(5)   whether an investment in the Bonds may cause the qualified plan to recognize unrelated business taxable income, ("**UBTI**"); and

33

The possibility that, in certain circumstances, pursuant to the terms and conditions of the Subscription Agreement, a portion of the assets may have to be liquidated from the Qualified Plan and invested in the Bonds in an individual name.

The prudence of a particular investment must be determined by the responsible fiduciary (usually the trustee, plan administrator or investment manager) with respect to each Qualified Plan, taking into account all of the facts and circumstances of the investment.

Tax-exempt investors in the Company may be subject to the tax on UBTI with respect to certain income of the Company. In general, UBTI does not include interest, rents from real property which are not dependent upon the income or profits of the lessee, or gain from disposition of non-inventory property, In general, the Company's income would constitute UBTI since its income is derived from operating a trade or business rather than from interest, rent from real property, or gains from the disposition of assets. If UBTI is generated, tax form 990-T must be prepared and filed along with the appropriate amount of tax paid as required by IRS tax code. It is the responsibility of the Plan owner to file and report taxes on form 990-T.

In addition to the foregoing, gain from the sale, or other disposition of property other than (i) stock in trade or other property of a kind which would properly be includible in inventory if on hand at the end of the year or (ii) property held primarily for sale to customers in the ordinary course of business **("dealer property")** is exempt from the tax on UBTI. Whether the property is dealer property depends on all of the facts and circumstances with respect to such property.

In addition, tax-exempt entities, in general, are subject to UBTI on otherwise exempt income derived from "debt-financed property," which is property subject to "acquisition indebtedness," including indebtedness incurred after, but reasonably foreseeable at the time of, the acquisition or improvement of property. Tax-exempt entities must consult their own tax counsel regarding the tax consequences that could arise in connection with the acquisition of an interest in the Company.

The risks of recognition of UBTI are particularly acute in respect of an investment by a charitable remainder trust ("CRT"). A CRT is a trust created to provide income for the benefit of at least one non-charitable beneficiary for life or a term of up to 20 years, with the property comprising the trust corpus then transferred to a charitable beneficiary upon the expiration of the trust. Upon the creation of a CRT, the grantor would normally be entitled to a charitable income tax deduction equal to the current fair market value of the remainder interest which will ultimately pass to charity. A CRT is also exempt from federal income taxation if the trust is established and maintained in compliance with highly complex rules contained in the Internal Revenue Code and underlying Treasury Regulations. Among these rules is a provision that a 100% excise tax is imposed on any portion of income derived by a CRT that is deemed to be UBTI.

ERISA provides that Bonds may not be purchased by a qualified plan if the Company, the Manager or any of their affiliates, is a fiduciary or party in interest (as defined in Sections 3(21) and 3(14) of ERISA) to the plan unless such purchase is exempt from the prohibited transaction provisions of Section 406 of ERISA. Under ERISA, it is the responsibility of the fiduciary responsible for purchasing the Bonds not to engage in such transactions. Section 4975 of the Code has similar restrictions applicable to transactions between disqualified persons and qualified plans or IRAs, which could result in the imposition of excise taxes on the Company,

34

unless and until such a prohibited transaction is corrected.

In the case of an IRA, if the Company, the Manager or any of their affiliates, is a disqualified person with respect to the IRA, the purchase of the Bonds by the IRA could instead cause the entire value of the IRA to be taxable to the IRA sponsor. Penalties arising out of prohibited transactions can also rise to a 100% tax on the amount involved.

Section 406 of ERISA and Code Section 4975 also prohibit qualified plans from engaging in certain transactions with specified parties involving Plan Assets. Code Section 4975 also prevents IRAs from engaging in such transactions. One of the transactions prohibited is the furnishing of services between a plan and a "party in interest" or a "disqualified person." Included in the definition of "party in interest" under Section 3(14) of ERISA and the definition of "disqualified person" in Code Section 4975(e)(2) are "persons providing services to the plan." If the Company, the Manager, the Sponsor Managers or certain entities and individuals related to them have previously provided services to a benefit plan investor, then the Company, or the Manager could be characterized as a "party in interest" under ERISA and/or a "disqualified person" under the Code with respect to such benefit plan investor. If such a relationship exists, it could be argued that the Company or affiliate of the Company or the Manager is being compensated directly out of Plan Assets for the provision of services (i.e. establishment of the Offering and making it available as an investment to the qualified plan). If this were the case, absent a specific exemption applicable to the transaction, a prohibited transaction could be determined to have occurred between the qualified plan and the affiliate of the Company or the Manager.

