**EXHIBIT 14**

**EXHIBIT**

**14**

# 18% HIGH YIELD BONDS
# SUBSCRIPTION AGREEMENT



# HCCF-1 LLC

**A Limited Liability Company under the laws of the State of Nevada**

## SUBSCRIPTION AGREEMENT

SUBSCRIPTION AGREEMENT between HCCF-1 LLC, a Nevada Limited Liability Company ('HCCF-1'), and the subscriber listed on the signature page hereof (the "Subscriber") made as of the date set forth by the subscriber opposite the subscriber's signature on the signature page hereof.

**WITNESSETH:**

WHEREAS, HCCF-1 is conducting a private placement (the "Private Placement") pursuant to which it is offering up to an aggregate of 1,000 HCCF-1 18% High Yield Bonds of HCCF-1; and

WHEREAS, the Subscriber desires to purchase from HCCF-1 in the Private Placement the number of HCCF-1 18% High Yield Bonds set forth on the signature page hereof, subject to the provisions described herein on the terms and conditions hereinafter set forth; and

WHEREAS, This Subscription Agreement is one of a limited number of such subscriptions for HCCF-1 18% High Yield Bonds offered by HCCF-1 to a limited number of suitable investors pursuant to Rule 506c of Regulation D and Section 4(2) and/or Section 4(6) of the Securities Act of 1933, as amended (the "Securities Act"). Execution of this Subscription Agreement by the Subscriber shall constitute an offer by the Subscriber to purchase on the terms and conditions specified herein and in HCCF-1 Confidential Private Placement Memorandum dated August 24, 2018(the "PPM"). HCCF-1 reserves the right to reject such subscription offer or, by executing a copy of this Subscription Agreement, to accept such an offer. If the Subscriber's offer is accepted, HCCF-1 will execute this Subscription Agreement and issue the HCCF-1 18% High Yield Bonds in accordance with the terms provided in the PPM. If the Subscriber's offer is rejected, the payment accompanying this Subscription Agreement will be returned to the Subscriber, with no interest thereon, with the notice of rejection.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto agree as follows:

1. **Issuance, Sale, and Delivery of the HCCF-1 18% High Yield Bonds**

   (a) Subject to the terms and conditions set forth herein and execution of this Agreement attached to the PPM to which this Agreement is attached, on the Closing Date (as defined below) HCCF-1 shall issue, sell and deliver to Subscriber, and Subscriber shall purchase from HCCF-1, the HCCF-1 18% High Yield Bonds for a purchase price of $1,000 per bond (the aggregate purchase price to be paid by the Subscriber for the HCCF-1 18% High Yield Bonds is referred to herein as the "Purchase Price").

   (b) The Subscriber will pay (i) the Purchase Price by wire transfer, check, money order or as otherwise directed by HCCF-1, of immediately payable funds. Subscriber shall be registered in the books of HCCF-1 as the owner of the HCCF-1 18% High Yield Bonds being purchased by Subscriber hereunder, which such HCCF-1 18% High Yield Bonds may be evidenced by more than one certificate in the name of the Subscriber.

   (c) Terms for payment: Upon the execution and submission of the Subscription Agreement the subscriber will include full payment for Subscribed number of bonds.

2. **Closing Date.**

In the event HCCF-1 accepts this subscription by execution of this Agreement, the closing of the sale and purchase of the HCCF-1 18% High Yield Bonds shall take place at the offices of HCCF-1 at such place, date and time as may be determined by HCCF-1 (such date and time of the closing being herein called the "Closing Date"). HCCF-1, IN ITS SOLE DISCRETION, MAY REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART. The Subscriber acknowledges that this subscription shall be deemed to be accepted by HCCF-1 only when this Agreement is countersigned by an authorized officer of HCCF-1. The Subscriber further acknowledges and agrees that subscriptions need not be accepted in the order they are received, that HCCF-1 shall not be obligated to sell all or any of the Number of HCCF-1 18% High Yield Bonds proposed to be sold in the Private Placement, that HCCF-1 shall not be required to sell any minimum number of HCCF-1 18% High Yield Bonds at any closing and that HCCF-1 may hold one or more closings for such number of HCCF-1 18% High Yield Bonds as it shall determine in its sole discretion.

3. **Representations and Warranties of HCCF-1.**

**HCCF-1 represents and warrants to Subscriber as follows:**

(a) Organization HCCF-1 is a Limited Liability Company duly formed, validly existing and in good standing under the laws of the State of Nevada. HCCF-1 has, or on or prior the Closing Date will have, the authority to own and hold its properties, to carry on its business as currently conducted, to execute, deliver and perform this Agreement and to issue and deliver the HCCF-1 18% High Yield Bonds

(b) Authorization of Agreements, Etc. This Agreement has, or on or prior to the Closing Date will have, been duly executed and delivered by HCCF-1 and constitutes the valid and binding obligation of HCCF-1 enforceable against it in accordance with its terms, except as may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization or similar laws affecting creditors' rights generally or by general equitable principles, and except insofar as the enforceability of any provision hereof would be restricted or void by reason of public policy.

(c) No Conflicts. HCCF-1 execution and delivery of this Agreement and HCCF-1 consummation of the transactions contemplated hereby will not (i) violate, conflict with or result in an event of default under any material agreement or contract to which HCCF-1 is a party or by which it is bound, (ii) violate any applicable law, ordinance, rule or regulation of any governmental body having jurisdiction over HCCF-1 or its business or any order, judgment or decree applicable to HCCF-1, or (iii) violate any provision of its Operating Agreement, each as may be in effect as of the Closing Date.

4. **Representations and Warranties of the Subscriber.**

**Subscriber represents and warrants to HCCF-1 with respect to itself as follows:**

(a) Organization, Power and Authority. The subscriber, if not a natural person, is duly authorized or organized, validly existing and in good standing in its jurisdiction of a corporation or organization. Subscriber has full power and authority to enter into, deliver and perform this Agreement and has taken all action required to authorize the execution and delivery hereof and to consummate the transactions contemplated hereby, including the purchase of the HCCF-1 18% High Yield Bonds , and, if Subscriber is not a natural person, the person signing this Agreement on behalf of Subscriber has been duly

authorized to act on behalf of and to bind such party.

(b) Authorization of Agreements, Etc. The Transaction Documents have been duly executed and delivered by the Subscriber and constitute the valid and binding obligation of the Subscriber, enforceable against the Subscriber in accordance with its terms, except as may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization or similar laws affecting creditors' rights generally or by general equitable principles, and except insofar as the enforceability of any provision hereof would be restricted or void by reason of public policy.

(c) No Conflicts. The execution and delivery of the Transaction Documents and the consummation of the transactions contemplated hereby will not (i) violate, conflict with or result in an event of default under any material agreement or contract to which the Subscriber is a party or by the Subscriber is bound, (ii) violate any applicable law, ordinance, rule or regulation of any governmental body having jurisdiction over such party or its business or any order, judgment or decree applicable to the Subscriber, (iii) require the Subscriber to obtain the consent of any governmental agency or entity or any other third party, other than such consents as have already been obtained, or (iv) if not a natural person, violate any provision of the Subscriber's certificate of incorporation, certificate of limited partnership, certificate of formation or other formation or organizational instrument or document, as applicable, and by-laws, partnership agreement or operating agreement, as applicable.

(d) Investment Representations. Subscriber represents and warrants to HCCF-1 that (i) it has completed the "Accredited Investor Certification" attached to this Agreement and provided independent certification that Subscriber meets the "Accredited" investor qualification. (ii) it is an "accredited investor" as such term is defined in Rule 501 of Regulation D ("Regulation D") promulgated under the Securities Act of 1933, as amended (the "Securities Act") and (iii) it is acquiring the HCCF-1 18% High Yield Bonds for its own account for the purpose of investment and not with a view to or for sale in connection with any distribution thereof. Subscriber further represents that Subscriber has knowledge and experience in business and financial matters and prior investment experience, including investment in securities that are non-listed, unregistered and/or not traded on a national securities exchange or on The NASDAQ Stock Market and that Subscriber understands that (i) the HCCF-1 18% High Yield Bonds have not been registered under the Securities Act, by reason of their issuance in a transaction exempt from the registration requirements of the Securities Act pursuant to Section 4(2) thereof or pursuant to Regulation D promulgated thereunder, (ii) the HCCF-1 18% High Yield Bonds must be held indefinitely unless a subsequent disposition thereof is registered under the Securities Act or is exempt from such registration, (iii) the HCCF-1 18% High Yield Bonds will bear a legend to such effect, and (iv) HCCF-1 will make a notation on its transfer books to such effect. The subscriber has delivered the completed "Accredited Investor Certification" to HCCF-1 along with any subscription made hereunder.

(e) No Public Market. Subscriber understands that there is no public market for either the HCCF-1 18% High Yield Bonds shares and that no market may develop. The Subscriber understands that even if a public market develops for the Class B Common Stock, Rule 144 promulgated under the Securities Act requires for non-affiliates, among other conditions, a one- year holding period prior to the resale (in limited amounts) of securities acquired in a non-public offering without having to satisfy the registration requirements under the Securities Act. The Subscriber understands and acknowledges that HCCF-1 is under no obligation to register the HCCF-1 18% High Yield Bonds under the Securities Act or any state securities or "blue sky" laws. The Subscriber acknowledges that at such time, if ever, as the HCCF-1 18% High Yield Bonds are registered, sales of such securities will be subject to state securities laws, and that

any sales must comply in all respects with all applicable state securities laws, including those of the state in which the Subscriber resides, which may require any securities sold in such state to be sold through a registered broker-dealer or in reliance upon an exemption from registration.

(f) Access to Information. The Subscriber represents that the Subscriber has been furnished by HCCF-1 during the course of this transaction with the PPM and all information regarding HCCF-1 which the Subscriber has requested or desired to know, has been afforded the opportunity to ask questions of and receive answers from duly authorized officers of HCCF-1 concerning the terms and conditions of the Private Placement and has received any additional information which the Subscriber has requested. The Subscriber has relied solely upon the information provided by HCCF-1 in this Agreement in making the decision to invest in the Class B Common Stock. The Subscriber disclaims reliance on any other statements made or information provided by any person or entity in the course of the Subscriber's consideration of the purchase of the HCCF-1 18% High Yield Bonds

(g) Risk. SUBSCRIBER UNDERSTANDS THAT THIS INVESTMENT IN THIS COMPANY IS ILLIQUID AND INVOLVES A HIGH DEGREE OF SPECULATIVE RISK. The Subscriber recognizes that the purchase of the HCCF-1 18% High Yield Bonds involves a high degree of risk in that, among other things, (i) HCCF-1 is a early stage business with a limited operating history and may require funding in addition to the proceeds of the Private Placement, which may be done through additional equity issuances which may cause additional dilution, (ii) an investment in HCCF-1 is highly speculative, and only an investor who can afford the loss of the Subscriber's entire investment should consider investing in HCCF-1 and the HCCF-1 18% High Yield Bonds, (iii) the Subscriber may not be able to liquidate the Subscriber's investment, and (iv) in the event of a disposition, the Subscriber could sustain the loss of the entire investment.

(h) No Commissions or FINRA Affiliation. The subscriber has not paid or received any commission or other remuneration in connection with the Private Placement. The Subscriber is not associated with a Unitholder firm of the National Association of Securities Dealers, Corporation.

(i) No Brokers or General Solicitation. Neither the Subscriber nor any of its officers, directors, employees, agents, stockholders or partners, if any, has either directly or indirectly, including through a broker or finder engaged in any general solicitation, or (ii) published any advertisement in connection with the offer and sale of the HCCF-1 18% High Yield Bonds The Subscriber represents that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction and agrees to indemnify and to hold harmless HCCF-1 from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which the Subscriber or any of its officers, directors, employees, agents, stockholders or partners, if any, is responsible.

(j) Address. The Subscriber represents that the address of the Subscriber furnished on the signature page hereof is (i) the Subscriber's principal business address if the Subscriber is not a natural person or (ii) the Subscriber's principal residence if the Subscriber is a natural person.

(k) Foreign Subscribers. If the Subscriber is not a United States person (as defined by Section 7701(a) (30) of the Internal Revenue Code of 1986, as amended), the Subscriber hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the HCCF-1 18% High Yield Bonds or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the HCCF-1 18% High Yield Bonds, (ii) any foreign

exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the HCCF-1 18% High Yield Bonds. The Subscriber's subscription and payment for and continued beneficial ownership of the HCCF-1 18% High Yield Bonds will not violate any applicable securities or other laws of the Subscriber's jurisdiction.

(l) Operating Agreement. The Subscriber acknowledges and agrees that (i) the HCCF-1 18% High Yield Bonds are subject to substantial restrictions on transfer and voting pursuant to the Operating Agreement, (ii) the HCCF-1 18% High Yield Bonds will bear a legend to such effect, and (iii) HCCF-1 will make a notation on its transfer books to such effect.

(m) SAFEKEEPING OF PROCEEDS. All funds will be deposited and held in company nonoperating bank account until the company meets the minimum offering amount or refund to an investor in the event the company fails to raise the minimum amount required to complete the offering within 12 months of the offering date.

**5. Miscellaneous.**

(a) Expenses, Etc. Each party hereto will pay its own expenses in connection with the transactions contemplated by this Agreement, whether or not such transactions shall be consummated

(b) Survival of Agreements. All covenants, agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement and the issuance, sale and delivery of the HCCF-1 18% High Yield Bonds pursuant hereto.

(c) Parties in Interest. All covenants and agreements contained in this Agreement by or on behalf of any of the parties hereto shall bind and inure to the benefit of the respective successors and permitted assigns of the parties hereto whether so expressed or not, except for transferees in a Public Sale. For the purposes of this Agreement, "Public Sale" means any sale of HCCF-1 18% High Yield Bonds to the public pursuant to an offering registered under the Securities Act or to the public pursuant to the provisions of Rule 144 (or any successor or similar rule) adopted under the Securities Act.

(d) Notices. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given, delivered and received upon the earlier of actual receipt or: (a) personal delivery to the party to be notified, (b) when sent, if sent by facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next day or next business day delivery, with written verification of receipt. All communications shall be sent to, if to the Subscriber, such Subscriber's address as set forth on the signature page hereto, or, if to HCCF-1, to the principal office of HCCF-1 and to the attention of the Manager, or to such facsimile number or address as subsequently modified by written notice given in accordance with this Section 5(d), with an email copy to the Manager at invest@harborcity.com

(e) Entire Agreement; Modifications. This Agreement, together with the Private Placement

Memorandum dated August 24, 2018, constitutes the entire agreement of the parties with respect to the subject matter hereof and may not be amended or modified nor any provisions waived except in a writing signed by HCCF-1 and Subscriber.

(f) Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(g) Governing Law. This agreement, the performance of this Agreement and any and all matters arising directly or indirectly herefrom or therefrom, including the legal relations among the parties, shall be governed by and construed and enforced in accordance with, the laws of the State of Nevada, without regard to its conflict of laws rules. The parties hereto hereby irrevocably and unconditionally (i) agree that any action or proceeding arising out of or in connection with this Agreement shall be brought only in the State of Nevada, and not in any other state or federal court in the United States of America or in any other country, (ii) consent to submit to the exclusive jurisdiction of the State courts for purposes of any action or proceeding arising out of or in connection with this Agreement, (iii) waive any objection to the laying of venue of any such action or proceeding in a State court, and (iv) waive, and agree not to plead or to make, any claim that any such action or proceeding brought in the State court has been brought in an improper or inconvenient forum.