Another type of transaction prohibited by ERISA and the Code is one in which fiduciaries of a qualified plan or the person who establishes an individual retirement account engage in self-dealing or in co-investment with the plan or account. Accordingly, affiliates of the Company and the Manager are not permitted to purchase the Bonds with assets of any benefit plan investor if they: (a) have investment discretion with respect to such assets or (b) regularly give individualized investment advice which serves as the primary basis for the investment decisions made with respect to such assets. In addition, no fiduciary of a qualified plan or owner of an individual retirement account should purchase the Bonds both individually and with assets of the benefit plan investor.

With respect to an investing IRA, the tax-exempt status of the account could be lost if the investment constitutes a prohibited transaction under Code Section 408(e)(2) by reason of the affiliate of the Company or the Manager engaging in the prohibited transaction with the IRA or the individual who established the IRA or his beneficiary. If the IRA were to lose its tax-exempt status, the entire value of the IRA would be considered to be distributed and taxable to the IRA sponsor.

**Definition of Plan Assets**

ERISA and the Code impose various duties and restrictions with respect to the investment, management, and disposition of plan assets. ERISA and the Code do not, however, define the term "plan assets," particularly in the context of pooled investment funds and other vehicles in which a plan may invest. The U.S. Department of Labor has, however, published the Plan Asset Regulation which generally provides that when a plan, including an individual retirement account ("IRA"), acquires an equity interest in an entity that is neither a "publicly-offered security" nor a security issued by an investment partnership registered under the Investment Company Act of 1940, as amended, the plan's assets will include both the equity interest in the entity and an undivided interest in each of the underlying assets of the entity (the **"Look-Through Rule"**) unless it is established that, as relevant to the Company, ownership of each class of equity interests in the entity by benefit

35

plan investors" has a value in the aggregate of less than 25% of the total value of such class of equity interests that are outstanding (not counting interests held by the general partner of the entity and its affiliates). A benefit plan investor is defined to include not only plans that are subject to ERISA but also other employee benefit and retirement arrangements (e.g. government plans, foreign employee benefit plans and IRAs), as well as entities that hold plan assets (e.g. group trusts and certain funds of funds). In certain circumstances, an investment by an insurance company of the assets of its general account or of a separate account may be treated as investment by a benefit plan investor, to the extent the assets held in such accounts are attributable to employee benefit plans. For purposes of the 25% limit, ownership by benefit plan investors is required to be tested immediately after each acquisition of an equity interest in the entity.

If the assets of the Company are deemed to be "plan assets" of a plan that is a Member, Subtitle A and Parts 1 and 4 of Subtitle B of Title I of ERISA and Section 4975 of the Code will extend to investments made by the Company. This would result, among other things, in (i) the application of the prudence and other fiduciary standards of ERISA (which impose liability on fiduciaries) to investments made by the Company, which could materially affect the operations of the Company; (ii) potential liability for persons having investment discretion over the assets of an ERISA-covered plan investing in the Company should investments made by the Company not conform to ERISA' s prudence and fiduciary standards under Part 4 of Subtitle B of Title I of ERISA, unless certain conditions are satisfied; and (iii) the possibility that certain transactions that the Company might enter into in the ordinary course of its business might constitute "prohibited transactions" under ERISA and the Code. A prohibited transaction, in addition to imposing potential personal liability upon fiduciaries of employee benefit plans, may also result in the imposition of an excise tax under the Code upon disqualified persons with respect to the employee benefit plans.

The Company intends to limit investment by benefit plan investors to less than 25% of any class of Bond so that it will qualify for an exemption from the Plan Asset Regulation's Look-Through Rule. As discussed above, by limiting the investment in the Company by benefit plan investors to less than 25%, the underlying assets of the Company will not be treated as plan assets and the Look-Through Rule will not apply to the Company by virtue of such investment. The Company may, in its sole and absolute discretion, reject subscriptions for Bonds made by benefit plan investors and/or prevent transfers of Bonds, each to the extent that the investment or transfer would result in the Company exceeding this 25% limit. In addition, because the 25% limit is to be calculated upon every subscription to or transfer, withdrawal or redemption from the Company, the Company has the authority to require the redemption of all or some of the Bonds held by any benefit plan investor if the continued holding of such Bonds, in the opinion of the Manager, in its sole and absolute discretion, would result in the Company being subject to ERISA. Such redemption could result in a lower than expected return on any such redeemed benefit plan investor's investment in the Company.

_Qualified plans and other tax-exempt entities should consult their own tax advisors with regard to the tax issues unique to such entities, including, but not limited to, issues relating to classification of the underlying properties of the Company as plan assets, unrelated business taxable income and required distributions. We can offer no assurance that the IRS will not take positions adverse to the Company on these or any other issue._

**Considerations for Foreign Investors**

The Company is required to withhold tax with respect to a Member's allocable portion of the Company's "effectively connected taxable income" within the United States if the Member is a foreign person or entity. In general, the amount of tax to be withheld is the applicable percentage equal to the highest appropriate tax

36

rate. The Company can be exempt from such withholding if the foreign Member certifies under penalty of perjury that it is not a foreign person as defined in the Code or Regulations.