## FEDERAL INCOME TAX MATTERS

**Treasury Department Circular 230 Notice**

To ensure compliance with Circular 230, prospective investors and the Unitholders are hereby notified that (a) any discussion of Federal tax issues contained or referred to in this Memorandum or in any supplements or annexes is not intended or written to be used, and cannot be used, by prospective investors and Unitholders for the purpose of avoiding penalties that may be imposed on them under the Internal Revenue Code; (b) such discussion is written in connection with the promotion or marketing by the Company of the transactions or matters addressed in this Memorandum or in any supplements or annexes and (c) prospective investors and Unitholders should seek tax advice based on their particular circumstances from an independent tax advisor.

**Each prospective investor is therefore urged to consult his or her tax advisor with respect to the tax consequences arising from an investment in the Company. No ruling from the Service regarding the tax aspects of the Company has been or will be requested.**

**General**

The following is a general discussion of certain federal income tax consequences of the purchase, ownership and disposition of the Shares based upon the relevant provisions of the Internal Revenue Code of 1986, as amended (the "Code"), the regulations thereunder, existing judicial decisions and published rulings. Future legislative, judicial or administrative changes or interpretations, which may or may not be retroactive, could affect the federal income tax consequences to the Unitholders or the Company. The discussion below does not purport to deal with the federal income tax consequences

applicable to all categories of investors, some of which may be subject to special rules. The discussion focuses primarily upon investors who will hold the Shares as "capital assets" within the meaning of the Code. You are advised to consult your own tax advisers with regard to the federal income tax consequences of acquiring, holding and disposing of the Shares, as well as state, local and other tax consequences resulting from an investment in the Shares.

## INVESTMENTS BY QUALIFIED PLANS AND INDIVIDUAL RETIREMENT ACCOUNTS

Certain investors in the Company may be subject to the fiduciary responsibility and prohibited transaction requirements of Employee Retirement Income Security Act of 1974, as amended **("ERISA"),** and/or related provisions of the Code. The following is a summary of some of the material fiduciary investment considerations that may apply to such investors under ERISA and the Code. This summary is based on the fiduciary responsibility provisions and prohibited transaction restrictions of ERISA, relevant regulations and opinions issued by the U.S. Department of Labor and court decisions thereunder, and on the pertinent provisions of the Code, relevant regulations published rulings and procedures of the Service and court decisions thereunder.

### Considerations for Foreign Investors

The Company is required to withhold tax with respect to a Unitholder's allocable portion of the Company's "effectively connected taxable income" within the United States if the Unitholder is a foreign person or entity. In general, the amount of tax to be withheld is the applicable percentage equal to the highest appropriate tax rate. The Company can be exempt from such withholding if the foreign Unitholder certifies under penalty of perjury that it is not a foreign person as defined in the Code or Regulations.

Additional issues may arise pertaining to information reporting and backup withholding for foreign Unitholders. Foreign Unitholders should consult their tax advisers with regard to U.S. information reporting and backup withholding.

### State and Local Taxes

The Company may be subject to State and local income, franchise, property, or other taxes in states and localities in which we do business or own property. Our tax treatment (and the tax treatment of our Unitholders) in state and local jurisdictions may differ from the federal income tax treatment described above. The discussion in this Offering does not attempt to describe state and local tax effects applicable to the Company or the Unitholders. Potential investors should consult their own tax advisors regarding these matters.

### Administrative Matters

The Company intends to furnish to each Unitholder within ninety (90) days after the close of our taxable year, certain tax information, including a Schedule K-1, which sets forth each Unitholder's allocable share of our income, gain, loss, deductions and credits. The federal income tax information

returns the Company files may be audited by the Service. Adjustments resulting from any such audit may require each Unitholder to file an amended tax return and possibly may result in an audit of the Unitholder's own return. Any audit of a Unitholder's return could result in adjustments of non-Company as well as Company items.

**Possible Changes in Tax Laws**

The statutes, regulations and rules with respect to all of the foregoing tax matters are constantly subject to change by Congress and/or by the Department of the Treasury, and the interpretations of such statutes, regulations and rules may be modified or affected by a judicial decision or by the Department of the Treasury. Because significant amendments have been made to the Code in recent years, and because of the continual changes made by Congress, the Department of the Treasury and the courts with respect to the administration and interpretation of the tax laws, no assurance can be given that the foregoing opinions and interpretations will be sustained or that tax aspects summarized herein will prevail and be available to the Unitholders.

**Need for Independent Advice**

The tax matters relating to the Company and its proposed transactions are complex and subject to various interpretations. The foregoing is not intended as a substitute for careful tax planning, particularly since the tax consequences of an investment in the Company may not be the same for all investors. Accordingly, the Company urges potential investors to consult their tax advisors prior to investing in the Company.

## REPORTS

The Company will furnish the following reports, statements and tax information to each Unitholder:

*Tax Information:* Except as may otherwise be required by applicable law, within ninety (90) days after the last day of each calendar year, the Company intends send to each Bondholder such tax information as shall be necessary for the preparation of federal income tax returns, state income tax returns, and any other tax returns required by any other applicable jurisdiction, if any.

Restrictions Imposed by the USA PATRIOT Act and Related Acts

- In accordance with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended (the "USA PATRIOT Act"), our Shares may not be offered, sold, transferred or delivered, directly or indirectly, to any "Unacceptable Investor," which means anyone who is:

- a "designated national," "specially designated national," "specially designated terrorist," "specially designated global terrorist," "foreign terrorist organization" or "blocked person" within the definitions set forth in the Foreign Assets Control Regulations of the U.S. Treasury Department;

- acting on behalf of, or an entity owned or controlled by, any government against whom the U.S. maintains economic sanctions or embargoes under the regulations of the U.S. Treasury Department;

- within the scope of Executive Order 13224 — Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten to Commit, or Support Terrorism, effective September 24, 2001;

- subject to additional restrictions imposed by the following statutes or regulations and executive orders issued thereunder: the Trading with the Enemy Act, the Iraq Sanctions Act, the National Emergencies Act, the Antiterrorism and Effective Death Penalty Act of 1996, the International Emergency Economic Powers Act, the United Nations Participation Act, the International Security and Development Cooperation Act, the Nuclear Proliferation Prevention Act of 1994, the Foreign Narcotics Kingpin Designation Act, the Iran and Libya Sanctions Act of 1996, the Cuban Democracy Act, the Cuban Liberty and Democratic Solidarity Act and the Foreign Operations, Export Financing and Related Programs Appropriation Act or any other law of similar import as to any non-U.S. country, as each such act or law has been or may be amended, adjusted, modified, or interpreted from time to time; or designated or blocked, associated or involved in terrorism, or subject to restrictions under laws, regulations, or executive orders as may apply in the future similar to those set forth above.

THE HCCF-1 18% HIGH YIELD BONDS BEING SOLD HEREUNDER HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE OFFERING OR THE ACCURACY OR ADEQUACY OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THE HCCF-1 18% HIGH YIELD BONDS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS. THE HCCF-1 18% HIGH YIELD BONDS ARE SUBJECT TO RESTRICTION ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER SAID ACT AND SUCH LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. SUBSCRIBER SHOULD BE AWARE THAT IT WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. SUBSCRIBER SHOULD CONSULT ITS OWN LEGAL COUNSEL, ACCOUNTANT AND BUSINESS AND FINANCIAL ADVISERS AS TO ALL LEGAL, TAX AND RELATED MATTERS CONCERNING ANY INVESTMENT IN HCCF-1.

**SIGNATURE PAGE FOLLOWS**

IN WITNESS WHEREOF, HCCF-1 LLC and the Subscriber have executed this Agreement.

For HCCF-1 LLC

By:_____ Dated:_____

Name: J.P. Maroney as Manager of HCCF-1 LLC


SUBSCRIBER:

By:_____ Dated:_____

Name:

Title:

Address:

Email:

Fax:

Social Security # or EIN #:

Number Of HCCF-1 18% High Yield Bonds:

Purchase Price Per Bond: $1,000

Total Purchase Price:

# 18% HIGH YIELD BONDS
# SUBSCRIPTION AGREEMENT



# HCCF-2 LLC

A Limited Liability Company under the laws of the State of Nevada

# SUBSCRIPTION AGREEMENT

SUBSCRIPTION AGREEMENT between HCCF-2 LLC, a Nevada Limited Liability Company ('HCCF-2'), and the subscriber listed on the signature page hereof (the "Subscriber") made as of the date set forth by the subscriber opposite the subscriber's signature on the signature page hereof.

**WITNESSETH:**

WHEREAS, HCCF-2 is conducting a private placement (the "Private Placement") pursuant to which it is offering up to an aggregate of 1,000 HCCF-2 18% High Yield Bonds of HCCF-2; and

WHEREAS, the Subscriber desires to purchase from HCCF-2 in the Private Placement the number of HCCF-2 18% High Yield Bonds set forth on the signature page hereof, subject to the provisions described herein on the terms and conditions hereinafter set forth; and

WHEREAS, This Subscription Agreement is one of a limited number of such subscriptions for HCCF-2 18% High Yield Bonds offered by HCCF-2 to a limited number of suitable investors pursuant to Rule 506c of Regulation D and Section 4(2) and/or Section 4(6) of the Securities Act of 1933, as amended (the "Securities Act"). Execution of this Subscription Agreement by the Subscriber shall constitute an offer by the Subscriber to purchase on the terms and conditions specified herein and in HCCF-2 Confidential Private Placement Memorandum dated August 24, 2018(the "PPM"). HCCF-2 reserves the right to reject such subscription offer or, by executing a copy of this Subscription Agreement, to accept such an offer. If the Subscriber's offer is accepted, HCCF-2 will execute this Subscription Agreement and issue the HCCF-2 18% High Yield Bonds in accordance with the terms provided in the PPM. If the Subscriber's offer is rejected, the payment accompanying this Subscription Agreement will be returned to the Subscriber, with no interest thereon, with the notice of rejection.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto agree as follows:

1. **Issuance, Sale, and Delivery of the HCCF-2 18% High Yield Bonds**

   (a) Subject to the terms and conditions set forth herein and execution of this Agreement attached to the PPM to which this Agreement is attached, on the Closing Date (as defined below) HCCF-2 shall issue, sell and deliver to Subscriber, and Subscriber shall purchase from HCCF-2, the HCCF-2 18% High Yield Bonds for a purchase price of $1,000 per bond (the aggregate purchase price to be paid by the Subscriber for the HCCF-2 18% High Yield Bonds is referred to herein as the "Purchase Price").

   (b) The Subscriber will pay (i) the Purchase Price by wire transfer, check, money order or as otherwise directed by HCCF-2, of immediately payable funds. Subscriber shall be registered in the books of HCCF-2 as the owner of the HCCF-2 18% High Yield Bonds being purchased by Subscriber hereunder, which such HCCF-2 18% High Yield Bonds may be evidenced by more than one certificate in the name of the Subscriber.

   (c) Terms for payment: Upon the execution and submission of the Subscription Agreement the subscriber will include full payment for Subscribed number of bonds.

2. **Closing Date.**

In the event HCCF-2 accepts this subscription by execution of this Agreement, the closing of the sale and purchase of the HCCF-2 18% High Yield Bonds shall take place at the offices of HCCF-2 at such place, date and time as may be determined by HCCF-2 (such date and time of the closing being herein called the "Closing Date"). HCCF-2, IN ITS SOLE DISCRETION, MAY REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART. The Subscriber acknowledges that this subscription shall be deemed to be accepted by HCCF-2 only when this Agreement is countersigned by an authorized officer of HCCF-2. The Subscriber further acknowledges and agrees that subscriptions need not be accepted in the order they are received, that HCCF-2 shall not be obligated to sell all or any of the Number of HCCF-2 18% High Yield Bonds proposed to be sold in the Private Placement, that HCCF-2 shall not be required to sell any minimum number of HCCF-2 18% High Yield Bonds at any closing and that HCCF-2 may hold one or more closings for such number of HCCF-2 18% High Yield Bonds as it shall determine in its sole discretion.

3. **Representations and Warranties of HCCF-2.**

HCCF-2 represents and warrants to Subscriber as follows:

(a) Organization HCCF-2 is a Limited Liability Company duly formed, validly existing and in good standing under the laws of the State of Nevada. HCCF-2 has, or on or prior the Closing Date will have, the authority to own and hold its properties, to carry on its business as currently conducted, to execute, deliver and perform this Agreement and to issue and deliver the HCCF-2 18% High Yield Bonds

(b) Authorization of Agreements, Etc. This Agreement has, or on or prior to the Closing Date will have, been duly executed and delivered by HCCF-2 and constitutes the valid and binding obligation of HCCF-2 enforceable against it in accordance with its terms, except as may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization or similar laws affecting creditors' rights generally or by general equitable principles, and except insofar as the enforceability of any provision hereof would be restricted or void by reason of public policy.

(c) No Conflicts. HCCF-2 execution and delivery of this Agreement and HCCF-2 consummation of the transactions contemplated hereby will not (i) violate, conflict with or result in an event of default under any material agreement or contract to which HCCF-2 is a party or by which it is bound, (ii) violate any applicable law, ordinance, rule or regulation of any governmental body having jurisdiction over HCCF-2 or its business or any order, judgment or decree applicable to HCCF-2, or (iii) violate any provision of its Operating Agreement, each as may be in effect as of the Closing Date.

4. **Representations and Warranties of the Subscriber.**

Subscriber represents and warrants to HCCF-2 with respect to itself as follows:

(a) Organization, Power and Authority. The subscriber, if not a natural person, is duly authorized or organized, validly existing and in good standing in its jurisdiction of a corporation or organization. Subscriber has full power and authority to enter into, deliver and perform this Agreement and has taken all action required to authorize the execution and delivery hereof and to consummate the transactions contemplated hereby, including the purchase of the HCCF-2 18% High Yield Bonds , and, if Subscriber is not a natural person, the person signing this Agreement on behalf of Subscriber has been duly

authorized to act on behalf of and to bind such party.

(b) Authorization of Agreements, Etc. The Transaction Documents have been duly executed and delivered by the Subscriber and constitute the valid and binding obligation of the Subscriber, enforceable against the Subscriber in accordance with its terms, except as may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization or similar laws affecting creditors' rights generally or by general equitable principles, and except insofar as the enforceability of any provision hereof would be restricted or void by reason of public policy.

(c) No Conflicts. The execution and delivery of the Transaction Documents and the consummation of the transactions contemplated hereby will not (i) violate, conflict with or result in an event of default under any material agreement or contract to which the Subscriber is a party or by the Subscriber is bound, (ii) violate any applicable law, ordinance, rule or regulation of any governmental body having jurisdiction over such party or its business or any order, judgment or decree applicable to the Subscriber, (iii) require the Subscriber to obtain the consent of any governmental agency or entity or any other third party, other than such consents as have already been obtained, or (iv) if not a natural person, violate any provision of the Subscriber's certificate of incorporation, certificate of limited partnership, certificate of formation or other formation or organizational instrument or document, as applicable, and by-laws, partnership agreement or operating agreement, as applicable.