Additional issues may arise pertaining to information reporting and backup withholding for foreign Members. Foreign Members should consult their tax advisers with regard to U.S. information reporting and backup withholding.

**State and Local Taxes**

The Company may be subject to State and local income, franchise, property, or other taxes in states and localities in which we do business or own property. Our tax treatment (and the tax treatment of our Members) in state and local jurisdictions may differ from the federal income tax treatment described above. The discussion in this Offering does not attempt to describe state and local tax effects applicable to the Company or the Members. Potential investors should consult their own tax advisors regarding these matters. Additionally, certain states impose an entity-level tax on limited liability companies. In such case, payment of this tax would reduce cash available for distribution.

**Need for Independent Advice**

The tax matters relating to the Company and its proposed transactions are complex and subject to various interpretations. The foregoing is not intended as a substitute for careful tax planning, particularly since the tax consequences of an investment in the Company may not be the same for all investors. Accordingly, the Company urges potential investors to consult their tax advisors prior to investing in the Company.

## REPORTS
## ADDITIONAL INFORMATION

The Company will answer inquiries from potential investors in the Bonds concerning the Bonds, the Company, the Manager, the Sponsor, and other matters relating to the offer and sale of the Bonds under this Memorandum. The Company will afford the potential investors in the Bonds the opportunity to obtain any additional information to the extent the Company possesses such information or can acquire such information without unreasonable effort or expense that is necessary to verify the information in this Memorandum.

All potential investors in the Bonds are entitled to review copies of any other material or non-material agreements relating to the Bonds described in this Memorandum, if any. In the Subscription Agreement, you will represent that you are completely satisfied with the results of your pre-investment due diligence activities. Additional information is available at 100 Rialto Place, Suite 700, Melbourne FL 32901.

The HCCF-4 12% High Yield Secured Bonds will contain a legend in substantially the following form:

THE BONDS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR THE SECURITIES OR "BLUE SKY" LAWS OF ANY STATE OF THE UNITED STATES. THE BONDS MAY NOT BE SOLD, TRANSFERRED OR ASSIGNED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR THE BONDS UNDER APPLICABLE SECURITIES LAWS, OR UNLESS OFFERED, SOLD OR TRANSFERRED PURSUANT TO AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THOSE LAWS. IN ADDITION, TRANSFERS, VOTING AND OTHER MATTERS IN RESPECT OF THE

BONDS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO AN OPERATING AGREEMENT DATED AS OF AUGUST 24, 2018 AMONG THE COMPANY AND CERTAIN COMMON UNITHOLDERS NAMED THEREIN, A COPY OF WHICH AGREEMENT IS ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY AND MAY BE OBTAINED WITHOUT CHARGE UPON WRITTEN REQUEST TO THE COMPANY.

**SUBSCRIPTION PROCEDURES & WIRE INSTRUCTIONS IF APPLICABLE**

In order to subscribe for the HCCF-4 12% High Yield Secured Bonds, prospective investors must complete, execute and/or deliver the following, as applicable, to 'HCCF-4'.

(a) A fully completed Subscription Agreement (including completion of the Accredited Investor Certification attached thereto) and Signature Page evidencing such prospective investor's execution of the Subscription Agreement and the number of HCCF-4 12% High Yield Secured Bonds for which such subscription is being made;

(b) A personal or business check or money order made payable to 'HCCF-4' contemporaneously with the execution and delivery of the Subscription Agreement. Payments may also be made by wire transfer to the account listed below or by such other means as the Company may direct, in its sole and absolute discretion.

(c) If a qualified accredited investor, proof of compliance that the prospective investor qualifies as an "accredited investor" as defined under Regulation 'D'.

**AVAILABLE INFORMATION**

Any documents or information concerning HCCF-4 which a prospective purchaser reasonably requests to inspect or have disclosed to him or her will be made available or disclosed, subject in appropriate circumstances to receipt by us of reasonable assurances that such documents or information will be maintained in confidence.

If you require additional information or have any questions please contact:
J.P. Maroney
HCCF-4
100 Rialto Place, Suite 700, Melbourne FL 32901,
Tel: 321-608-0605 Ext 704
Email: invest@harborcity.com

*Annex Documents that are included and made a part of this Offering Document*

| | |
|---|---|
| Business Plan | ANNEX A |
| Subscription Agreement | ANNEX B |
| Investor Questionnaire | ANNEX C |