(d) Investment Representations. Subscriber represents and warrants to HCCF-2 that (i) it has completed the "Accredited Investor Certification" attached to this Agreement and provided independent certification that Subscriber meets the "Accredited" investor qualification. (ii) it is an "accredited investor" as such term is defined in Rule 501 of Regulation D ("Regulation D") promulgated under the Securities Act of 1933, as amended (the "Securities Act") and (iii) it is acquiring the HCCF-2 18% High Yield Bonds for its own account for the purpose of investment and not with a view to or for sale in connection with any distribution thereof. Subscriber further represents that Subscriber has knowledge and experience in business and financial matters and prior investment experience, including investment in securities that are non-listed, unregistered and/or not traded on a national securities exchange or on The NASDAQ Stock Market and that Subscriber understands that (i) the HCCF-2 18% High Yield Bonds have not been registered under the Securities Act, by reason of their issuance in a transaction exempt from the registration requirements of the Securities Act pursuant to Section 4(2) thereof or pursuant to Regulation D promulgated thereunder, (ii) the HCCF-2 18% High Yield Bonds must be held indefinitely unless a subsequent disposition thereof is registered under the Securities Act or is exempt from such registration, (iii) the HCCF-2 18% High Yield Bonds will bear a legend to such effect, and (iv) HCCF-2 will make a notation on its transfer books to such effect. The subscriber has delivered the completed "Accredited Investor Certification" to HCCF-2 along with any subscription made hereunder.

(e) No Public Market. Subscriber understands that there is no public market for either the HCCF-2 18% High Yield Bonds shares and that no market may develop. The Subscriber understands that even if a public market develops for the Class B Common Stock, Rule 144 promulgated under the Securities Act requires for non-affiliates, among other conditions, a one- year holding period prior to the resale (in limited amounts) of securities acquired in a non-public offering without having to satisfy the registration requirements under the Securities Act. The Subscriber understands and acknowledges that HCCF-2 is under no obligation to register the HCCF-2 18% High Yield Bonds under the Securities Act or any state securities or "blue sky" laws. The Subscriber acknowledges that at such time, if ever, as the HCCF-2 18% High Yield Bonds are registered, sales of such securities will be subject to state securities laws, and that

any sales must comply in all respects with all applicable state securities laws, including those of the state in which the Subscriber resides, which may require any securities sold in such state to be sold through a registered broker-dealer or in reliance upon an exemption from registration.

(f) Access to Information. The Subscriber represents that the Subscriber has been furnished by HCCF-2 during the course of this transaction with the PPM and all information regarding HCCF-2 which the Subscriber has requested or desired to know, has been afforded the opportunity to ask questions of and receive answers from duly authorized officers of HCCF-2 concerning the terms and conditions of the Private Placement and has received any additional information which the Subscriber has requested. The Subscriber has relied solely upon the information provided by HCCF-2 in this Agreement in making the decision to invest in the Class B Common Stock. The Subscriber disclaims reliance on any other statements made or information provided by any person or entity in the course of the Subscriber's consideration of the purchase of the HCCF-2 18% High Yield Bonds

(g) Risk. SUBSCRIBER UNDERSTANDS THAT THIS INVESTMENT IN THIS COMPANY IS ILLIQUID AND INVOLVES A HIGH DEGREE OF SPECULATIVE RISK. The Subscriber recognizes that the purchase of the HCCF-2 18% High Yield Bonds involves a high degree of risk in that, among other things, (i) HCCF-2 is a early stage business with a limited operating history and may require funding in addition to the proceeds of the Private Placement, which may be done through additional equity issuances which may cause additional dilution, (ii) an investment in HCCF-2 is highly speculative, and only an investor who can afford the loss of the Subscriber's entire investment should consider investing in HCCF-2 and the HCCF-2 18% High Yield Bonds, (iii) the Subscriber may not be able to liquidate the Subscriber's investment, and (iv) in the event of a disposition, the Subscriber could sustain the loss of the entire investment.

(h) No Commissions or FINRA Affiliation. The subscriber has not paid or received any commission or other remuneration in connection with the Private Placement. The Subscriber is not associated with a Unitholder firm of the National Association of Securities Dealers, Corporation.

(i) No Brokers or General Solicitation. Neither the Subscriber nor any of its officers, directors, employees, agents, stockholders or partners, if any, has either directly or indirectly, including through a broker or finder engaged in any general solicitation, or (ii) published any advertisement in connection with the offer and sale of the HCCF-2 18% High Yield Bonds The Subscriber represents that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction and agrees to indemnify and to hold harmless HCCF-2 from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which the Subscriber or any of its officers, directors, employees, agents, stockholders or partners, if any, is responsible.

(j) Address. The Subscriber represents that the address of the Subscriber furnished on the signature page hereof is (i) the Subscriber's principal business address if the Subscriber is not a natural person or (ii) the Subscriber's principal residence if the Subscriber is a natural person.

(k) Foreign Subscribers. If the Subscriber is not a United States person (as defined by Section 7701(a) (30) of the Internal Revenue Code of 1986, as amended), the Subscriber hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the HCCF-2 18% High Yield Bonds or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the HCCF-2 18% High Yield Bonds, (ii) any foreign

exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the HCCF-2 18% High Yield Bonds. The Subscriber's subscription and payment for and continued beneficial ownership of the HCCF-2 18% High Yield Bonds will not violate any applicable securities or other laws of the Subscriber's jurisdiction.

(l) Operating Agreement. The Subscriber acknowledges and agrees that (i) the HCCF-2 18% High Yield Bonds are subject to substantial restrictions on transfer and voting pursuant to the Operating Agreement, (ii) the HCCF-2 18% High Yield Bonds will bear a legend to such effect, and (iii) HCCF-2 will make a notation on its transfer books to such effect.

(m) SAFEKEEPING OF PROCEEDS. All funds will be deposited and held in company nonoperating bank account until the company meets the minimum offering amount or refund to an investor in the event the company fails to raise the minimum amount required to complete the offering within 12 months of the offering date.

5. **Miscellaneous.**

(a) Expenses, Etc. Each party hereto will pay its own expenses in connection with the transactions contemplated by this Agreement, whether or not such transactions shall be consummated

(b) Survival of Agreements. All covenants, agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement and the issuance, sale and delivery of the HCCF-2 18% High Yield Bonds pursuant hereto.

(c) Parties in Interest. All covenants and agreements contained in this Agreement by or on behalf of any of the parties hereto shall bind and inure to the benefit of the respective successors and permitted assigns of the parties hereto whether so expressed or not, except for transferees in a Public Sale. For the purposes of this Agreement, "Public Sale" means any sale of HCCF-2 18% High Yield Bonds to the public pursuant to an offering registered under the Securities Act or to the public pursuant to the provisions of Rule 144 (or any successor or similar rule) adopted under the Securities Act.

(d) Notices. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given, delivered and received upon the earlier of actual receipt or: (a) personal delivery to the party to be notified, (b) when sent, if sent by facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next day or next business day delivery, with written verification of receipt. All communications shall be sent to, if to the Subscriber, such Subscriber's address as set forth on the signature page hereto, or, if to HCCF-2, to the principal office of HCCF-2 and to the attention of the Manager, or to such facsimile number or address as subsequently modified by written notice given in accordance with this Section 5(d), with an email copy to the Manager at invest@harborcity.com

(e) Entire Agreement; Modifications. This Agreement, together with the Private Placement

Memorandum dated August 24, 2018, constitutes the entire agreement of the parties with respect to the subject matter hereof and may not be amended or modified nor any provisions waived except in a writing signed by HCCF-2 and Subscriber.

(f) Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(g) Governing Law. This agreement, the performance of this Agreement and any and all matters arising directly or indirectly herefrom or therefrom, including the legal relations among the parties, shall be governed by and construed and enforced in accordance with, the laws of the State of Nevada, without regard to its conflict of laws rules. The parties hereto hereby irrevocably and unconditionally (i) agree that any action or proceeding arising out of or in connection with this Agreement shall be brought only in the State of Nevada, and not in any other state or federal court in the United States of America or in any other country, (ii) consent to submit to the exclusive jurisdiction of the State courts for purposes of any action or proceeding arising out of or in connection with this Agreement, (iii) waive any objection to the laying of venue of any such action or proceeding in a State court, and (iv) waive, and agree not to plead or to make, any claim that any such action or proceeding brought in the State court has been brought in an improper or inconvenient forum.

## FEDERAL INCOME TAX MATTERS

### Treasury Department Circular 230 Notice

To ensure compliance with Circular 230, prospective investors and the Unitholders are hereby notified that (a) any discussion of Federal tax issues contained or referred to in this Memorandum or in any supplements or annexes is not intended or written to be used, and cannot be used, by prospective investors and Unitholders for the purpose of avoiding penalties that may be imposed on them under the Internal Revenue Code; (b) such discussion is written in connection with the promotion or marketing by the Company of the transactions or matters addressed in this Memorandum or in any supplements or annexes and (c) prospective investors and Unitholders should seek tax advice based on their particular circumstances from an independent tax advisor.

**Each prospective investor is therefore urged to consult his or her tax advisor with respect to the tax consequences arising from an investment in the Company. No ruling from the Service regarding the tax aspects of the Company has been or will be requested.**

### General

The following is a general discussion of certain federal income tax consequences of the purchase, ownership and disposition of the Shares based upon the relevant provisions of the Internal Revenue Code of 1986, as amended (the "Code"), the regulations thereunder, existing judicial decisions and published rulings. Future legislative, judicial or administrative changes or interpretations, which may or may not be retroactive, could affect the federal income tax consequences to the Unitholders or the Company. The discussion below does not purport to deal with the federal income tax consequences

applicable to all categories of investors, some of which may be subject to special rules. The discussion focuses primarily upon investors who will hold the Shares as "capital assets" within the meaning of the Code. You are advised to consult your own tax advisers with regard to the federal income tax consequences of acquiring, holding and disposing of the Shares, as well as state, local and other tax consequences resulting from an investment in the Shares.

### INVESTMENTS BY QUALIFIED PLANS AND INDIVIDUAL RETIREMENT ACCOUNTS

Certain investors in the Company may be subject to the fiduciary responsibility and prohibited transaction requirements of Employee Retirement Income Security Act of 1974, as amended **("ERISA")**, and/or related provisions of the Code. The following is a summary of some of the material fiduciary investment considerations that may apply to such investors under ERISA and the Code. This summary is based on the fiduciary responsibility provisions and prohibited transaction restrictions of ERISA, relevant regulations and opinions issued by the U.S. Department of Labor and court decisions thereunder, and on the pertinent provisions of the Code, relevant regulations published rulings and procedures of the Service and court decisions thereunder.

**Considerations for Foreign Investors**

The Company is required to withhold tax with respect to a Unitholder's allocable portion of the Company's "effectively connected taxable income" within the United States if the Unitholder is a foreign person or entity. In general, the amount of tax to be withheld is the applicable percentage equal to the highest appropriate tax rate. The Company can be exempt from such withholding if the foreign Unitholder certifies under penalty of perjury that it is not a foreign person as defined in the Code or Regulations.

Additional issues may arise pertaining to information reporting and backup withholding for foreign Unitholders. Foreign Unitholders should consult their tax advisers with regard to U.S. information reporting and backup withholding.

**State and Local Taxes**

The Company may be subject to State and local income, franchise, property, or other taxes in states and localities in which we do business or own property. Our tax treatment (and the tax treatment of our Unitholders) in state and local jurisdictions may differ from the federal income tax treatment described above. The discussion in this Offering does not attempt to describe state and local tax effects applicable to the Company or the Unitholders. Potential investors should consult their own tax advisors regarding these matters.

**Administrative Matters**

The Company intends to furnish to each Unitholder within ninety (90) days after the close of our taxable year, certain tax information, including a Schedule K-1, which sets forth each Unitholder's allocable share of our income, gain, loss, deductions and credits. The federal income tax information

returns the Company files may be audited by the Service. Adjustments resulting from any such audit may require each Unitholder to file an amended tax return and possibly may result in an audit of the Unitholder's own return. Any audit of a Unitholder's return could result in adjustments of non-Company as well as Company items.

**Possible Changes in Tax Laws**

The statutes, regulations and rules with respect to all of the foregoing tax matters are constantly subject to change by Congress and/or by the Department of the Treasury, and the interpretations of such statutes, regulations and rules may be modified or affected by a judicial decision or by the Department of the Treasury. Because significant amendments have been made to the Code in recent years, and because of the continual changes made by Congress, the Department of the Treasury and the courts with respect to the administration and interpretation of the tax laws, no assurance can be given that the foregoing opinions and interpretations will be sustained or that tax aspects summarized herein will prevail and be available to the Unitholders.

**Need for Independent Advice**

The tax matters relating to the Company and its proposed transactions are complex and subject to various interpretations. The foregoing is not intended as a substitute for careful tax planning, particularly since the tax consequences of an investment in the Company may not be the same for all investors. Accordingly, the Company urges potential investors to consult their tax advisors prior to investing in the Company.

## REPORTS

The Company will furnish the following reports, statements and tax information to each Unitholder:

*Tax Information:* Except as may otherwise be required by applicable law, within ninety (90) days after the last day of each calendar year, the Company intends send to each Bondholder such tax information as shall be necessary for the preparation of federal income tax returns, state income tax returns, and any other tax returns required by any other applicable jurisdiction, if any.

Restrictions Imposed by the USA PATRIOT Act and Related Acts

- In accordance with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended (the "USA PATRIOT Act"), our Shares may not be offered, sold, transferred or delivered, directly or indirectly, to any "Unacceptable Investor," which means anyone who is:

- a "designated national," "specially designated national," "specially designated terrorist," "specially designated global terrorist," "foreign terrorist organization" or "blocked person" within the definitions set forth in the Foreign Assets Control Regulations of the U.S. Treasury Department;

- acting on behalf of, or an entity owned or controlled by, any government against whom the U.S. maintains economic sanctions or embargoes under the regulations of the U.S. Treasury Department;

- within the scope of Executive Order 13224 — Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten to Commit, or Support Terrorism, effective September 24, 2001;

- subject to additional restrictions imposed by the following statutes or regulations and executive orders issued thereunder: the Trading with the Enemy Act, the Iraq Sanctions Act, the National Emergencies Act, the Antiterrorism and Effective Death Penalty Act of 1996, the International Emergency Economic Powers Act, the United Nations Participation Act, the International Security and Development Cooperation Act, the Nuclear Proliferation Prevention Act of 1994, the Foreign Narcotics Kingpin Designation Act, the Iran and Libya Sanctions Act of 1996, the Cuban Democracy Act, the Cuban Liberty and Democratic Solidarity Act and the Foreign Operations, Export Financing and Related Programs Appropriation Act or any other law of similar import as to any non-U.S. country, as each such act or law has been or may be amended, adjusted, modified, or interpreted from time to time; or designated or blocked, associated or involved in terrorism, or subject to restrictions under laws, regulations, or executive orders as may apply in the future similar to those set forth above.

THE HCCF-2 18% HIGH YIELD BONDS BEING SOLD HEREUNDER HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE OFFERING OR THE ACCURACY OR ADEQUACY OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THE HCCF-2 18% HIGH YIELD BONDS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS. THE HCCF-2 18% HIGH YIELD BONDS ARE SUBJECT TO RESTRICTION ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER SAID ACT AND SUCH LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. SUBSCRIBER SHOULD BE AWARE THAT IT WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. SUBSCRIBER SHOULD CONSULT ITS OWN LEGAL COUNSEL, ACCOUNTANT AND BUSINESS AND FINANCIAL ADVISERS AS TO ALL LEGAL, TAX AND RELATED MATTERS CONCERNING ANY INVESTMENT IN HCCF-2.

**SIGNATURE PAGE FOLLOWS**

IN WITNESS WHEREOF, HCCF-2 LLC and the Subscriber have executed this Agreement.

For HCCF-2 LLC

By:_____ Dated:_____

Name: J.P. Maroney as Manager of HCCF-2 LLC


SUBSCRIBER:

By:_____ Dated:_____

Name:

Title:

Address:

Email:

Fax:

Social Security # or EIN #:

Number Of HCCF-2 18% High Yield Bonds:

Purchase Price Per Bond: $1,000

Total Purchase Price:

# 18% HIGH YIELD BONDS
# SUBSCRIPTION AGREEMENT



# HCCF-3 LLC
**A Limited Liability Company under the laws of the State of Nevada**

CONFIDENTIAL TREATMENT REQUESTED BY FINRA

## SUBSCRIPTION AGREEMENT

SUBSCRIPTION AGREEMENT between HCCF-3 LLC, a Nevada Limited Liability Company ('HCCF-3'), and the subscriber listed on the signature page hereof (the "Subscriber") made as of the date set forth by the subscriber opposite the subscriber's signature on the signature page hereof.

**WITNESSETH:**

WHEREAS, HCCF-3 is conducting a private placement (the "Private Placement") pursuant to which it is offering up to an aggregate of 1,000 HCCF-3 18% High Yield Bonds of HCCF-3; and

WHEREAS, the Subscriber desires to purchase from HCCF-3 in the Private Placement the number of HCCF-3 18% High Yield Bonds set forth on the signature page hereof, subject to the provisions described herein on the terms and conditions hereinafter set forth; and

WHEREAS, This Subscription Agreement is one of a limited number of such subscriptions for HCCF-3 18% High Yield Bonds offered by HCCF-3 to a limited number of suitable investors pursuant to Rule 506c of Regulation D and Section 4(2) and/or Section 4(6) of the Securities Act of 1933, as amended (the "Securities Act"). Execution of this Subscription Agreement by the Subscriber shall constitute an offer by the Subscriber to purchase on the terms and conditions specified herein and in HCCF-3 Confidential Private Placement Memorandum dated August 24, 2018(the "PPM"). HCCF-3 reserves the right to reject such subscription offer or, by executing a copy of this Subscription Agreement, to accept such an offer. If the Subscriber's offer is accepted, HCCF-3 will execute this Subscription Agreement and issue the HCCF-3 18% High Yield Bonds in accordance with the terms provided in the PPM. If the Subscriber's offer is rejected, the payment accompanying this Subscription Agreement will be returned to the Subscriber, with no interest thereon, with the notice of rejection.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto agree as follows:

1. **Issuance, Sale, and Delivery of the HCCF-3 18% High Yield Bonds**

(a) Subject to the terms and conditions set forth herein and execution of this Agreement attached to the PPM to which this Agreement is attached, on the Closing Date (as defined below) HCCF-3 shall issue, sell and deliver to Subscriber, and Subscriber shall purchase from HCCF-3, the HCCF-3 18% High Yield Bonds for a purchase price of $1,000 per bond (the aggregate purchase price to be paid by the Subscriber for the HCCF-3 18% High Yield Bonds is referred to herein as the "Purchase Price").

(b) The Subscriber will pay (i) the Purchase Price by wire transfer, check, money order or as otherwise directed by HCCF-3, of immediately payable funds. Subscriber shall be registered in the books of HCCF-3 as the owner of the HCCF-3 18% High Yield Bonds being purchased by Subscriber hereunder, which such HCCF-3 18% High Yield Bonds may be evidenced by more than one certificate in the name of the Subscriber.

(c) Terms for payment: Upon the execution and submission of the Subscription Agreement the subscriber will include full payment for Subscribed number of bonds.

CONFIDENTIAL TREATMENT REQUESTED BY FINRA                                                                              FINRA000121

2. **Closing Date.**

In the event HCCF-3 accepts this subscription by execution of this Agreement, the closing of the sale and purchase of the HCCF-3 18% High Yield Bonds shall take place at the offices of HCCF-3 at such place, date and time as may be determined by HCCF-3 (such date and time of the closing being herein called the "Closing Date"). HCCF-3, IN ITS SOLE DISCRETION, MAY REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART. The Subscriber acknowledges that this subscription shall be deemed to be accepted by HCCF-3 only when this Agreement is countersigned by an authorized officer of HCCF-3. The Subscriber further acknowledges and agrees that subscriptions need not be accepted in the order they are received, that HCCF-3 shall not be obligated to sell all or any of the Number of HCCF-3 18% High Yield Bonds proposed to be sold in the Private Placement, that HCCF-3 shall not be required to sell any minimum number of HCCF-3 18% High Yield Bonds at any closing and that HCCF-3 may hold one or more closings for such number of HCCF-3 18% High Yield Bonds as it shall determine in its sole discretion.

3. **Representations and Warranties of HCCF-3.**

**HCCF-3 represents and warrants to Subscriber as follows:**

(a) Organization HCCF-3 is a Limited Liability Company duly formed, validly existing and in good standing under the laws of the State of Nevada. HCCF-3 has, or on or prior the Closing Date will have, the authority to own and hold its properties, to carry on its business as currently conducted, to execute, deliver and perform this Agreement and to issue and deliver the HCCF-3 18% High Yield Bonds

(b) Authorization of Agreements, Etc. This Agreement has, or on or prior to the Closing Date will have, been duly executed and delivered by HCCF-3 and constitutes the valid and binding obligation of HCCF-3 enforceable against it in accordance with its terms, except as may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization or similar laws affecting creditors' rights generally or by general equitable principles, and except insofar as the enforceability of any provision hereof would be restricted or void by reason of public policy.

(c) No Conflicts. HCCF-3 execution and delivery of this Agreement and HCCF-3 consummation of the transactions contemplated hereby will not (i) violate, conflict with or result in an event of default under any material agreement or contract to which HCCF-3 is a party or by which it is bound, (ii) violate any applicable law, ordinance, rule or regulation of any governmental body having jurisdiction over HCCF-3 or its business or any order, judgment or decree applicable to HCCF-3, or (iii) violate any provision of its Operating Agreement, each as may be in effect as of the Closing Date.

4. **Representations and Warranties of the Subscriber.**

**Subscriber represents and warrants to HCCF-3 with respect to itself as follows:**

(a) Organization, Power and Authority. The subscriber, if not a natural person, is duly authorized or organized, validly existing and in good standing in its jurisdiction of a corporation or organization. Subscriber has full power and authority to enter into, deliver and perform this Agreement and has taken all action required to authorize the execution and delivery hereof and to consummate the transactions contemplated hereby, including the purchase of the HCCF-3 18% High Yield Bonds , and, if Subscriber is not a natural person, the person signing this Agreement on behalf of Subscriber has been duly

CONFIDENTIAL TREATMENT REQUESTED BY FINRA                        FINRA000122

authorized to act on behalf of and to bind such party.

(b) Authorization of Agreements, Etc. The Transaction Documents have been duly executed and delivered by the Subscriber and constitute the valid and binding obligation of the Subscriber, enforceable against the Subscriber in accordance with its terms, except as may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization or similar laws affecting creditors' rights generally or by general equitable principles, and except insofar as the enforceability of any provision hereof would be restricted or void by reason of public policy.

(c) No Conflicts. The execution and delivery of the Transaction Documents and the consummation of the transactions contemplated hereby will not (i) violate, conflict with or result in an event of default under any material agreement or contract to which the Subscriber is a party or by the Subscriber is bound, (ii) violate any applicable law, ordinance, rule or regulation of any governmental body having jurisdiction over such party or its business or any order, judgment or decree applicable to the Subscriber, (iii) require the Subscriber to obtain the consent of any governmental agency or entity or any other third party, other than such consents as have already been obtained, or (iv) if not a natural person, violate any provision of the Subscriber's certificate of incorporation, certificate of limited partnership, certificate of formation or other formation or organizational instrument or document, as applicable, and by-laws, partnership agreement or operating agreement, as applicable.

(d) Investment Representations. Subscriber represents and warrants to HCCF-3 that (i) it has completed the "Accredited Investor Certification" attached to this Agreement and provided independent certification that Subscriber meets the "Accredited" investor qualification. (ii) it is an "accredited investor" as such term is defined in Rule 501 of Regulation D ("Regulation D") promulgated under the Securities Act of 1933, as amended (the "Securities Act") and (iii) it is acquiring the HCCF-3 18% High Yield Bonds for its own account for the purpose of investment and not with a view to or for sale in connection with any distribution thereof. Subscriber further represents that Subscriber has knowledge and experience in business and financial matters and prior investment experience, including investment in securities that are non-listed, unregistered and/or not traded on a national securities exchange or on The NASDAQ Stock Market and that Subscriber understands that (i) the HCCF-3 18% High Yield Bonds have not been registered under the Securities Act, by reason of their issuance in a transaction exempt from the registration requirements of the Securities Act pursuant to Section 4(2) thereof or pursuant to Regulation D promulgated thereunder, (ii) the HCCF-3 18% High Yield Bonds must be held indefinitely unless a subsequent disposition thereof is registered under the Securities Act or is exempt from such registration, (iii) the HCCF-3 18% High Yield Bonds will bear a legend to such effect, and (iv) HCCF-3 will make a notation on its transfer books to such effect. The subscriber has delivered the completed "Accredited Investor Certification" to HCCF-3 along with any subscription made hereunder.

(e) No Public Market. Subscriber understands that there is no public market for either the HCCF-3 18% High Yield Bonds shares and that no market may develop. The Subscriber understands that even if a public market develops for the Class B Common Stock, Rule 144 promulgated under the Securities Act requires for non-affiliates, among other conditions, a one- year holding period prior to the resale (in limited amounts) of securities acquired in a non-public offering without having to satisfy the registration requirements under the Securities Act. The Subscriber understands and acknowledges that HCCF-3 is under no obligation to register the HCCF-3 18% High Yield Bonds under the Securities Act or any state securities or "blue sky" laws. The Subscriber acknowledges that at such time, if ever, as the HCCF-3 18% High Yield Bonds are registered, sales of such securities will be subject to state securities laws, and that

CONFIDENTIAL TREATMENT REQUESTED BY FINRA                                     FINRA000123

any sales must comply in all respects with all applicable state securities laws, including those of the state in which the Subscriber resides, which may require any securities sold in such state to be sold through a registered broker-dealer or in reliance upon an exemption from registration.

(f) Access to Information. The Subscriber represents that the Subscriber has been furnished by HCCF-3 during the course of this transaction with the PPM and all information regarding HCCF-3 which the Subscriber has requested or desired to know, has been afforded the opportunity to ask questions of and receive answers from duly authorized officers of HCCF-3 concerning the terms and conditions of the Private Placement and has received any additional information which the Subscriber has requested. The Subscriber has relied solely upon the information provided by HCCF-3 in this Agreement in making the decision to invest in the Class B Common Stock. The Subscriber disclaims reliance on any other statements made or information provided by any person or entity in the course of the Subscriber's consideration of the purchase of the HCCF-3 18% High Yield Bonds

(g) Risk. SUBSCRIBER UNDERSTANDS THAT THIS INVESTMENT IN THIS COMPANY IS ILLIQUID AND INVOLVES A HIGH DEGREE OF SPECULATIVE RISK. The Subscriber recognizes that the purchase of the HCCF-3 18% High Yield Bonds involves a high degree of risk in that, among other things, (i) HCCF-3 is a early stage business with a limited operating history and may require funding in addition to the proceeds of the Private Placement, which may be done through additional equity issuances which may cause additional dilution, (ii) an investment in HCCF-3 is highly speculative, and only an investor who can afford the loss of the Subscriber's entire investment should consider investing in HCCF-3 and the HCCF-3 18% High Yield Bonds, (iii) the Subscriber may not be able to liquidate the Subscriber's investment, and (iv) in the event of a disposition, the Subscriber could sustain the loss of the entire investment.

(h) No Commissions or FINRA Affiliation. The subscriber has not paid or received any commission or other remuneration in connection with the Private Placement. The Subscriber is not associated with a Unitholder firm of the National Association of Securities Dealers, Corporation.

(i) No Brokers or General Solicitation. Neither the Subscriber nor any of its officers, directors, employees, agents, stockholders or partners, if any, has either directly or indirectly, including through a broker or finder engaged in any general solicitation, or (ii) published any advertisement in connection with the offer and sale of the HCCF-3 18% High Yield Bonds The Subscriber represents that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction and agrees to indemnify and to hold harmless HCCF-3 from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which the Subscriber or any of its officers, directors, employees, agents, stockholders or partners, if any, is responsible.

(j) Address. The Subscriber represents that the address of the Subscriber furnished on the signature page hereof is (i) the Subscriber's principal business address if the Subscriber is not a natural person or (ii) the Subscriber's principal residence if the Subscriber is a natural person.

(k) Foreign Subscribers. If the Subscriber is not a United States person (as defined by Section 7701(a) (30) of the Internal Revenue Code of 1986, as amended), the Subscriber hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the HCCF-3 18% High Yield Bonds or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the HCCF-3 18% High Yield Bonds, (ii) any foreign

CONFIDENTIAL TREATMENT REQUESTED BY FINRA     FINRA000124

exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the HCCF-3 18% High Yield Bonds. The Subscriber's subscription and payment for and continued beneficial ownership of the HCCF-3 18% High Yield Bonds will not violate any applicable securities or other laws of the Subscriber's jurisdiction.

(l) Operating Agreement. The Subscriber acknowledges and agrees that (i) the HCCF-3 18% High Yield Bonds are subject to substantial restrictions on transfer and voting pursuant to the Operating Agreement, (ii) the HCCF-3 18% High Yield Bonds will bear a legend to such effect, and (iii) HCCF-3 will make a notation on its transfer books to such effect.

(m) SAFEKEEPING OF PROCEEDS. All funds will be deposited and held in company nonoperating bank account until the company meets the minimum offering amount or refund to an investor in the event the company fails to raise the minimum amount required to complete the offering within 12 months of the offering date.

5. **Miscellaneous.**

(a) Expenses, Etc. Each party hereto will pay its own expenses in connection with the transactions contemplated by this Agreement, whether or not such transactions shall be consummated

(b) Survival of Agreements. All covenants, agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement and the issuance, sale and delivery of the HCCF-3 18% High Yield Bonds pursuant hereto.

(c) Parties in Interest. All covenants and agreements contained in this Agreement by or on behalf of any of the parties hereto shall bind and inure to the benefit of the respective successors and permitted assigns of the parties hereto whether so expressed or not, except for transferees in a Public Sale. For the purposes of this Agreement, "Public Sale" means any sale of HCCF-3 18% High Yield Bonds to the public pursuant to an offering registered under the Securities Act or to the public pursuant to the provisions of Rule 144 (or any successor or similar rule) adopted under the Securities Act.

(d) Notices. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given, delivered and received upon the earlier of actual receipt or: (a) personal delivery to the party to be notified, (b) when sent, if sent by facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next day or next business day delivery, with written verification of receipt. All communications shall be sent to, if to the Subscriber, such Subscriber's address as set forth on the signature page hereto, or, if to HCCF-3, to the principal office of HCCF-3 and to the attention of the Manager, or to such facsimile number or address as subsequently modified by written notice given in accordance with this Section 5(d), with an email copy to the Manager at invest@harborcity.com

(e) Entire Agreement; Modifications. This Agreement, together with the Private Placement

CONFIDENTIAL TREATMENT REQUESTED BY FINRA

FINRA000125

Memorandum dated July 1, 2019, constitutes the entire agreement of the parties with respect to the subject matter hereof and may not be amended or modified nor any provisions waived except in a writing signed by HCCF-3 and Subscriber.

(f) Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(g) Governing Law. This agreement, the performance of this Agreement and any and all matters arising directly or indirectly herefrom or therefrom, including the legal relations among the parties, shall be governed by and construed and enforced in accordance with, the laws of the State of Nevada, without regard to its conflict of laws rules. The parties hereto hereby irrevocably and unconditionally (i) agree that any action or proceeding arising out of or in connection with this Agreement shall be brought only in the State of Nevada, and not in any other state or federal court in the United States of America or in any other country, (ii) consent to submit to the exclusive jurisdiction of the State courts for purposes of any action or proceeding arising out of or in connection with this Agreement, (iii) waive any objection to the laying of venue of any such action or proceeding in a State court, and (iv) waive, and agree not to plead or to make, any claim that any such action or proceeding brought in the State court has been brought in an improper or inconvenient forum.

## FEDERAL INCOME TAX MATTERS

### Treasury Department Circular 230 Notice

To ensure compliance with Circular 230, prospective investors and the Unitholders are hereby notified that (a) any discussion of Federal tax issues contained or referred to in this Memorandum or in any supplements or annexes is not intended or written to be used, and cannot be used, by prospective investors and Unitholders for the purpose of avoiding penalties that may be imposed on them under the Internal Revenue Code; (b) such discussion is written in connection with the promotion or marketing by the Company of the transactions or matters addressed in this Memorandum or in any supplements or annexes and (c) prospective investors and Unitholders should seek tax advice based on their particular circumstances from an independent tax advisor.

**Each prospective investor is therefore urged to consult his or her tax advisor with respect to the tax consequences arising from an investment in the Company. No ruling from the Service regarding the tax aspects of the Company has been or will be requested.**

### General

The following is a general discussion of certain federal income tax consequences of the purchase, ownership and disposition of the Shares based upon the relevant provisions of the Internal Revenue Code of 1986, as amended (the "Code"), the regulations thereunder, existing judicial decisions and published rulings. Future legislative, judicial or administrative changes or interpretations, which may or may not be retroactive, could affect the federal income tax consequences to the Unitholders or the Company. The discussion below does not purport to deal with the federal income tax consequences

CONFIDENTIAL TREATMENT REQUESTED BY FINRA                    FINRA000126

applicable to all categories of investors, some of which may be subject to special rules. The discussion focuses primarily upon investors who will hold the Shares as "capital assets" within the meaning of the Code. You are advised to consult your own tax advisers with regard to the federal income tax consequences of acquiring, holding and disposing of the Shares, as well as state, local and other tax consequences resulting from an investment in the Shares.

### INVESTMENTS BY QUALIFIED PLANS AND INDIVIDUAL RETIREMENT ACCOUNTS

Certain investors in the Company may be subject to the fiduciary responsibility and prohibited transaction requirements of Employee Retirement Income Security Act of 1974, as amended **("ERISA"),** and/or related provisions of the Code. The following is a summary of some of the material fiduciary investment considerations that may apply to such investors under ERISA and the Code. This summary is based on the fiduciary responsibility provisions and prohibited transaction restrictions of ERISA, relevant regulations and opinions issued by the U.S. Department of Labor and court decisions thereunder, and on the pertinent provisions of the Code, relevant regulations published rulings and procedures of the Service and court decisions thereunder.

**Considerations for Foreign Investors**

The Company is required to withhold tax with respect to a Unitholder's allocable portion of the Company's "effectively connected taxable income" within the United States if the Unitholder is a foreign person or entity. In general, the amount of tax to be withheld is the applicable percentage equal to the highest appropriate tax rate. The Company can be exempt from such withholding if the foreign Unitholder certifies under penalty of perjury that it is not a foreign person as defined in the Code or Regulations.

Additional issues may arise pertaining to information reporting and backup withholding for foreign Unitholders. Foreign Unitholders should consult their tax advisers with regard to U.S. information reporting and backup withholding.

**State and Local Taxes**

The Company may be subject to State and local income, franchise, property, or other taxes in states and localities in which we do business or own property. Our tax treatment (and the tax treatment of our Unitholders) in state and local jurisdictions may differ from the federal income tax treatment described above. The discussion in this Offering does not attempt to describe state and local tax effects applicable to the Company or the Unitholders. Potential investors should consult their own tax advisors regarding these matters.

**Administrative Matters**

The Company intends to furnish to each Unitholder within ninety (90) days after the close of our taxable year, certain tax information, including a Schedule K-1, which sets forth each Unitholder's allocable share of our income, gain, loss, deductions and credits. The federal income tax information

CONFIDENTIAL TREATMENT REQUESTED BY FINRA                                                    FINRA000127

returns the Company files may be audited by the Service. Adjustments resulting from any such audit may require each Unitholder to file an amended tax return and possibly may result in an audit of the Unitholder's own return. Any audit of a Unitholder's return could result in adjustments of non-Company as well as Company items.

**Possible Changes in Tax Laws**

The statutes, regulations and rules with respect to all of the foregoing tax matters are constantly subject to change by Congress and/or by the Department of the Treasury, and the interpretations of such statutes, regulations and rules may be modified or affected by a judicial decision or by the Department of the Treasury. Because significant amendments have been made to the Code in recent years, and because of the continual changes made by Congress, the Department of the Treasury and the courts with respect to the administration and interpretation of the tax laws, no assurance can be given that the foregoing opinions and interpretations will be sustained or that tax aspects summarized herein will prevail and be available to the Unitholders.

**Need for Independent Advice**

The tax matters relating to the Company and its proposed transactions are complex and subject to various interpretations. The foregoing is not intended as a substitute for careful tax planning, particularly since the tax consequences of an investment in the Company may not be the same for all investors. Accordingly, the Company urges potential investors to consult their tax advisors prior to investing in the Company.

## REPORTS

The Company will furnish the following reports, statements and tax information to each Unitholder:

*Tax Information:* Except as may otherwise be required by applicable law, within ninety (90) days after the last day of each calendar year, the Company intends send to each Bondholder such tax information as shall be necessary for the preparation of federal income tax returns, state income tax returns, and any other tax returns required by any other applicable jurisdiction, if any.

Restrictions Imposed by the USA PATRIOT Act and Related Acts

- In accordance with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended (the "USA PATRIOT Act"), our Shares may not be offered, sold, transferred or delivered, directly or indirectly, to any "Unacceptable Investor," which means anyone who is:

- a "designated national," "specially designated national," "specially designated terrorist," "specially designated global terrorist," "foreign terrorist organization" or "blocked person" within the definitions set forth in the Foreign Assets Control Regulations of the U.S. Treasury Department;

Page 9 of 11

- acting on behalf of, or an entity owned or controlled by, any government against whom the U.S. maintains economic sanctions or embargoes under the regulations of the U.S. Treasury Department;

- within the scope of Executive Order 13224 — Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten to Commit, or Support Terrorism, effective September 24, 2001;

- subject to additional restrictions imposed by the following statutes or regulations and executive orders issued thereunder: the Trading with the Enemy Act, the Iraq Sanctions Act, the National Emergencies Act, the Antiterrorism and Effective Death Penalty Act of 1996, the International Emergency Economic Powers Act, the United Nations Participation Act, the International Security and Development Cooperation Act, the Nuclear Proliferation Prevention Act of 1994, the Foreign Narcotics Kingpin Designation Act, the Iran and Libya Sanctions Act of 1996, the Cuban Democracy Act, the Cuban Liberty and Democratic Solidarity Act and the Foreign Operations, Export Financing and Related Programs Appropriation Act or any other law of similar import as to any non-U.S. country, as each such act or law has been or may be amended, adjusted, modified, or interpreted from time to time; or designated or blocked, associated or involved in terrorism, or subject to restrictions under laws, regulations, or executive orders as may apply in the future similar to those set forth above.

THE HCCF-3 18% HIGH YIELD BONDS BEING SOLD HEREUNDER HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE OFFERING OR THE ACCURACY OR ADEQUACY OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THE HCCF-3 18% HIGH YIELD BONDS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS. THE HCCF-3 18% HIGH YIELD BONDS ARE SUBJECT TO RESTRICTION ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER SAID ACT AND SUCH LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. SUBSCRIBER SHOULD BE AWARE THAT IT WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. SUBSCRIBER SHOULD CONSULT ITS OWN LEGAL COUNSEL, ACCOUNTANT AND BUSINESS AND FINANCIAL ADVISERS AS TO ALL LEGAL, TAX AND RELATED MATTERS CONCERNING ANY INVESTMENT IN HCCF-3.

**SIGNATURE PAGE FOLLOWS**

CONFIDENTIAL TREATMENT REQUESTED BY FINRA                FINRA000129

IN WITNESS WHEREOF, HCCF-3 LLC and the Subscriber have executed this Agreement.

For HCCF-3 LLC

By:_____ Dated:_____

Name: J.P. Maroney as Manager of HCCF-3 LLC

SUBSCRIBER:

By:_____ Dated:_____

Name:

Contact:

Address:

City:

State:

Postal Code:

Phone:

Email:

Fax:

Social Security # or EIN #:

Number Of HCCF-3 18% High Yield Bonds:

Purchase Price Per Bond: $1,000

Total Purchase Price:

CONFIDENTIAL TREATMENT REQUESTED BY FINRA                                    FINRA000130

# 12% HIGH YIELD SECURED BONDS SUBSCRIPTION AGREEMENT



# HCCF-4 LLC

A Limited Liability Company under the laws of the State of Wyoming

# SUBSCRIPTION AGREEMENT

SUBSCRIPTION AGREEMENT between HCCF-4 LLC, a Wyoming Limited Liability Company ('HCCF-4'), and the subscriber listed on the signature page hereof (the "Subscriber") made as of the date set forth by the subscriber opposite the subscriber's signature on the signature page hereof.

**WITNESSETH:**

WHEREAS, HCCF-4 is conducting a private placement (the "Private Placement") pursuant to which it is offering up to an aggregate of 5,000 HCCF-4 12% High Yield Secured Bonds of HCCF-4; and

WHEREAS, the Subscriber desires to purchase from HCCF-4 in the Private Placement the number of HCCF-4 12% High Yield Secured Bonds set forth on the signature page hereof, subject to the provisions described herein on the terms and conditions hereinafter set forth; and

WHEREAS, This Subscription Agreement is one of a limited number of such subscriptions for HCCF-4 12% High Yield Secured Bonds offered by HCCF-4 to a limited number of suitable investors pursuant to Rule 506b of Regulation D of the Securities Act of 1933, as amended (the "Securities Act"). Execution of this Subscription Agreement by the Subscriber shall constitute an offer by the Subscriber to purchase on the terms and conditions specified herein and in HCCF-4 Confidential Private Placement Memorandum dated November 24, 2019(the "PPM"). HCCF-4 reserves the right to reject such subscription offer or, by executing a copy of this Subscription Agreement, to accept such an offer. If the Subscriber's offer is accepted, HCCF-4 will execute this Subscription Agreement and issue the HCCF-4 12% High Yield Secured Bonds in accordance with the terms provided in the PPM. If the Subscriber's offer is rejected, the payment accompanying this Subscription Agreement will be returned to the Subscriber, with no interest thereon, with the notice of rejection.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto agree as follows:

1. **Issuance, Sale, and Delivery of the HCCF-4 12% High Yield Secured Bonds**

   (a) Subject to the terms and conditions set forth herein and execution of this Agreement attached to the PPM to which this Agreement is attached, on the Closing Date (as defined below) HCCF-4 shall issue, sell and deliver to Subscriber, and Subscriber shall purchase from HCCF-4, the HCCF-4 12% High Yield Secured Bonds for a purchase price of $1,000 per bond (the aggregate purchase price to be paid by the Subscriber for the HCCF-4 12% High Yield Secured Bonds is referred to herein as the "Purchase Price").

   (b) The Subscriber will pay (i) the Purchase Price by wire transfer, check, money order or as otherwise directed by HCCF-4, of immediately payable funds. Subscriber shall be registered in the books of HCCF-4 as the owner of the HCCF-4 12% High Yield Secured Bonds being purchased by Subscriber hereunder, which such HCCF-4 12% High Yield Secured Bonds may be evidenced by a bond registration in the books of HCCF-4 in the name of the Subscriber.

   (c) Terms for payment: Upon the execution and submission of the Subscription Agreement the subscriber will include full payment for Subscribed number of bonds.

**2. Closing Date.**

In the event HCCF-4 accepts this subscription by execution of this Agreement, the closing of the sale and purchase of the HCCF-4 12% High Yield Secured Bonds shall take place at the offices of HCCF-4 at such place, date and time as may be determined by HCCF-4 (such date and time of the closing being herein called the "Closing Date"). HCCF-4, IN ITS SOLE DISCRETION, MAY REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART. The Subscriber acknowledges that this subscription shall be deemed to be accepted by HCCF-4 only when this Agreement is countersigned by an authorized officer of HCCF-4. The Subscriber further acknowledges and agrees that subscriptions need not be accepted in the order they are received, that HCCF-4 shall not be obligated to sell all or any of the Number of HCCF-4 12% High Yield Secured Bonds proposed to be sold in the Private Placement, that HCCF-4 shall not be required to sell any minimum number of HCCF-4 12% High Yield Secured Bonds at any closing and that HCCF-4 may hold one or more closings for such number of HCCF-4 12% High Yield Secured Bonds as it shall determine in its sole discretion.

**3. Representations and Warranties of HCCF-4.**

HCCF-4 represents and warrants to Subscriber as follows:

(a) Organization HCCF-4 is a Limited Liability Company duly formed, validly existing and in good standing under the laws of the State of Wyoming. HCCF-4 has, or on or prior to the Closing Date will have, the authority to own and hold its properties, to carry on its business as currently conducted, to execute, deliver and perform this Agreement and to issue and deliver the HCCF-4 12% High Yield Secured Bonds

(b) Authorization of Agreements, Etc. This Agreement has, or on or prior to the Closing Date will have, been duly executed and delivered by HCCF-4 and constitutes the valid and binding obligation of HCCF-4 enforceable against it in accordance with its terms, except as may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization or similar laws affecting creditors' rights generally or by general equitable principles, and except insofar as the enforceability of any provision hereof would be restricted or void by reason of public policy.

(c) Secured Position. The HCCF-4 Bonds are secured in a collateral position with a $5,000,000.00 Standby Letter of Credit issued by 1st American and Citibank. Claims are secured in and against this Standby Letter of Credit during the term of this Agreement and are fully redeemable in the event of non performance.

(d) No Conflicts. HCCF-4 execution and delivery of this Agreement and HCCF-4 consummation of the transactions contemplated hereby will not (i) violate, conflict with or result in an event of default under any material agreement or contract to which HCCF-4 is a party or by which it is bound, (ii) violate any applicable law, ordinance, rule or regulation of any governmental body having jurisdiction over HCCF-4 or its business or any order, judgment or decree applicable to HCCF-4, or (iii) violate any provision of its Operating Agreement, each as may be in effect as of the Closing Date.

**4. Representations and Warranties of the Subscriber.**

Subscriber represents and warrants to HCCF-4 with respect to itself as follows:

(a) Organization, Power and Authority. The subscriber, if not a natural person, is duly authorized or

organized, validly existing and in good standing in its jurisdiction of a corporation or organization. Subscriber has full power and authority to enter into, deliver and perform this Agreement and has taken all action required to authorize the execution and delivery hereof and to consummate the transactions contemplated hereby, including the purchase of the HCCF-4 12% High Yield Secured Bonds , and, if Subscriber is not a natural person, the person signing this Agreement on behalf of Subscriber has been duly authorized to act on behalf of and to bind such party.

(b) Authorization of Agreements, Etc. The Transaction Documents have been duly executed and delivered by the Subscriber and constitute the valid and binding obligation of the Subscriber, enforceable against the Subscriber in accordance with its terms, except as may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization or similar laws affecting creditors' rights generally or by general equitable principles, and except insofar as the enforceability of any provision hereof would be restricted or void by reason of public policy.

(c) No Conflicts. The execution and delivery of the Transaction Documents and the consummation of the transactions contemplated hereby will not (i) violate, conflict with or result in an event of default under any material agreement or contract to which the Subscriber is a party or by the Subscriber is bound, (ii) violate any applicable law, ordinance, rule or regulation of any governmental body having jurisdiction over such party or its business or any order, judgment or decree applicable to the Subscriber, (iii) require the Subscriber to obtain the consent of any governmental agency or entity or any other third party, other than such consents as have already been obtained, or (iv) if not a natural person, violate any provision of the Subscriber's certificate of incorporation, certificate of limited partnership, certificate of formation or other formation or organizational instrument or document, as applicable, and by-laws, partnership agreement or operating agreement, as applicable.

(d) Investment Representations. Subscriber represents and warrants to HCCF-4 that (i) it has completed the "Accredited Investor Certification" attached to this Agreement and provided that Subscriber meets the "Accredited" investor qualification or that Subscriber meets the limited qualifications as an Non Accredited" investor under Rule 506b (FILL IN). (ii) it is an "accredited investor" as such term is defined in Rule 501 of Regulation D ("Regulation D") promulgated under the Securities Act of 1933, as amended (the "Securities Act") and (iii) it is acquiring the HCCF-4 12% High Yield Secured Bonds for its own account for the purpose of investment and not with a view to or for sale in connection with any distribution thereof. Subscriber further represents that Subscriber has knowledge and experience in business and financial matters and prior investment experience, including investment in securities that are non-listed, unregistered and/or not traded on a national securities exchange or on The NASDAQ Stock Market and that Subscriber understands that (i) the HCCF-4 12% High Yield Secured Bonds have not been registered under the Securities Act, by reason of their issuance in a transaction exempt from the registration requirements of the Securities Act pursuant to Section 4(2) thereof or pursuant to Regulation D promulgated thereunder, (ii) the HCCF-4 12% High Yield Secured Bonds must be held indefinitely unless a subsequent disposition thereof is registered under the Securities Act or is exempt from such registration, (iii) the HCCF-4 12% High Yield Secured Bonds will bear a legend to such effect, and (iv) HCCF-4 will make a notation on its transfer books to such effect.

(e) No Public Market. Subscriber understands that there is no public market for either the HCCF-4 12% High Yield Secured Bonds and that no market may develop. The Subscriber understands and acknowledges that HCCF-4 is under no obligation to register the HCCF-4 12% High Yield Secured Bonds under the Securities Act or any state securities or "blue sky" laws. The Subscriber acknowledges that at such time,

if ever, as the HCCF-4 12% High Yield Secured Bonds are registered, sales of such securities will be subject to state securities laws, and that any sales must comply in all respects with all applicable state securities laws, including those of the state in which the Subscriber resides, which may require any securities sold in such state to be sold through a registered broker-dealer or in reliance upon an exemption from registration.

(f) Access to Information. The Subscriber represents that the Subscriber has been furnished by HCCF-4 during the course of this transaction with the PPM and all information regarding HCCF-4 which the Subscriber has requested or desired to know, has been afforded the opportunity to ask questions of and receive answers from duly authorized officers of HCCF-4 concerning the terms and conditions of the Private Placement and has received any additional information which the Subscriber has requested. The Subscriber has relied solely upon the information provided by HCCF-4 in this Agreement in making the decision to invest in the Class B Common Stock. The Subscriber disclaims reliance on any other statements made or information provided by any person or entity in the course of the Subscriber's consideration of the purchase of the HCCF-4 12% High Yield Secured Bonds

(g) Risk. SUBSCRIBER UNDERSTANDS THAT THIS INVESTMENT IN THIS COMPANY IS ILLIQUID AND INVOLVES A HIGH DEGREE OF SPECULATIVE RISK. The Subscriber recognizes that the purchase of the HCCF-4 12% High Yield Secured Bonds involves a high degree of risk in that, among other things, (i) HCCF-4 is an early stage business with a limited operating history and may require funding in addition to the proceeds of the Private Placement, which may be done through additional equity issuances which may cause additional dilution, (ii) an investment in HCCF-4 is highly speculative, and only an investor who can afford the loss of the Subscriber's entire investment should consider investing in HCCF-4 and the HCCF-4 12% High Yield Secured Bonds, (iii) the Subscriber acknowledges that as a Secured bond, in the event and only in the event that HCCF-4 cannot fulfill the repayment under the terms of this Agreement, such Subscriber shall retain a legal right to any and all claims under the Standby Letter of Credit instrument secured up to $5,000,000,00.

(h) No Commissions or FINRA Affiliation. The subscriber has not paid or received any commission or other remuneration in connection with the Private Placement. The Subscriber is not associated with a Unitholder firm of the National Association of Securities Dealers, Corporation.

(i) No Brokers or General Solicitation. Neither the Subscriber nor any of its officers, directors, employees, agents, stockholders or partners, if any, has either directly or indirectly, including through a broker or finder engaged in any general solicitation, or (ii) published any advertisement in connection with the offer and sale of the HCCF-4 12% High Yield Secured Bonds The Subscriber represents that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction and agrees to indemnify and to hold harmless HCCF-4 from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which the Subscriber or any of its officers, directors, employees, agents, stockholders or partners, if any, is responsible.

(j) Address. The Subscriber represents that the address of the Subscriber furnished on the signature page hereof is (i) the Subscriber's principal business address if the Subscriber is not a natural person or (ii) the Subscriber's principal residence if the Subscriber is a natural person.

(k) Foreign Subscribers. If the Subscriber is not a United States person (as defined by Section 7701(a) (30) of

the Internal Revenue Code of 1986, as amended), the Subscriber hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the HCCF-4 12% High Yield Secured Bonds or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the HCCF-4 12% High Yield Secured Bonds, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the HCCF-4 12% High Yield Secured Bonds. The Subscriber's subscription and payment for and continued beneficial ownership of the HCCF-4 12% High Yield Secured Bonds will not violate any applicable securities or other laws of the Subscriber's jurisdiction.

(l) Operating Agreement. The Subscriber acknowledges and agrees that (i) the HCCF-4 12% High Yield Secured Bonds are subject to substantial restrictions on transfer and voting pursuant to the Operating Agreement, (ii) the HCCF-4 12% High Yield Secured Bonds will be recorded in the records of HCCF-4, and (iii) HCCF-4 will make a notation on its transfer books to such effect.

(m) SAFEKEEPING OF PROCEEDS. All funds will be deposited and held in company nonoperating bank account until the company meets the minimum offering amount or refund to an investor in the event the company fails to raise the minimum amount required to complete the offering within 12 months of the offering date.

5. **Miscellaneous.**

(a) Expenses, Etc. Each party hereto will pay its own expenses in connection with the transactions contemplated by this Agreement, whether or not such transactions shall be consummated

(b) Survival of Agreements. All covenants, agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement and the issuance, sale and delivery of the HCCF-4 12% High Yield Secured Bonds pursuant hereto.

(c) Parties in Interest. All covenants and agreements contained in this Agreement by or on behalf of any of the parties hereto shall bind and inure to the benefit of the respective successors and permitted assigns of the parties hereto whether so expressed or not, except for transferees in a Public Sale. For the purposes of this Agreement, "Public Sale" means any sale of HCCF-4 12% High Yield Secured Bonds to the public pursuant to an offering registered under the Securities Act or to the public pursuant to the provisions of Rule 144 (or any successor or similar rule) adopted under the Securities Act.

(d) Notices. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given, delivered and received upon the earlier of actual receipt or: (a) personal delivery to the party to be notified, (b) when sent, if sent by facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next day or next business day delivery, with written verification of receipt. All communications shall be sent to, if to the Subscriber, such Subscriber's address as set forth on the signature page

hereto, or, if to HCCF-4, to the principal office of HCCF-4 and to the attention of the Manager, or to such facsimile number or address as subsequently modified by written notice given in accordance with this Section 5(d), with an email copy to the Manager at invest@harborcity.com

(e) Entire Agreement; Modifications. This Agreement, together with the Private Placement Memorandum dated November 24, 2019, constitutes the entire agreement of the parties with respect to the subject matter hereof and may not be amended or modified nor any provisions waived except in a writing signed by HCCF-4 and Subscriber.

(f) Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(g) Governing Law. This agreement, the performance of this Agreement and any and all matters arising directly or indirectly herefrom or therefrom, including the legal relations among the parties, shall be governed by and construed and enforced in accordance with, the laws of the State of Wyoming, without regard to its conflict of laws rules. The parties hereto hereby irrevocably and unconditionally (i) agree that any action or proceeding arising out of or in connection with this Agreement shall be brought only in the State of Wyoming, and not in any other state or federal court in the United States of America or in any other country, (ii) consent to submit to the exclusive jurisdiction of the State courts for purposes of any action or proceeding arising out of or in connection with this Agreement, (iii) waive any objection to the laying of venue of any such action or proceeding in a State court, and (iv) waive, and agree not to plead or to make, any claim that any such action or proceeding brought in the State court has been brought in an improper or inconvenient forum.

## FEDERAL INCOME TAX MATTERS

### Treasury Department Circular 230 Notice

To ensure compliance with Circular 230, prospective investors and the Bondholders are hereby notified that (a) any discussion of Federal tax issues contained or referred to in this Memorandum or in any supplements or annexes is not intended or written to be used, and cannot be used, by prospective investors and Bondholders for the purpose of avoiding penalties that may be imposed on them under the Internal Revenue Code; (b) such discussion is written in connection with the promotion or marketing by the Company of the transactions or matters addressed in this Memorandum or in any supplements or annexes and (c) prospective investors and Bondholders should seek tax advice based on their particular circumstances from an independent tax advisor.

**Each prospective investor is therefore urged to consult his or her tax advisor with respect to the tax consequences arising from an investment in the Company. No ruling from the Service regarding the tax aspects of the Company has been or will be requested.**

### General

The following is a general discussion of certain federal income tax consequences of the purchase,

ownership and disposition of the Shares based upon the relevant provisions of the Internal Revenue Code of 1986, as amended (the "Code"), the regulations thereunder, existing judicial decisions and published rulings. Future legislative, judicial or administrative changes or interpretations, which may or may not be retroactive, could affect the federal income tax consequences to the Bondholders or the Company. The discussion below does not purport to deal with the federal income tax consequences applicable to all categories of investors, some of which may be subject to special rules. The discussion focuses primarily upon investors who will hold the Shares as "capital assets" within the meaning of the Code. You are advised to consult your own tax advisers with regard to the federal income tax consequences of acquiring, holding and disposing of the Shares, as well as state, local and other tax consequences resulting from an investment in the Shares.

### INVESTMENTS BY QUALIFIED PLANS AND INDIVIDUAL RETIREMENT ACCOUNTS

Certain investors in the Company may be subject to the fiduciary responsibility and prohibited transaction requirements of Employee Retirement Income Security Act of 1974, as amended **("ERISA"),** and/or related provisions of the Code. The following is a summary of some of the material fiduciary investment considerations that may apply to such investors under ERISA and the Code. This summary is based on the fiduciary responsibility provisions and prohibited transaction restrictions of ERISA, relevant regulations and opinions issued by the U.S. Department of Labor and court decisions thereunder, and on the pertinent provisions of the Code, relevant regulations published rulings and procedures of the Service and court decisions thereunder.

**Considerations for Foreign Investors**

The Company is required to withhold tax with respect to a Unitholder's allocable portion of the Company's "effectively connected taxable income" within the United States if the Unitholder is a foreign person or entity. In general, the amount of tax to be withheld is the applicable percentage equal to the highest appropriate tax rate. The Company can be exempt from such withholding if the foreign Unitholder certifies under penalty of perjury that it is not a foreign person as defined in the Code or Regulations.

Additional issues may arise pertaining to information reporting and backup withholding for foreign Bondholders. Foreign Bondholders should consult their tax advisers with regard to U.S. information reporting and backup withholding.

**State and Local Taxes**

The Company may be subject to State and local income, franchise, property, or other taxes in states and localities in which we do business or own property. Our tax treatment (and the tax treatment of our Bondholders) in state and local jurisdictions may differ from the federal income tax treatment described above. The discussion in this Offering does not attempt to describe state and local tax effects applicable to the Company or the Bondholders. Potential investors should consult their own tax advisors regarding these matters.

**Administrative Matters**

The Company intends to send to each Bondholder within ninety (90) days after the close of our taxable year, certain tax information, including a 1099-INT, which sets forth each bondholder's allocable share of our income, gain, loss, deductions and credits. The federal income tax information returns the Company files may be audited by the Service. Adjustments resulting from any such audit may require each Bondholder to file an amended tax return and possibly may result in an audit of the Unitholder's own return. Any audit of Bondholders return could result in adjustments of non-Company as well as Company items.

**Possible Changes in Tax Laws**

The statutes, regulations and rules with respect to all of the foregoing tax matters are constantly subject to change by Congress and/or by the Department of the Treasury, and the interpretations of such statutes, regulations and rules may be modified or affected by a judicial decision or by the Department of the Treasury. Because significant amendments have been made to the Code in recent years, and because of the continual changes made by Congress, the Department of the Treasury and the courts with respect to the administration and interpretation of the tax laws, no assurance can be given that the foregoing opinions and interpretations will be sustained or that tax aspects summarized herein will prevail and be available to the Bondholders.

**Need for Independent Advice**

The tax matters relating to the Company and its proposed transactions are complex and subject to various interpretations. The foregoing is not intended as a substitute for careful tax planning, particularly since the tax consequences of an investment in the Company may not be the same for all investors. Accordingly, the Company urges potential investors to consult their tax advisors prior to investing in the Company.

## REPORTS

The Company will furnish the following reports, statements and tax information to each Unitholder:

*Tax Information:* Except as may otherwise be required by applicable law, within ninety (90) days after the last day of each calendar year, the Company intends send to each Bondholder such tax information as shall be necessary for the preparation of federal income tax returns, state income tax returns, and any other tax returns required by any other applicable jurisdiction, if any.

Restrictions Imposed by the USA PATRIOT Act and Related Acts

- In accordance with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended (the "USA PATRIOT Act"), our Bonds may not be offered, sold, transferred or delivered, directly or indirectly, to any "Unacceptable Investor," which means anyone who is:

- a "designated national," "specially designated national," "specially designated terrorist," "specially designated global terrorist," "foreign terrorist organization" or "blocked person" within the definitions set forth in the Foreign Assets Control Regulations of the U.S. Treasury Department;

- acting on behalf of, or an entity owned or controlled by, any government against whom the U.S. maintains economic sanctions or embargoes under the regulations of the U.S. Treasury Department;

- within the scope of Executive Order 13224 — Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten to Commit, or Support Terrorism, effective September 24, 2001;

- subject to additional restrictions imposed by the following statutes or regulations and executive orders issued thereunder: the Trading with the Enemy Act, the Iraq Sanctions Act, the National Emergencies Act, the Antiterrorism and Effective Death Penalty Act of 1996, the International Emergency Economic Powers Act, the United Nations Participation Act, the International Security and Development Cooperation Act, the Nuclear Proliferation Prevention Act of 1994, the Foreign Narcotics Kingpin Designation Act, the Iran and Libya Sanctions Act of 1996, the Cuban Democracy Act, the Cuban Liberty and Democratic Solidarity Act and the Foreign Operations, Export Financing and Related Programs Appropriation Act or any other law of similar import as to any non-U.S. country, as each such act or law has been or may be amended, adjusted, modified, or interpreted from time to time; or designated or blocked, associated or involved in terrorism, or subject to restrictions under laws, regulations, or executive orders as may apply in the future similar to those set forth above.

THE HCCF-4 12% HIGH YIELD SECURED BONDS BEING SOLD HEREUNDER HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE OFFERING OR THE ACCURACY OR ADEQUACY OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THE HCCF-4 12% HIGH YIELD SECURED BONDS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS. THE HCCF-4 12% HIGH YIELD SECURED BONDS ARE SUBJECT TO RESTRICTION ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER SAID ACT AND SUCH LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. SUBSCRIBER SHOULD BE AWARE THAT IT WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. SUBSCRIBER SHOULD CONSULT ITS OWN LEGAL COUNSEL, ACCOUNTANT AND BUSINESS AND FINANCIAL ADVISERS AS TO ALL LEGAL, TAX AND RELATED MATTERS CONCERNING ANY INVESTMENT IN HCCF-4.

**SIGNATURE PAGE FOLLOWS**

IN WITNESS WHEREOF, HCCF-4 LLC and the Subscriber have executed this Agreement.

For HCCF-4 LLC

By:_____ Dated:_____
Name: J.P. Maroney as Manager of HCCF-4 LLC


SUBSCRIBER:

By:_____ Dated:_____

Social Security # or EIN #:


Name:

Contact:


Address:

City:

State:

Postal Code:


Phone:

Email:

Fax:


Number Of HCCF-4 12% High Yield Secured Bonds:

Purchase Price Per Bond:   $1,000

Total Purchase Price:

# SUBSCRIPTION AGREEMENT



**10%\* 1 Year Secured Bonds (Series A Bonds)**
**12%\* 3 Year Secured Bonds (Series B Bonds)**
**14%\* 5 Year Secured Bonds (Series C Bonds)**

## HCCF-5, LLC

A Wyoming limited liability company
100 Rialto Place, Suite 700
Melbourne, Florida 32901
(321) 608-0605

**\*See *Special Provision Addendum* for complete rate disclosure.**

# SUBSCRIPTION AGREEMENT

SUBSCRIPTION AGREEMENT between HCCF-5 LLC, a Wyoming Limited Liability Company ("HCCF-5"), and the subscriber listed on the signature page hereof (the "Subscriber" or "Bondholder") made as of the date set forth by the subscriber opposite the subscriber's signature on the signature page hereof.

## WITNESSETH:

WHEREAS, HCCF-5 is conducting a private placement (the "Private Placement") pursuant to which it is offering up to an aggregate of 15,000 HCCF-5 Series A, B or C High Yield Secured Bonds of HCCF-5; and

WHEREAS, the Subscriber desires to purchase from HCCF-5 in the Private Placement the number of HCCF-5 Series A, B or C High Yield Secured Bonds set forth on the signature page hereof, subject to the provisions described herein on the terms and conditions hereinafter set forth; and

WHEREAS, This Subscription Agreement is one of a limited number of such subscriptions for HCCF-5 Series A, B or C High Yield Secured Bonds offered by HCCF-5 to a limited number of suitable investors pursuant to Rule 506c of Regulation D of the Securities Act of 1933, as amended (the "Securities Act"). Execution of this Subscription Agreement by the Subscriber shall constitute an offer by the Subscriber to purchase on the terms and conditions specified herein and in HCCF-5 Confidential Private Placement Memorandum dated July 24, 2020 (the "PPM"). HCCF-5 reserves the right to reject such a subscription offer or, by executing a copy of this Subscription Agreement, to accept such an offer. If the Subscriber's offer is accepted, HCCF-5 will execute this Subscription Agreement and issue the HCCF-5 Series A, B or C High Yield Secured Bonds in accordance with the terms provided in the PPM. If the Subscriber's offer is rejected, the payment accompanying this Subscription Agreement will be returned to the Subscriber, with no interest thereon, with the notice of rejection.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto agree as follows:

## 1. ISSUANCE, SALE, AND DELIVERY OF THE HCCF-5 SERIES A, B OR C HIGH YIELD SECURED BONDS

   a. Subject to the terms and conditions set forth herein and execution of this Agreement attached to the PPM to which this Agreement is attached, on the Closing Date (as defined below) HCCF-5 shall issue, sell and deliver to Subscriber, and Subscriber shall purchase from HCCF-5, the HCCF-5 Series A, B or C High Yield Secured Bonds for a purchase price of $1,000 per bond (the aggregate purchase price to be paid by the Subscriber for the HCCF-5 Series A, B or C High Yield Secured Bonds is referred to herein as the "Purchase Price").

   b. The Subscriber will pay (i) the Purchase Price by wire transfer, check, money order or as otherwise directed by HCCF-5, of immediately payable funds. Subscriber shall be registered in the books of HCCF-5 as the owner of the HCCF-5 Series A, B or C High

Yield Secured Bonds being purchased by Subscriber hereunder, which such HCCF-5 Series A, B or C High Yield Secured Bonds may be evidenced by a bond registration in the books of HCCF-5 in the name of the Subscriber.

c. Terms for payment: Upon the execution and submission of the Subscription Agreement the subscriber will include full payment for Subscribed number of bonds.

## 2. CLOSING DATE

In the event HCCF-5 accepts this subscription by execution of this Agreement, the closing of the sale and purchase of the HCCF-5 Series A, B or C High Yield Secured Bonds shall take place at the offices of HCCF-5 at such place, date and time as may be determined by HCCF-5 (such date and time of the closing being herein called the "Closing Date"). HCCF-5, IN ITS SOLE DISCRETION, MAY REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART. The Subscriber acknowledges that this subscription shall be deemed to be accepted by HCCF-5 only when this Agreement is countersigned by an authorized officer of HCCF-5. The Subscriber further acknowledges and agrees that subscriptions need not be accepted in the order they are received, that HCCF-5 shall not be obligated to sell all or any of the Number of HCCF-5 Series A, B or C High Yield Secured Bonds proposed to be sold in the Private Placement, that HCCF-5 shall not be required to sell any minimum number of HCCF-5 Series A, B or C High Yield Secured Bonds at any closing and that HCCF-5 may hold one or more closings for such number of HCCF-5 Series A, B or C High Yield Secured Bonds as it shall determine in its sole discretion.

## 3. SERIES STRUCTURE AND TERMS

The HCCF-5 Bond is presented in three series: A; B and C as set forth in the chart below:

|  | Bond Period | Interest Rate | Monthly Payment |
|---|---|---|---|
| SERIES A | 12 months | 10% annual rate | 0.833% per month on the 15th of the month following initial investment. |
| SERIES B | 36 months | 12% annual rate | 1% per month on the 15th of the month following initial investment. |
| SERIES C | 60 months | 14% annual rate | 1.167% per month on the 15th of the month following initial investment. |

## 4.  REPRESENTATIONS AND WARRANTIES OF HCCF-5

### HCCF-5 represents and warrants to Subscriber as follows:

a. Organization HCCF-5 is a Limited Liability Company duly formed, validly existing and in good standing under the laws of the State of Wyoming. HCCF-5 has, or on or prior to the Closing Date will have, the authority to own and hold its properties, to carry on its business as currently conducted, to execute, deliver and perform this Agreement and to issue and deliver the HCCF-5 Series A, B or C High Yield Secured Bonds

b. Authorization of Agreements, Etc. This Agreement has, or on or prior to the Closing Date will have, been duly executed and delivered by HCCF-5 and constitutes the valid and binding obligation of HCCF-5 enforceable against it in accordance with its terms, except as may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization or similar laws affecting creditors' rights generally or by general equitable principles, and except insofar as the enforceability of any provision hereof would be restricted or void by reason of public policy.

c. Secured Position The HCCF-5 Bond holds a secured position in the $15,000,000.00 Standby Letter of Credit with a top tier bank or alternatively in the event of trade or sale of said instrument, HCCF-5 will maintain a secured position with blocked or escrowed funds of $15,000,000.00 during the term of this Agreement. The secured position with the claim rights against an instrument or a cash or other liquid positions will be provided in a quarterly statement to the investor with any and all provisions to the method of claim. At no point during the investment period, shall HCCF-5 compromise or reduce the claim rights below the subscribed position of $15,000,000.00. Claims are secured in and against this Standby Letter of Credit or blocked or escrowed account during the term of this Agreement and are fully redeemable in the event of non performance in part or full under this Agreement.

d. No Conflicts. HCCF-5 execution and delivery of this Agreement and HCCF-5 consummation of the transactions contemplated hereby will not (i) violate, conflict with or result in an event of default under any material agreement or contract to which HCCF-5 is a party or by which it is bound, (ii) violate any applicable law, ordinance, rule or regulation of any governmental body having jurisdiction over HCCF-5 or its business or any order, judgment or decree applicable to HCCF-5, or (iii) violate any provision of its Operating Agreement, each as may be in effect as of the Closing Date.

## 5.  REPRESENTATIONS AND WARRANTIES OF THE SUBSCRIBER

### Subscriber represents and warrants to HCCF-5 with respect to itself as follows:

a. Organization, Power and Authority. The subscriber, if not a natural person, is duly authorized or organized, validly existing and in good standing in its jurisdiction of a corporation or organization. Subscriber has full power and authority to enter into, deliver and perform this Agreement and has taken all action required to authorize the execution and delivery hereof and to consummate the transactions contemplated hereby, including the purchase of the HCCF-5 Series A, B or C High Yield Secured Bonds , and, if

Subscriber is not a natural person, the person signing this Agreement on behalf of Subscriber has been duly authorized to act on behalf of and to bind such party.

b.  Authorization of Agreements, Etc. The Transaction Documents have been duly executed and delivered by the Subscriber and constitute the valid and binding obligation of the Subscriber, enforceable against the Subscriber in accordance with its terms, except as may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization or similar laws affecting creditors' rights generally or by general equitable principles, and except insofar as the enforceability of any provision hereof would be restricted or void by reason of public policy.

c.  No Conflicts. The execution and delivery of the Transaction Documents and the consummation of the transactions contemplated hereby will not (i) violate, conflict with or result in an event of default under any material agreement or contract to which the Subscriber is a party or by the Subscriber is bound, (ii) violate any applicable law, ordinance, rule or regulation of any governmental body having jurisdiction over such party or its business or any order, judgment or decree applicable to the Subscriber, (iii) require the Subscriber to obtain the consent of any governmental agency or entity or any other third party, other than such consents as have already been obtained, or (iv) if not a natural person, violate any provision of the Subscriber's certificate of incorporation, certificate of limited partnership, certificate of formation or other formation or organizational instrument or document, as applicable, and by-laws, partnership agreement or operating agreement, as applicable.

d.  Investment Representations. Subscriber represents and warrants to HCCF-5 that (i) it has completed the "Accredited Investor Certification" attached to this Agreement and provided that Subscriber meets the "Accredited" investor qualification investor under Rule 506c and it is an "accredited investor" as such term is defined in Rule 501 of Regulation D ("Regulation D") promulgated under the Securities Act of 1933, as amended (the "Securities Act") and it is acquiring the HCCF-5 Series A, B or C High Yield Secured Bonds for its own account for the purpose of investment and not with a view to or for sale in connection with any distribution thereof. Subscriber further represents that Subscriber has knowledge and experience in business and financial matters and prior investment experience, including investment in securities that are non-listed, unregistered and/or not traded on a national securities exchange or on The NASDAQ Stock Market and that Subscriber understands that (i) the HCCF-5 Series A, B or C High Yield Secured Bonds have not been registered under the Securities Act, by reason of their issuance in a transaction exempt from the registration requirements of the Securities Act pursuant to Section 4(2) thereof or pursuant to Regulation D promulgated thereunder, (ii) the HCCF-5 Series A, B or C High Yield Secured Bonds must be held indefinitely unless a subsequent disposition thereof is registered under the Securities Act or is exempt from such registration, (iii) the HCCF-5 Series A, B or C High Yield Secured Bonds will bear a legend to such effect, and (iv) HCCF-5 will make a notation on its transfer books to such effect.

e.  No Public Market. Subscriber understands that there is no public market for either the HCCF-5 Series A, B or C High Yield Secured Bonds and that no market may develop. The Subscriber understands and acknowledges that HCCF-5 is under no obligation to register the HCCF-5 Series A, B or C High Yield Secured Bonds under the Securities Act or any state securities or "blue sky" laws. The Subscriber acknowledges that at such time, if ever, as the HCCF-5 Series A, B or C High Yield Secured Bonds are registered, sales of such securities will be subject to state securities laws, and that any sales must

comply in all respects with all applicable state securities laws, including those of the state in which the Subscriber resides, which may require any securities sold in such state to be sold through a registered broker-dealer or in reliance upon an exemption from registration.

f. Access to Information. The Subscriber represents that the Subscriber has been furnished by HCCF-5 during the course of this transaction with the PPM and all information regarding HCCF-5 which the Subscriber has requested or desired to know, has been afforded the opportunity to ask questions of and receive answers from duly authorized officers of HCCF-5 concerning the terms and conditions of the Private Placement and has received any additional information which the Subscriber has requested. The Subscriber has relied solely upon the information provided by HCCF-5 in this Agreement in making the decision to invest in the respective Bond offering. The Subscriber disclaims reliance on any other statements made or information provided by any person or entity in the course of the Subscriber's consideration of the purchase of the HCCF-5 Series A, B or C High Yield Secured Bonds

g. Risk. SUBSCRIBER UNDERSTANDS THAT THIS INVESTMENT IN THIS COMPANY IS ILLIQUID AND INVOLVES A HIGH DEGREE OF SPECULATIVE RISK. The Subscriber recognizes that the purchase of the HCCF-5 Series A, B or C High Yield Secured Bonds involves a high degree of risk in that, among other things, (i) HCCF-5 is an early stage business with a limited operating history and may require funding in addition to the proceeds of the Private Placement, which may be done through additional equity issuances which may cause additional dilution, (ii) an investment in HCCF-5 is highly speculative, and only an investor who can afford the loss of the Subscriber's entire investment should consider investing in HCCF-5 and the HCCF-5 Series A, B or C High Yield Secured Bonds, (iii) the Subscriber acknowledges that as a Secured bond, in the event and only in the event that HCCF-5 cannot fulfill the repayment under the terms of this Agreement, such Subscriber shall retain a legal right to any and all claims under the Standby Letter of Credit instrument or cash or cash equivalent account secured up to $15,000,000,00.

h. No Commissions or FINRA Affiliation. The subscriber has not paid or received any commission or other remuneration in connection with the Private Placement. The Subscriber is not associated with a member firm of the National Association of Securities Dealers, Corporation.

i. No Brokers or General Solicitation. Neither the Subscriber nor any of its officers, directors, employees, agents, stockholders or partners, if any, has either directly or indirectly, including through a broker or finder engaged in any general solicitation, or (ii) published any advertisement in connection with the offer and sale of the HCCF-5 Series A, B or C High Yield Secured Bonds The Subscriber represents that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction and agrees to indemnify and to hold harmless HCCF-5 from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which the Subscriber or any of its officers, directors, employees, agents, stockholders or partners, if any, is responsible.

j. Address. The Subscriber represents that the address of the Subscriber furnished on the signature page hereof is (i) the Subscriber's principal business address if the Subscriber is not a natural person or (ii) the Subscriber's principal residence if the Subscriber is a natural person.

k.  Foreign Subscribers. If the Subscriber is not a United States person (as defined by Section 7701(a) (30) of the Internal Revenue Code of 1986, as amended), the Subscriber hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the HCCF-5 Series A, B or C High Yield Secured Bonds or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the HCCF-5 Series A, B or C High Yield Secured Bonds, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the HCCF-5 Series A, B or C High Yield Secured Bonds. The Subscriber's subscription and payment for and continued beneficial ownership of the HCCF-5 Series A, B or C High Yield Secured Bonds will not violate any applicable securities or other laws of the Subscriber's jurisdiction.

l.  Operating Agreement. The Subscriber acknowledges and agrees that (i) the HCCF-5 Series A, B or C High Yield Secured Bonds are subject to substantial restrictions on transfer and voting pursuant to the Operating Agreement, (ii) the HCCF-5 Series A, B or C High Yield Secured Bonds will be recorded in the records of HCCF-5, and (iii) HCCF-5 will make a notation on its transfer books to such effect.

m.  SAFEKEEPING OF PROCEEDS. All funds will be deposited and held in a Company bank account until the company meets the minimum offering amount or refund to an investor in the event the company fails to raise the minimum amount required to complete the offering within 12 months of the offering date.

## 6. MISCELLANEOUS

a.  Expenses, Etc. Each party hereto will pay its own expenses in connection with the transactions contemplated by this Agreement, whether or not such transactions shall be consummated

b.  Survival of Agreements. All covenants, agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement and the issuance, sale and delivery of the HCCF-5 Series A, B or C High Yield Secured Bonds pursuant hereto.

c.  Parties in Interest. All covenants and agreements contained in this Agreement by or on behalf of any of the parties hereto shall bind and inure to the benefit of the respective successors and permitted assigns of the parties hereto whether so expressed or not, except for transferees in a Public Sale. For the purposes of this Agreement, "Public Sale" means any sale of HCCF-5 Series A, B or C High Yield Secured Bonds to the public pursuant to an offering registered under the Securities Act or to the public pursuant to the provisions of Rule 144 (or any successor or similar rule) adopted under the Securities Act.

d.  Notices. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given, delivered and received upon the earlier of actual receipt or: (a) personal delivery to the party to be notified, (b) when sent, if sent by facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight

courier, freight prepaid, specifying next day or next business day delivery, with written verification of receipt. All communications shall be sent to, if to the Subscriber, such Subscriber's address as set forth on the signature page hereto, or, if to HCCF-5, to the principal office of HCCF-5 and to the attention of the Manager, or to such facsimile number or address as subsequently modified by written notice given in accordance with this Section 5(d), with an email copy to the Manager at hccf-5@hccmediafunding.com

e.  Claims. Any claims made under the Standby Letter of Credit ("SBLC") must be made in full accordance with the terms and conditions set forth in the Notice of Claim section provided as an addendum hereto.

f.  Entire Agreement; Modifications. This Agreement, together with the Private Placement Memorandum dated July 24, 2020, constitutes the entire agreement of the parties with respect to the subject matter hereof and may not be amended or modified nor any provisions waived except in a writing signed by HCCF-5 and Subscriber.

g.  Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

h.  Governing Law. This agreement, the performance of this Agreement and any and all matters arising directly or indirectly herefrom or therefrom, including the legal relations among the parties, shall be governed by and construed and enforced in accordance with, the laws of the State of Wyoming, without regard to its conflict of laws rules. The parties hereto hereby irrevocably and unconditionally (i) agree that any action or proceeding arising out of or in connection with this Agreement shall be brought only in the State of Wyoming, and not in any other state or federal court in the United States of America or in any other country, (ii) consent to submit to the exclusive jurisdiction of the State courts for purposes of any action or proceeding arising out of or in connection with this Agreement, (iii) waive any objection to the laying of venue of any such action or proceeding in a State court, and (iv) waive, and agree not to plead or to make, any claim that any such action or proceeding brought in the State court has been brought in an improper or inconvenient forum.

# FEDERAL INCOME TAX MATTERS

## Treasury Department Circular 230 Notice

To ensure compliance with Circular 230, prospective investors and the Bondholders are hereby notified that (a) any discussion of Federal tax issues contained or referred to in this Memorandum or in any supplements or annexes is not intended or written to be used, and cannot be used, by prospective investors and Bondholders for the purpose of avoiding penalties that may be imposed on them under the Internal Revenue Code; (b) such discussion is written in connection with the promotion or marketing by the Company of the transactions or matters addressed in this Memorandum or in any supplements or annexes and (c) prospective investors and Bondholders should seek tax advice based on their particular circumstances from an independent tax advisor.

Each prospective investor is therefore urged to consult his or her tax advisor with respect to the tax consequences arising from an investment in the Company. No ruling from the Service regarding the tax aspects of the Company has been or will be requested.

## General

The following is a general discussion of certain federal income tax consequences of the purchase, ownership and disposition of the Shares based upon the relevant provisions of the Internal Revenue Code of 1986, as amended (the "Code"), the regulations thereunder, existing judicial decisions and published rulings. Future legislative, judicial or administrative changes or interpretations, which may or may not be retroactive, could affect the federal income tax consequences to the Bondholders or the Company. The discussion below does not purport to deal with the federal income tax consequences applicable to all categories of investors, some of which may be subject to special rules. The discussion focuses primarily upon investors who will hold the Shares as "capital assets" within the meaning of the Code. You are advised to consult your own tax advisers with regard to the federal income tax consequences of acquiring, holding and disposing of the Shares, as well as state, local and other tax consequences resulting from an investment in the Shares.

# INVESTMENTS BY QUALIFIED PLANS AND INDIVIDUAL RETIREMENT ACCOUNTS

Certain investors in the Company may be subject to the fiduciary responsibility and prohibited transaction requirements of Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and/or related provisions of the Code. The following is a summary of some of the material fiduciary investment considerations that may apply to such investors under ERISA and the Code. This summary is based on the fiduciary responsibility provisions and prohibited transaction restrictions of ERISA, relevant regulations and opinions issued by the U.S. Department of Labor and court decisions thereunder, and on the pertinent provisions of the Code, relevant regulations published rulings and procedures of the Service and court decisions thereunder.

## Considerations for Foreign Investors

The Company is required to withhold tax with respect to a bondholder's allocable portion of the Company's "effectively connected taxable income" within the United States if the bondholder is a foreign person or entity. In general, the amount of tax to be withheld is the applicable percentage equal to the highest appropriate tax rate. The Company can be exempt from such withholding if the foreign bondholder certifies under penalty of perjury that it is not a foreign person as defined in the Code or Regulations.

Additional issues may arise pertaining to information reporting and backup withholding for foreign Bondholders. Foreign Bondholders should consult their tax advisers with regard to U.S. information reporting and backup withholding.

## State and Local Taxes

The Company may be subject to State and local income, franchise, property, or other taxes in states and localities in which we do business or own property. Our tax treatment (and the tax treatment of our Bondholders) in state and local jurisdictions may differ from the federal income

tax treatment described above. The discussion in this Offering does not attempt to describe state and local tax effects applicable to the Company or the Bondholders. Potential investors should consult their own tax advisors regarding these matters.

## Administrative Matters

The Company intends to send to each Bondholder within ninety (90) days after the close of our taxable year, certain tax information, including a 1099-INT, which sets forth each bondholder's allocable share of our income, gain, loss, deductions and credits. The federal income tax information returns the Company files may be audited by the Service. Adjustments resulting from any such audit may require each Bondholder to file an amended tax return and possibly may result in an audit of the Bondholder's own return. Any audit of Bondholder's return could result in adjustments of non-Company as well as Company items.

## Possible Changes in Tax Laws

The statutes, regulations and rules with respect to all of the foregoing tax matters are constantly subject to change by Congress and/or by the Department of the Treasury, and the interpretations of such statutes, regulations and rules may be modified or affected by a judicial decision or by the Department of the Treasury. Because significant amendments have been made to the Code in recent years, and because of the continual changes made by Congress, the Department of the Treasury and the courts with respect to the administration and interpretation of the tax laws, no assurance can be given that the foregoing opinions and interpretations will be sustained or that tax aspects summarized herein will prevail and be available to the Bondholders.

## Need for Independent Advice

The tax matters relating to the Company and its proposed transactions are complex and subject to various interpretations. The foregoing is not intended as a substitute for careful tax planning, particularly since the tax consequences of an investment in the Company may not be the same for all investors. Accordingly, the Company urges potential investors to consult their tax advisors prior to investing in the Company.

# REPORTS

The Company will furnish the following reports, statements and tax information to each bondholder:

Tax Information: Except as may otherwise be required by applicable law, within ninety (90) days after the last day of each calendar year, the Company intends send to each Bondholder such tax information as shall be necessary for the preparation of federal income tax returns, state income tax returns, and any other tax returns required by any other applicable jurisdiction, if any.

## Restrictions Imposed by the USA PATRIOT Act and Related Acts

- In accordance with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended (the "USA PATRIOT Act"), our Bonds may not be offered, sold, transferred or delivered, directly or indirectly, to any "Unacceptable Investor," which means anyone who is:

- a "designated national," "specially designated national," "specially designated terrorist," "specially designated global terrorist," "foreign terrorist organization" or "blocked person" within the definitions set forth in the Foreign Assets Control Regulations of the U.S. Treasury Department;

- acting on behalf of, or an entity owned or controlled by, any government against whom the U.S. maintains economic sanctions or embargoes under the regulations of the U.S. Treasury Department;

- within the scope of Executive Order 13224 — Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten to Commit, or Support Terrorism, effective September 24, 2001;

- subject to additional restrictions imposed by the following statutes or regulations and executive orders issued thereunder: the Trading with the Enemy Act, the Iraq Sanctions Act, the National Emergencies Act, the Antiterrorism and Effective Death Penalty Act of 1996, the International Emergency Economic Powers Act, the United Nations Participation Act, the International Security and Development Cooperation Act, the Nuclear Proliferation Prevention Act of 1994, the Foreign Narcotics Kingpin Designation Act, the Iran and Libya Sanctions Act of 1996, the Cuban Democracy Act, the Cuban Liberty and Democratic Solidarity Act and the Foreign Operations, Export Financing and Related Programs Appropriation Act or any other law of similar import as to any non-U.S. country, as each such act or law has been or may be amended, adjusted, modified, or interpreted from time to time; or designated or blocked, associated or involved in terrorism, or subject to restrictions under laws, regulations, or executive orders as may apply in the future similar to those set forth above.

THE HCCF-5 SERIES A, B OR C HIGH YIELD SECURED BONDS BEING SOLD HEREUNDER HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE OFFERING OR THE ACCURACY OR ADEQUACY OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THE HCCF-5 SERIES A, B OR C HIGH YIELD SECURED BONDS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS. THE HCCF-5 SERIES A, B OR C HIGH YIELD SECURED BONDS ARE SUBJECT TO RESTRICTION ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER SAID ACT AND SUCH LAWS PURSUANT TO

REGISTRATION OR EXEMPTION THEREFROM. SUBSCRIBER SHOULD BE AWARE THAT IT WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. SUBSCRIBER SHOULD CONSULT ITS OWN LEGAL COUNSEL, ACCOUNTANT AND BUSINESS AND FINANCIAL ADVISERS AS TO ALL LEGAL, TAX AND RELATED MATTERS CONCERNING ANY INVESTMENT IN HCCF-5.

**SUBSCRIPTION AGREEMENT INFORMATION AND SIGNATURE PAGES FOLLOWS**

**SUBSCRIPTION AGREEMENT INFORMATION AND SIGNATURE PAGES**

IN WITNESS WHEREOF, HCCF-5 LLC and the Subscriber have executed this Agreement.

| SU | IBER INFORMATION: | | |
|---|---|---|---|
| Su ␀egal Name: An ␀ital Funding Bond Fund I, LLC | | | Primary Contact: Dave Anthony |
| Ma ␀ess: 11 ␀0th Ave. #400 | | | |
| Ci Br | | State: Colorado | Postal Code: 80021 |
| Ph 30 ␀8 | | Email: dave@anthonycap.com | |
| Ta ␀er (Social Security # or EIN): 85 | | | |
| SU | ION INFORMATION: | | |
| To ␀ Bond Series (A, B or C): Se ␀ Series B: Series C: | | | Aggregate Total Of Bonds: |
| Pur ␀rice Per Bond: $1,000.00 USD | | Total Subscription Purchase Amount: | |
| SIGNATURES: | | | |
| Subscriber: | | Date: | |
| For HCCF-5, LLC   J.P. Maroney as Manager of HCCF-5, LLC | | Date: | |

**SPECIAL PROVISION ADDENDUM**

**An additional preferred rate of return is added to the rates outlined in this subscription agreement agreement, and corresponding Private Placement Memorandum.**

**1 Year Series A Bond: Additional 3%**
for total of 13% annual rate of return, paid .011% monthly.

**3 Year Series B Bond: Additional 3.5%**
for total of 15.5% annual rate of return, paid .013 monthly.

**5 Year Series C Bond: Additional 4%**
for total of 18% annual rate of return, paid .015 monthly.

**EXHIBIT A**

**BOND DEPOSIT AND INITIAL PAYMENT SCHEDULE**

| Bond Investment Received* By | First Monthly Distribution Issued** |
|---|---|
| January 10th | February 15th |
| February 10th | March 15th |
| March 10th | April 15th |
| April 10th | May 15th |
| May 10th | June 15th |
| June 10th | July 15th |
| July 10th | August 15th |
| August 10th | September 15th |
| September 10th | October 15th |
| October 10th | November 15th |
| November 10th | December 15th |
| December 10th | January 15th |

*Received and cleared at HCCF-5's bank account. Most wire transactions post within 1-2 days. Check's often take up to 10-14 days to clear and post.

**Monthly distributions are issued on the 15th of each month when that day falls on a banking business day. If the 15th falls on a weekend or banking holiday, then the distributions are issued the next open business banking day.